IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| DAMIAN ORLOWSKI, et al., | ) | |
| | ) | |
| Plaintiffs, on behalf of | ) | |
| themselves and all others | ) | |
| similarly situated, | ) | |
| | ) | No. 2:11-cv-01396-JPM-cgc |
| v. | ) | |
| | ) | |
| LARRY BATES, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT CINDY
STANDLEY'S MOTION TO DISMISS**

Before the Court are Defendant Cindy Standley's Motion to
Dismiss (ECF No. 300) and Supplemental Memorandum of Facts and
Law in Support of Defendant Cindy Standley's Motion to Dismiss
("Supplemental Mem.") (ECF No. 378). For the reasons stated
below, the Motion is DENIED as to Plaintiffs' claim for
conversion against Standley and GRANTED as to the remaining
claims.

I.    **BACKGROUND**

      A.    **Procedural Background**

      Plaintiffs initially filed this case more than three years
ago, on December 28, 2011. (See Compl., ECF No. 1.) Since the
action was initiated, the case has been continuously actively
litigated. As a result of the age of the case, the number of
parties on each side of the action, and the complexity of the

allegations, the procedural history of this case has a labyrinthine quality, replete with paths irrelevant to the determination of the instant Motion. Accordingly, the Court summarizes just that portion of the procedural history that is relevant.

Plaintiffs filed their First Amended Complaint on August 13, 2012 (ECF No. 53), and their Second Amended Complaint on March 14, 2014 (ECF No. 224). The Second Amended Complaint added Cindy Standley as a Defendant. (See id.) Plaintiffs moved for preliminary injunctive relief against Cindy Standley on March 16, 2014, requesting that the Court freeze her assets and order her to surrender her passport to the Clerk of Court. (ECF No. 225.) The Court held a hearing on March 21, 2014 on the motion for a preliminary injunction. (ECF No. 240.) The Court granted the Plaintiffs' motion for a preliminary injunction against Standley on March 21, 2014. (ECF No. 243.)

On December 17, 2013, Plaintiffs moved for class certification. (ECF No. 182.) The Court held a hearing on the motion for class certification on April 29, 2014. (ECF No. 285.) The Court granted Plaintiffs' motion for class certification on April 30, 2014 (ECF No. 289), and issued an amended order certifying the class later that same day (ECF No. 290).

On May 16, 2014, Defendant Standley filed the Motion to
Dismiss currently before the Court. (ECF No. 300.) Plaintiffs
filed their response to the Motion on June 27, 2014 (ECF No.
321), and attached a number of factual exhibits. (Id.; ECF Nos.
322 (sealed), 323 (sealed).)

On July 10, 2014, the Court held a hearing on the Motion to
Dismiss. (ECF No. 336.) At the hearing, Counsel for Plaintiffs
and Defendant Cindy Standley represented that Standley would be
deposed. The Court subsequently ordered Plaintiffs and Standley
to file a status report indicating which portions of the Motion
to Dismiss, if any, would remain for determination by the Court.
(ECF No. 334.)

On October 1, 2014, Plaintiffs filed a motion for leave to
amend their Second Amended Complaint to include additional
information as to Standley. (ECF No. 368 (sealed).) On October
6, 2014, the Court granted Plaintiffs leave to amend their
Second Amended Complaint as to Standley and granted Standley
leave to supplement her Motion to Dismiss. (ECF No. 370.)
Plaintiffs filed their Third Amended Complaint on October 20,
2014. (ECF No. 375.) Standley filed her Supplemental
Memorandum of Facts and Law in support of her Motion to Dismiss
on November 6, 2014. (ECF No. 378.)

**B. Factual Background**

This case involves allegations of a complex, large-scale scheme to defraud hundreds of people over the course of many years. (<u>See</u> 3d Am. Compl., ECF No. 375.) Plaintiffs' allegations that are relevant to this Motion are summarized as follows.

**1. General Allegations**

**Defendant Larry Bates** was the CEO and "Chief Economist" of **Defendant First American Monetary Consultants, Inc. ("FAMC")** as well as CEO and President of **Defendant Information Radio Network, Inc. ("IRN")**. (<u>Id.</u> ¶ 6.) **Defendant Charles Bates** served as Executive Vice President and News Director for IRN (<u>id.</u> ¶ 10) and held himself out as an "Economist" of FAMC (<u>id.</u> ¶ 22). **Defendant Barbara Bates** served as Vice President of Administration for FAMC and was a 50% shareholder in FAMC. (<u>Id.</u> ¶ 9.) **Defendant Robert Bates** served as "Senior Monetary Consultant" for FAMC. (<u>Id.</u> ¶ 11.) **Defendant Kinsey Brown Bates** served as Executive Assistant to Larry Bates. (<u>Id.</u> ¶ 13.) **Defendant Cindy Standley** served as Vice President of FAMC. (<u>Id.</u> ¶ 12.)

Through mechanisms including "radio, television, books, newsletters, toll free numbers, email, direct mail, and personal solicitation at churches and conferences across the nation," Defendants advertised and solicited individuals "for the alleged

4

and believed purpose of purchasing gold, silver and precious metals through Defendants." (Id. ¶ 25.) "These purchases of precious metals [were] advertised by Defendants as a 'safe' purchase to protect and harness wealth during, what Defendants characterize[d] as, a period of world chaos and uncertainty, based on Christian beliefs and political upheaval." (Id. ¶ 26.) Defendants received orders for precious metals from more than 500 customers. (Id. ¶ 148.) Plaintiffs allege that these sales were made as part of a scheme devised by Larry Bates, Robert Bates, Charles Bates, Barbara Bates, Cindy Standley, Kinsey Brown Bates, and other Defendants, designed to defraud customers by:

a. delaying fulfillment of orders of specific precious metals for an unjustifiable amount of time that far exceeds the market standard (sometimes as long as several years);
b. knowingly and intentionally filling only parts of precious metals orders, while keeping the money of clients without either a refund or distribution of the purchased precious metals;
c. knowingly and intentionally failing to fill orders in their entirety;
d. knowingly and intentionally substituting inferior and less valuable products for those ordered by their clients; and
e. [k]nowingly and intentionally failing to fund precious metal IRA's after receiving the requisite approval/authority and funds to do so.

(Id. ¶ 46.) In addition to alleging that Standley in part devised the scheme, Plaintiffs allege the following with respect to Standley:

Cindy Standley, specifically, knew that customers had
ordered metals and not received them timely. As Vice
President of FAMC for over ten years, and one of three
people in the Accounting Department, she was
responsible for depositing all customer checks for the
purchase of precious metals for FAMC, Inc. and FAMC
PM, LLC. She deposited customer checks for the
purchase of precious metals into various accounts on
which she was the signatory or had depository
authority, along with Barbara Bates and Larry Bates,
only. She was solely responsible for depositing
customer checks, and would issue a customer invoice
based on the transaction information she received from
other Defendants. She kept a ledger on clients
including payment of the orders, date of sale, the
economist who transacted the order, what was
purchased, the name of the client, the total amount,
and the date of shipment of the order. She solely
received checks and transaction forms about orders,
then typed invoices that were mailed to customers via
United States Postal Service mail. As early as 2008
and as late as 2013, she knew that the Defendants
represented to customers that their orders were locked
in at the time of sale, and that their monies were
advanced into the market, yet saw through her
bookkeeping and ledger and other records that customer
monies deposited by her were not being advanced into
the market to fulfill orders as represented. As early
as 2008 and as late as November 2013, Standley knew
that customer orders were not being fulfilled, and had
reviewed state and Better Business Bureau complaints
reflecting the pattern of orders remaining
unfulfilled, but continued the practice of depositing,
transferring monies, and signing checks made payable
to Defendants. Standley knew that civil judgments had
been obtained against Bates and FAMC for the failure
to fulfill customer orders. Standley knew that
customers had ordered metals and not received them
timely. Standley also transacted business with
clients, answering questions in person at the Colorado
office concerning orders, delivering coins, and was
the only employee in Colorado with the key to the
safe. She managed the payroll for FAMC and IRN, and
had firsthand knowledge of the amount of commissions
to be paid on each order, and wrote commission checks
for FAMC economists and Defendants. Standley knew that
commissions were being paid, despite orders remaining

unfulfilled. Standley was responsible, as Vice
President, for reconciling ledgers on multiple FAMC
accounts to which only she, Larry Bates and Barbara
Bates had access. Despite this knowledge, she
continued to transact business on behalf of FAMC, IRN
and related entities, along with the other Defendants,
as late as November of 2013, using monies deposited by
her from customers to pay overhead, payroll,
commissions to Defendants, and provide advances to
Defendants for monies not yet earned in the form of
checks drawn and signed by her. Other than overhead,
payroll, and advances to Defendants, she cannot
account for why the customer monies that were not used
to order coins are not in the FAMC/IRN accounts.
Standley, despite knowing of these issues as early as
2008, had direct knowledge of the problems and
patterns of unfulfilled orders and unearned payments
to Defendants, and continued to transact business to
the detriment of customers and for the benefit of
Defendants as late as November 2013.

(Id. ¶ 47.)

## 2. Allegations by Plaintiff Orlowski

Orlowski contacted FAMC by telephone in September 2008
"because of its strong affiliation with Christianity, its
advertised propaganda, and its assurances of Christian trust."
(Id. ¶ 59.) Orlowski learned about FAMC by watching "the
Christian television program," seeing FAMC advertisements, and
listening to several radio programs featuring Larry and Charles
Bates. (Id. ¶ 58.) During the September 2008 call with FAMC,
Orlowski placed an order for gold valued at $100,000 and Silver
Eagle coins valued at approximately $200,000. (Id. ¶ 60.) On
or about September 21, 2008, Orlowski wired payment of
approximately $300,000. (Id. ¶ 61.) Larry Bates personally

7

phoned Orlowski shortly after the order was placed.  (Id. ¶ 63.)
Defendant Larry Bates told Orlowski that the Silver Eagle coins
were in short supply, and so FAMC would deliver 1000-ounce
silver bars instead.  (Id. ¶ 65.)  Defendant Larry Bates
explained that FAMC would replace the bars with Silver Eagle
coins when they became available.  (Id.)  The bars are less
valuable and harder to liquidate than the coins that were agreed
upon.  (Id. ¶ 66.)  FAMC never replaced the bars with the coins
Orlowski ordered (id. ¶ 72), and Orlowski did not receive the
gold he purchased until December 8, 2008 (id. ¶ 74).

### 3.    Allegations as to Plaintiff Cechin

Cechin spoke to Defendant Larry Bates on the telephone
before placing several orders with FAMC.  (Id. ¶ 77.)  On July
10, 2008, Cechin placed an order for gold totaling approximately
$75,000 and mailed Defendant Larry Bates a check on the same
day.  (Id. ¶¶ 77, 78.)  After contacting Larry Bates and FAMC
multiple times to determine when her gold would be delivered,
"[s]he was told that her gold would be hand delivered by Larry
Bates personally on September 27, 2008.  It was not."  (Id. 81.)

On October 10, 2008, Cechin and Larry Bates spoke via
telephone.  (Id. ¶ 82.)  Larry Bates told Cechin that he had not
yet purchased the gold and did not know when the gold would be
available.  (Id. ¶ 83.)  After this conversation, Cechin sent
via letter and fax a request for a refund.  (Id. ¶ 83.)  Cechin

was sent a refund on October 22, 2008. (Id. ¶ 87.) Due to the increase in the value of gold, however, between the time of the order and the time of the refund, Cechin suffered a loss of "approximately $7,500 - $10,000, or more." (Id. ¶ 89.)

### 4.  Allegations as to Plaintiff Carmack Trust

In December 2008, Mindi Carmack was trustee for the Bryan and Mindi Carmack Revocable Trust (the "Carmack Trust"). (Id. ¶ 91.) As trustee, Mindi Carmack made purchases of precious metals through Larry Bates and FAMC totaling $1,004,112. (Id.) "At various times beginning in 2010, Mrs. Carmack instructed Larry Bates and FAMC to begin liquidating certain purchases and to begin shipping other holdings to her." (Id. ¶ 93.) In 2010 and 2011, FAMC and its agents sold approximately $1.3 million worth of precious metals held for the trust. (Id. ¶ 94.) During that same period, FAMC and its agents issued checks to the Carmack Trust totaling approximately $500,000. (Id. ¶ 95.) Near the end of 2011, at the instruction of Mindi Carmack, via her son Aaron Carmack, FAMC and Larry Bates purchased $568,434 worth of Swiss 20 Franc Gold coins on behalf of the trust. (Id. ¶ 96.)

In 2011, Mindi Carmack was recieving treatment for cancer. (Id. ¶ 97.) Even though she informed Larry Bates via email that she needed her outstanding coins to pay for her treatment, the coins were not sent. (Id.) In November 2011, Mindi Carmack

died, and Aaron Carmack was appointed trustee of the Carmack Trust. (Id. ¶ 98.) Larry Bates stated to both Aaron and Mindi Carmack that the coins would be shipped as soon as they became available, which would be less than 180 days from November 3, 2011. (Id. ¶ 99.) No coins were ever shipped. (Id.)

On March 21, 2012, Aaron Carmack requested that the Carmack Trust's funds be returned. (Id. ¶ 102.) Neither the coins nor the funds associated with the purchase were sent to the Carmack Trust. (Id. ¶ 103.) Further, FAMC never paid the Carmack Trust interest on funds held by FAMC during 2010 and 2011, and never paid the trust profits to which it was entitled on sales made by FAMC on behalf of the trust during that time period. (Id. ¶ 105.)

5. **Allegations as to Plaintiff Judith Ponder, Individually and as the Personal Representative of the Estate of Catherine C. Painter**

Judith Ponder and her mother, Catherine Painter, "read the Defendants' publications [and] books, listened to them on the radio, and watched them on Christian television." (Id. ¶ 110.) Ponder purchased precious metals worth $354,749.85 from FAMC on August 25, 2004 and placed them in an IRA account. (Id. ¶ 106.) Ponder considered herself a "friend" of Bates over the next six years, during which time he "placed special emphasis on his Christian principles and beliefs." (Id. ¶ 110.)

On August 6, 2010, Ponder purchased 636 Swiss gold francs from Defendants for $190,000, and Painter purchased 3,673 Swiss gold francs for approximately $1 million. (<u>Id.</u> ¶¶ 108, 109.) Larry Bates was the "consultant" on the sale to Painter. (<u>Id.</u> ¶ 109.) On August 25, 2010, at the direction of Larry Bates and representatives of FAMC, Ponder moved 13,289 Silver Eagle coins and 315 Gold Eagle coins out of her precious metals IRA and sold them for $665,647.89. (<u>Id.</u> ¶ 107.) Ponder used the money from the sale to purchase 2,141 gold francs from Defendants. (<u>Id.</u>) On each of these August 2010 sales, Defendants represented that they would store the coins until the purchaser requested delivery. (<u>Id.</u> ¶¶ 107–09.)

Painter died on July 20, 2012. (<u>Id.</u> ¶ 111.) Attorneys for Painter's estate sent letters on September 28, 2012 and October 9, 2012 that instructed Larry Bates and FAMC to deliver the coins as previously promised, but no delivery was made. (<u>Id.</u>)

In November 2012, Ponder traveled to Tennessee in order to meet with Larry Bates at his FAMC office. (<u>Id.</u> ¶ 112.) Ponder scheduled an appointment to meet with Larry Bates on November 15, 2012. (<u>See</u> <u>id.</u> ¶ 114.) Larry Bates sent Ponder an email on November 14, 2012 that stated, "We expect to begin shipping within the next two to three weeks." (<u>Id.</u> ¶ 113.) When Ponder arrived for her appointment at the FAMC office, Kinsey Brown Bates told Ponder that Larry Bates would not meet her in person,

but that Larry Bates would instead speak to Ponder via speaker phone in the office. (Id. ¶ 114.) Ponder proceeded to speak to Larry Bates over the phone. (Id. ¶ 115.) She requested either delivery of her coins by certain dates or a refund by 5:00 p.m. the next day. (Id.) Larry Bates "indicated" that he would email Ponder an agreement following their conversation. (Id.) Larry Bates sent Ponder an email that "was simply a recitation of the November 14, 2013 email and had nothing specific regarding the delivery dates of her coins." (Id. ¶ 117.) When Ponder returned to the FAMC office, Kinsey Brown Bates told her: "Dr. Bates will not revise his email, because he's having trouble with his suppliers -- it's not his fault." (Id. ¶ 118.) Ponder has not yet received any coins from her own orders or from Painter's estate. (Id. ¶ 119.)

**5. Allegations as to Plaintiffs Marjean and Orrin Conklin**

Marjean Conklin saw Larry Bates on "Christian television programming," and ordered his DVD, "which was sent to her by one or more of the named Defendants." (Id. ¶ 135.) Marjean Conklin and her husband, Orrin Conklin, watched the DVD. (Id.) In reliance on representations in the DVD of "Christian principles" and a coming economic crisis -- as well as Larry Bates' self-proclaimed expertise in economics and finance -- the Conklins believed it urgent to convert their savings into precious metals. (Id. ¶¶ 136, 146.) Larry Bates expressed that

purchasing precious metals that were available through FAMC
would provide a "safety net" that would "avoid the pending
financial crash and crisis." (Id. ¶ 146.) The Conklins
therefore liquidated all of their savings and purchased a total
of nearly $450,000 in coins in person at the Colorado FAMC
office on October 11, 2010 and November 8, 2010, where their
checks were deposited by Cindy Standley. (Id. ¶¶ 138, 139.) No
coins were ever delivered. (Id. ¶ 142.) Further, despite
repeated calls by the Conklins to Defendants, Defendants have
not provided information to the Conklins as to the status of
their orders. (Id. ¶ 143.)

## II.  LEGAL STANDARD

### A.  Motion-to-Dismiss Standard

Under Federal Rule of Civil Procedure 12(b)(6), a court can
dismiss a complaint for "failure to state a claim upon which
relief can be granted." The general requirements of pleading
are stated in Rule 8 of the Federal Rules of Civil Procedure;
Rule 9 provides some special pleading rules for certain claims.
Pursuant to Rule 8(a), a complaint generally need only contain
"a short and plain statement of the claim showing that the
pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

> In assessing a complaint for failure to state a claim,
> [a court] must construe the complaint in the light
> most favorable to the plaintiff, accept all well-pled
> factual allegations as true, and determine whether the
> complaint "contain[s] sufficient factual matter,

accepted as true, to state a claim to relief that is
plausible on its face."

Ouwinga v. Benistar 419 Plan Servs., Inc., 694 F.3d 783, 790
(6th Cir. 2012) (second alteration in original) (quoting
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)); see also Bovee v.
Coopers & Lybrand C.P.A., 272 F.3d 356, 360 (6th Cir. 2001)
(noting that a court may not dismiss a complaint for failure to
state a claim "based on disbelief of a complaint's factual
allegations").

Regarding the plausibility standard, the United States
Court of Appeals for the Sixth Circuit has stated that "[a]
claim is plausible on its face if the plaintiff pleads factual
content that allows the court to draw the reasonable inference
that the defendant is liable for the misconduct alleged." Ctr.
for Bio-Ethical Reform, Inc. v. Napolitano, 648 F.3d 365, 369
(6th Cir. 2011) (citation and internal quotation marks omitted).
"Plausibility is not the same as probability, but it requires
'more than a sheer possibility that a defendant has acted
unlawfully.'" Mik v. Fed. Home Loan Mortg. Corp., 743 F.3d 149,
157 (6th Cir. 2014) (quoting Iqbal, 556 U.S. at 678).
Accordingly, the "complaint must contain either direct or
inferential allegations with respect to all material elements of
the claim." Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899,
902 (6th Cir. 2003).

The Court, however, "need not accept as true legal conclusions or unwarranted factual inferences, and [c]onclusory allegations or legal conclusions masquerading as factual allegations will not suffice." In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 903 (6th Cir. 2009) (alteration in original) (citation omitted) (internal quotation marks omitted); see also Mik, 743 F.3d at 157 ("[A] complaint must contain 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007))).

Additionally, special rules apply to pleading when alleging claims that "sound in fraud." Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc., 583 F.3d 935, 942 (6th Cir. 2009). In such a case, "the pleading strictures of Federal Rule of Civil Procedure 9(b) apply." Id. (citing Frank v. Dana, 547 F.3d 564, 569–70 (6th Cir. 2008)). When Rule 9(b) applies, "a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

> A complaint is sufficient under Rule 9(b) if it
> alleges "the time, place, and content of the alleged
> misrepresentation on which [the plaintiff] relied; the
> fraudulent scheme; the fraudulent intent of the
> defendants; and the injury resulting from the fraud,"
> and enables defendants to "prepare an informed

15

pleading responsive to the specific allegations of
fraud."

U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc., 501 F.3d 493,

509 (6th Cir. 2007) (quoting U.S. ex rel. Bledsoe v. Cmty.

Health Sys., Inc., 342 F.3d 634, 643 (6th Cir. 2003)).  In cases

involving multiple defendants, allegations under Rule 9(b) must

include specific facts as to each defendant; "general averments

of fraud attributed to 'the defendants'" do not suffice.  Hoover

v. Langston Equip. Associates, Inc., 958 F.2d 742, 745 (6th Cir.

1992).

## III. ANALYSIS

In their Third Amended Complaint, Plaintiffs allege seven

total causes of action against Defendants.[1]  (3d Am. Compl. at

38-64.)  Against Defendant Standley, Plaintiffs allege six

causes of action[2]: (1) fraud/tortious misrepresentation (id.

¶¶ 180-87); (2) wrongful trover and conversion (id. ¶¶ 188-93);

(3) breach of trust and breach of fiduciary duty (id. ¶¶ 194-

202); (4) civil RICO (id. ¶¶  203-286); (5) tortious conspiracy

(id. ¶¶ 287-91); and (6) unfair and deceptive acts and practices

(id. ¶¶ 303-09).  Defendant Standley moves the Court to dismiss

---

[1] In addition to the seven apparent causes of action, Plaintiffs also include
"constructive trust" and "accounting" in their causes of action section.
(ECF No. 375 at 61-63.)  These "causes of action," however, appear to be
relief requested as a result of the other causes of action alleged as opposed
to independent grounds for relief.
[2] Plaintiffs also assert "constructive trust" and "accounting" as grounds for
relief as causes of action against Defendant Standley, but the Court declines
to consider them for the reasons stated in note 1, supra.

all claims in the Third Amended Complaint against her.
(Supplemental Mem. at 2.)

In order to determine whether Plaintiffs have stated a
claim that, if true, entitles them to relief, the Court first
must look to the substantive elements of the claim articulated.
See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Because five
of the six causes of action against Standley are based on state
law, the Court must first make a choice-of-law determination as
to which state's law applies.

"[A] a federal court sitting in diversity applies the
choice-of-law rules of the state in which the court sits."
Performance Contracting Inc. v. DynaSteel Corp., 750 F.3d 608,
611 (6th Cir. 2014) (citing Klaxon Co. v. Stentor Elec. Mfg.
Co., 313 U.S. 487, 497).  This Court therefore applies the
choice-of-law rules of Tennessee.  With respect to tort claims,
Tennessee applies "the 'most significant relationship' approach
of §§ 6, 145, 146, and 175 of the Restatement (Second) of
Conflict of Laws."  Hataway v. McKinley, 830 S.W.2d 53, 59
(Tenn. 1992).  To determine which state has the most significant
relationship pursuant to § 6 of the Second Restatement,[3]

---

[3] The relevant factors include: (a) the needs of the interstate and
international systems, (b) the relevant policies of the forum, (c) the
relevant policies of other interested states and the relative interests of
those states in the determination of the particular issue, (d) the protection
of justified expectations, (e) the basic policies underlying the particular
field of law, (f) certainty, predictability and uniformity of result, and (g)
ease in the determination and application of the law to be applied.
Restatement (Second) of Conflict of Laws § 6(2).

Tennessee courts look to the following factors: (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered. <u>Hataway</u>, 830 S.W.2d at 59. (quoting Restatement (Second) of Conflict of Laws § 145(2)).

The Court finds that, under the facts as alleged in the Third Amended Complaint, factors (b), (c), and (d) weigh heavily in favor of applying Tennessee law. Consequently, Tennessee tort law applies in this action.

The Court first addresses Standley's arguments as to each of Plaintiffs' claims in turn.[4]

## 1. Fraud / Tortious Misrepresentation

There are three elements to a claim for fraud under Tennessee state law. First, the alleged tortfeasor must have made a representation "with knowledge of its falsity and with a fraudulent intent." <u>Haynes v. Cumberland Builders, Inc.</u>, 546 S.W.2d 228, 232 (Tenn. Ct. App. 1976) (citing <u>Shwab v. Walters</u>, 147 Tenn. 638, 251 S.W. 42 (1922); <u>Vela v. Beard</u>, 59 Tenn.App. 544, 442 S.W.2d 644 (1968)). Second, "[t]he representation must

---

[4] The Court acknowledges that much factual information was attached to Plaintiffs' response to the instant motion, but declines to consider the attached exhibits as part of the analysis. <u>See</u> <u>Devlin v. Kalm</u>, 531 F. App'x 697, 707 (6th Cir. 2013) ("[A]t the motion-to-dismiss-stage[,] . . . facts outside the complaint cannot be considered and the plaintiff's allegations must be accepted as true[.]")

have been to an existing fact which is material . . . ." Id.
(citing Whitson v. Gray, 40 Tenn. 441 (1859)).  Third, "the
plaintiff must have reasonably relied upon that representation
to his injury."  Id.

Standley argues that the Third Amended Complaint fails to
state a claim for fraud against Standley because it does not
meet the particularity requirements of Rule 9(b).  (ECF No. 378
at 8–10.)  Specifically, Standley explains that Plaintiffs'
claims fail because they have not alleged even one false
statement individually attributable to Standley.  (Id. at 8.)

In response, Plaintiffs argue that they have alleged
numerous facts in order to state a claim for fraud.  (See ECF
No. 321 at 14–24.)  As to the particularity requirements of
Rule 9(b), Plaintiffs argue that Standley's briefing incorrectly
suggests "an impossible standard of particularity."  (Id. at
15.)

The Court agrees with Standley.  Although Rule 9(b) "should
not be read to defeat the general policy of simplicity and
flexibility in pleadings contemplated by the Federal Rules,
. . . a plaintiff must allege the time, place, and content of
the alleged misrepresentation[;] the fraudulent scheme; the
fraudulent intent of the defendants; and the injury resulting
from the fraud."  U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.,
532 F.3d 496, 503–04 (6th Cir. 2008) (internal alterations and

19

quotation marks omitted).  "So long as a relator pleads sufficient detail -- in terms of time, place and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud -- to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met."  Id. at 504.

Although references to statements generally made by Defendants permeate the Third Amended Complaint, not a single reference indicates the content of a fraudulent statement as to Standley particularly.  There is not even a reference to any particular statement that Standley is alleged to have been responsible for in part.  Statements attributed to groups of people without identifying any particular one -- or the role that each individual played in the generation of the statement -- fail to satisfy the heightened pleading requirements of Rule 9(b).  See Rohland v. Syn-Fuel Associates-1982 Ltd. P'ship, 879 F. Supp. 322, 334 (S.D.N.Y. 1995) ("As a general rule, a plaintiff claiming fraud must [] establish a connection between the fraudulent statements and each defendant so that each defendant receives notice of the nature of his participation in the alleged fraud."); see also United States ex rel. Branhan v. Mercy Health Sys. of Sw. Ohio, 188 F.3d 510, 1999 WL 618018, at *9 (6th Cir. Aug. 5, 1999) (unpublished table decision) (Clay, J., concurring in part and dissenting in part) (noting that

"Rule 9(b) does not permit a plaintiff to allege fraud by
indiscriminately grouping all of the individual defendants into
one wrongdoing monolith" (citation and internal quotation marks
omitted)); DiVittorio v. Equidyne Extractive Indus., Inc., 822
F.2d 1242, 1247 (2d Cir. 1987) ("Where multiple defendants are
asked to respond to allegations of fraud, the complaint should
inform each defendant of the nature of his alleged participation
in the fraud."). Consequently, Plaintiffs fail to state a claim
for fraud against Defendant Standley.

### 2. Wrongful Trover and Conversion

"Conversion is the appropriation of tangible property to a
party's own use in exclusion or defiance of the owner's rights."
PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v.
Bluff City Cmty. Dev. Corp., 387 S.W.3d 525, 553 (Tenn. Ct. App.
2012) (citing Barger v. Webb, 216 Tenn. 275, 391 S.W.2d 664, 665
(1965)). "In order to establish conversion, the plaintiffs must
show that 'the defendant . . . had an intent to exercise
dominion and control over the property that is in fact
inconsistent with the plaintiff[s'] rights, and [did] so.'"
Kinnard v. Shoney's, Inc., 100 F. Supp. 2d 781, 797 (M.D. Tenn.
2000) aff'd, 39 F. App'x 313 (6th Cir. 2002) (quoting Mammoth
Cave Prod. Credit Ass'n v. Oldham, 569 S.W.2d 833, 836 (Tenn.
App. 1977)) (alterations in original).

Standley argues that, viewing the facts in the light most favorable to Plaintiffs, the Third Amended Complaint's allegations of conversion describe a breach of contract between a creditor and a debtor. (Supplemental Mem. at 13-16.) According to Standley, once customer funds were tendered, they were no longer the customer's property, and therefore a claim for conversion cannot be properly asserted. (Id. at 13-14 (citing, inter alia, Newbro v. Freed, 409 F. Supp. 2d 386, 396 (S.D.N.Y. 2006)).

On this point, Standley's argument fails. Viewing the facts pleaded in the light most favorable to Plaintiffs, the Third Amended Complaint adequately pleads a claim for conversion. "Because the claim for conversion exists independently of the claim for fraud, the heightened pleading standard of Rule 9(b) does not apply." Amusement Indus., Inc. v. Stern, 693 F. Supp. 2d 327, 355 (S.D.N.Y. 2010). Consequently, Plaintiffs need only "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ctr. for Bio-Ethical Reform, Inc., 648 F.3d at 369 (citation and internal quotation marks omitted).

Plaintiffs have pleaded sufficient facts to proceed on their claim for conversion against Standley. Under Tennessee law, a conversion claim can be brought against a depositing

institution when it has actual notice that a particular use of funds is "'without the consent or approbation, either expressed or implied, of the owner' . . . ." <u>New York Life Ins. Co. v. Bank of Commerce & Trust Co.</u>, 172 Tenn. 226, 111 S.W.2d 371, 374 (1937) (quoting <u>Scruggs v. Davis</u>, 37 Tenn. 261, 264 (1857)). The Third Amended Complaint includes allegations that Standley herself was on actual notice that her use of funds given to Defendants was in direct violation of the express direction of the owner of the funds:

> As early as 2008 and as late as 2013, she knew that the Defendants represented to customers that their orders were locked in at the time of sale, and that their monies were advanced into the market, yet saw through her bookkeeping and ledger and other records that customer monies deposited by her were not being advanced into the market to fulfill orders as represented.

(3d Am. Compl. ¶ 47.) Accordingly, Plaintiffs have properly stated a claim for conversion against Standley.

### 3.   Breach of Trust[5] and Breach of Fiduciary Duty

It is not entirely clear on the face of the Third Amended Complaint the nature of the fiduciary relationship that is alleged to have been breached by Defendant Standley. The crux

---

[5] The Court notes that Plaintiffs' claim as to "breaches of trust" appear to be an alternative way to describe breaches of fiduciary duty. Although a breach of trust is actionable in the state of Tennessee, it is an action that relates to trust instruments, which are not at issue in this case. <u>See</u> <u>Kennard v. AmSouth Bank</u>, No. M200700075COAR3CV, 2008 WL 427260, at *2 (Tenn. Ct. App. Feb. 12, 2008); Tenn. Code Ann. § 35-15-1001 <u>et seq.</u> Consequently, the Court addresses the allegations in paragraphs 194–202 under Tennessee law regarding breaches of fiduciary duty.

of the allegation appears to be stated in paragraph 199: that
Defendants violated

> the fiduciary duty and trust created/established by
> Defendants through their representations as trusted
> Christian financial advisors, and in violation of the
> standard of care required of them as trusted Christian
> financial advisors assisting with the purchase of precious
> metals from their own companies, Defendants took the
> properties of Plaintiffs and class members for the use and
> benefit of Defendants.

Standley argues that "[e]ven assuming the Court were to
find a fiduciary relationship between FAMC and its customers,
Plaintiffs have pled no facts to support a finding of a
fiduciary relationship between the customers and Ms. Standley
personally." (Supplemental Mem. at 17.)  The Court agrees with
Standley.

"Under Tennessee common law, there are two principal types
of fiduciary status." Foster Bus. Park, LLC v. Winfree, No.
M2006-02340-COA-R3-CV, 2009 WL 113242, at *12 (Tenn. Ct. App.
Jan. 15, 2009).  "The first category of common law fiduciary
status consists of relationships that are fiduciary per se,
sometimes referred to as legal fiduciary, such as between a
guardian and ward, an attorney and client, or conservator and
incompetent." Id.  "The second category consists of
relationships that are not per se fiduciary in nature, but arise
in situations where one party exercised 'dominion and control

over another.'" Id. (quoting Kelley v. Johns, 96 S.W.3d 189, 197 (Tenn. Ct. App. 2002)).

Totally absent from the Third Amended Complaint is any allegation that Standley had a fiduciary relationship per se over any Plaintiff, or any allegation that she exercised dominion and control over anybody. Accordingly, the Third Amended Complaint does not state a claim under Rule 8 as to Standley for a breach of fiduciary duty.

### 4. Tortious Conspiracy and Civil RICO

The elements of civil conspiracy under Tennessee law are:

> (1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury.

Kincaid v. SouthTrust Bank, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006) (citing Morgan v. Brush Wellman, Inc., 165 F.Supp.2d 704, 720 (E.D. Tenn. 2001)); Menuskin v. Williams, 145 F.3d 755, 770 (6th Cir. 1998). "In addition, a claim for civil conspiracy 'requires an underlying predicate tort allegedly committed pursuant to the conspiracy.'" PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp., 387 S.W.3d 525, 556 (Tenn. Ct. App. 2012) (quoting Watson's Carpet & Floor Coverings, Inc. v. McCormick, 247 S.W.3d 169, 180 (Tenn. Ct. App. 2007)).

If either the unlawful purpose or the unlawful means of
civil conspiracy sound in fraud, then a claim for civil
conspiracy must comport with the standards of Rule 9(b).
Borsellino v. Goldman Sachs Grp., Inc., 477 F.3d 502, 507 (7th
Cir. 2007) ("Rule 9(b) applies to 'averments of fraud,' not
claims of fraud, so whether the rule applies will depend on the
plaintiffs' factual allegations."); Swartz v. KPMG LLP, 476 F.3d
756, 765 (9th Cir. 2007) ("Rule 9(b) imposes heightened pleading
requirements where the object of the conspiracy is fraudulent."
(internal quotation marks omitted)); Am. United Life Ins. Co. v.
Martinez, 480 F.3d 1043, 1067-68 (11th Cir. 2007) ("[W]here a
conspiracy claim alleges that two or more parties agreed to
commit fraud, the plaintiffs must plead this act with
specificity.").

The civil conspiracy claim alleged in the Third Amended
Complaint sounds in fraud.  "A claim sounds in fraud when,
although not an essential element of the claim, the plaintiff
alleges fraud as an integral part of the conduct giving rise to
the claim."  Xpedior Creditor Trust v. Credit Suisse First
Boston (USA) Inc., 341 F. Supp. 2d 258, 269 (S.D.N.Y. 2004).  As
alleged by Plaintiffs, the purpose of the civil conspiracy was
to "obtain Plaintiffs' and class members' monies and assets by
fraudulent and unlawful means."  (3d Am. Compl. ¶ 288.)  By
alleging fraud as an integral part of their civil conspiracy

claim, Plaintiffs' civil conspiracy claim sounds in fraud.  The claim must therefore meet the pleading requirements of Rule 9(b).  See Borsellino, 477 F.3d at 507.

For similar reasons, the civil RICO claims against Standley must also meet the pleading requirements of Rule 9(b).  When the predicate act for a civil RICO claim would need to meet the requirements of Rule 9(b), the civil RICO claim itself must meet the pleading requirements of Rule 9(b).  See Holloway v. Netbank, No. 12-2960-STA-TMP, 2014 WL 112029, at *5 (W.D. Tenn. Jan. 10, 2014) (citing Brown v. Cassens Transp. Co., 546 F.3d 347, 356 n.4 (6th Cir. 2008)).  "The particularity requirements of Rule 9(b) apply to allegations of mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, when used as predicate acts for a RICO claim."  Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co., 48 F.3d 1066, 1069 (8th Cir. 1995).  Claims of money laundering for the purpose of concealing fraudulent activity similarly must meet the particularity requirements of Rule 9(b).  See Stooksbury v. Ross, No. 3:09-CV-498, 2011 WL 1637916, at *13 n.12 (E.D. Tenn. Apr. 29, 2011).  Because Plaintiffs' claims of money laundering all relate to concealing the proceeds "secured by Defendants' numerous instances of mail and wire fraud" (see 3d Am. Compl. ¶¶ 272–82), those allegations must also meet the particularity requirements of Rule 9(b).

Plaintiffs have failed to state a claim pursuant to Rule 9(b) as to Cindy Standley for either civil conspiracy or violations of civil RICO. Critically, Plaintiffs have not pleaded with particularity a single overt act that Cindy Standley individually took in furtherance of the conspiracy, or pleaded with particularity a single act of mail fraud, wire fraud, or money laundering. With respect to the civil conspiracy claim, Plaintiffs simply generally allege:

> All of the acts and activities of the Defendants, as set forth hereinabove, were either lawful acts taken for an unlawful purpose or unlawful acts taken in concert as a part of a wrongful and unlawful scheme to wrongfully defraud, convert, and obtain Plaintiffs' and class members' monies and assets by fraudulent and unlawful means for the said Defendants, and as a result thereof, the Defendants have committed the tort of unlawful conspiracy.

(Id. at ¶ 288.) As to Standley's participation in the allegedly fraudulent scheme at issue in the civil RICO claims, Plaintiffs allege the following:

> Defendant Cindy Standley, from 2004 until November of 2013, was Vice President of FAMC, an agent of Defendant FAMC, and one of three people (Barbara Bates and Larry Bates are the others) with the capacity to write checks and conduct wire transfers for FAMC and IRN. She managed all of the books and records located outside of the Tennessee office. She issued all customer invoices for all transactions. She participated in the fraud by interacting with customers and offering reasons for delay, while knowing that the reasons are untrue. She participated in the fraud by delivering mail, including checks, to Defendants for deposit, while knowing that the ledger kept by her showed outstanding orders. She participated in the fraud by knowing, as early as 2008, that orders were being untimely filled, if filled at all, yet continued to deposit funds on behalf of Defendants and converting customer monies for the use and

benefit of Defendants. She participated in the fraud by
continuing to represent to customers that the monies were
advanced into the market, while knowing that the ledger
kept by her and shared with Defendants did not reflect such
an advance, and instead reflected that customer monies were
converted into payments of overhead, advances to Defendants
and other monies paid to Defendants, and payroll.

(Id. at ¶ 222.)  Each allegation is stated only in general terms

and fails to describe any particular action allegedly taken by

Standley.  Moreover, the allegations as to Standley elaborated

earlier in the Third Amended Complaint -- primarily in paragraph

47 -- are similarly general.  (See, e.g., id. at ¶ 47

("Standley, despite knowing of these issues as early as 2008,

had direct knowledge of the problems and patterns of unfulfilled

orders and unearned payments to Defendants, and continued to

transact business to the detriment of customers and for the

benefit of Defendants as late as November 2013.")).

Accordingly, Plaintiffs have failed to state a claim for either

civil conspiracy or civil RICO as to Defendant Cindy Standley.

### 5.    Unfair and Deceptive Practices

Plaintiffs allege that "Defendants have, inter alia,

committed unfair and/or deceptive acts including, but not

limited to:

a. Causing likelihood of confusion or misunderstanding
as to the source, approval, and/or certification of
goods and/or services;

b. Using deceptive representations or designations of
geographic origin in connection with goods and/or
services;

c. Representing that goods or services have
sponsorship, approval, characteristics, ingredients,
uses, benefits or quantities that they do not have;

d. Representing that goods are original or new if they
are deteriorated;

e. Representing that goods or services are of a
particular standard, quality, or grade, or that goods
are of a particular style or model, if they are
another;

f. Advertising goods or services with intent not to
sell them as advertised;

g. Advertising goods or services with intent not to
supply reasonably expectable public demand; and

h. Representing that a service, replacement, or repair
is needed when it is not;

(3d Am. Compl. ¶ 305.)  The kinds of unfair and deceptive

practices alleged are part of the Tennessee Consumer Protection

Act codified at Tennessee Code Annotated § 47-18-101 et seq.

("TCPA").

The pleading requirements of Rule 9(b) apply to TCPA

claims.  "In order to be successful under the TCPA it must be

proven that there was some deception, misrepresentation or

unfairness, regardless of any breach of contract."  Wilson v.

State Farm Fire & Cas. Co., 799 F. Supp. 2d 829, 842 (E.D. Tenn.

2011) (internal alterations and quotation marks omitted).

Consequently, a claim under the TCPA sounds in fraud and thereby

must be pleaded with particularity under Rule 9(b).  See

Borsellino, 477 F.3d at 507.

Standley argues, consistent with the other claims that fail under Rule 9(b), Plaintiffs' TCPA allegations must also fail as to Standley for lack of particularity. (<u>See</u> Supplemental Mem. at 12–13.) The Court agrees. As noted several times above, Plaintiffs have failed to make any allegations as to Standley individually sufficient to state a claim under Rule 9(b). Accordingly, Plaintiffs have failed to state a claim for unfair and deceptive practices as to Defendant Cindy Standley.

## IV. CONCLUSION

For the reasons stated above, Defendant Cindy Standley's Motion to Dismiss is GRANTED IN PART AND DENIED IN PART.


**IT IS SO ORDERED,** this 31st day of March, 2015.


/s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT JUDGE