# In The Matter Of:

*DAMIAN ORLOWSKI vs.*

*LARRY BATES*

---

*JOHN RYDER*

*June 1, 2015*

---

*Alpha Reporting Corporation*

*236 Adams Avenue*

*Memphis, TN 38103*

*901-523-8974*



Original File 32895ln.txt

**Min-U-Script® with Word Index**

Case 2:11-cv-01396-SHL-cgc   Document 433-1   Filed 07/29/15   Page 2 of 47   PageID 6023

DAMIAN ORLOWSKI vs.                                              JOHN RYDER
LARRY BATES                                                    June 1, 2015

## Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF TENNESSEE
 2                  WESTERN DIVISION

 3   _____
     DAMIAN ORLOWSKI, an          )
 4   individual, LYNN CECHIN,     )
     an individual and AARON      )
 5   CARMACK, as Trustee of the)
     Bryan and Mindi Carmack      )
 6   Revocable Trust, dated       )
     March 13, 2008,              )
 7                                )
         Plaintiffs on behalf)
 8       of themselves and       )
         all others similarly    )
 9       situated,               )
     VS.                          )NO. 2:11-cv-01396
10   LARRY BATES, an individual)
     FIRST AMERICAN MONETARY      )
11   CONSULTANTS, INC., a        )
     Colorado corporation,       )
12   INFORMATION RADIO NETWORK,)
     INC., a Tennessee           )
13   corporation, BARRY DENISON)
     an individual, BARBARA      )
14   BATES, an individual,       )
     individual, ROBERT BATES, )
15   an individual, BARRY         )
     FRIEDRICHS, an individual,)
16   STUART CADIEU, an           )
     individual, JOHN DOES A, B)
17   & C, individuals, and JANE)
     DOES A, B & C, individuals)
18                                )
         Defendants.             )
19   _____

20                  DEPOSITION

21                     OF

22                 JOHN RYDER

23                June 1, 2015

24
```

## Page 2

```
 1        The Deposition of JOHN RYDER is taken on

 2   this, the 1st day of June 2015, on behalf of the

 3   Defendants, pursuant to notice and consent of

 4   counsel, beginning at approximately 10:00 a.m. in

 5   the offices of Ballin, Ballin and Fishman, 200

 6   Jefferson Avenue, Suite 1250, Memphis, Tennessee.

 7        This deposition is taken pursuant to the

 8   terms and provisions of the

 9   Federal Rules of Civil Procedure.

10        All forms and formalities are waived.

11   Objections are reserved, except as to form of the

12   question, to be disposed of at or before the

13   hearing.

14        The signature of the witness is not

15   waived.

16

17

18

19

20

21

22

23

24
```

## Page 3

```
 1          A P P E A R A N C E S

 2   FOR THE PLAINTIFFS:
                   AMBER GRIFFIN SHAW, ESQ.
 3               Law Office of J. Houston Gordon
                 Lindo Hotel Building, Suite 300
 4               114 West Liberty Avenue
                 Covington, Tennessee 38019
 5               901-476-7100

 6   FOR CHARLES AND ROBERT BATES:
                   TARRY BEASLEY, ESQ.
 7               The Beasley Law Firm
                 1850 Poplar Crest Cove, Suite 200
 8               Memphis, Tennessee 38119
                 901-682-2000

 9

10   FOR MS. CINDY STANLEY:
                   RICHARD TOWNLEY, ESQ.
11               Ballin, Ballin and Fishman
                 200 Jefferson Avenue, Suite 1250
12               Memphis, Tennessee 38103
                 901-525-6278

13

14   FOR MR. RYDER:
                   LAURA S. MARTIN, ESQ.
15               Harris Shelton Hanover Walsh
                 One Commerce Square, Suite 2700
16               40 South Main Street
                 Memphis, Tennessee 38103
17               901-525-1455

18   ALSO PRESENT:

19                   LARRY BATES, PRO SE

20   COURT REPORTING FIRM:

21                   ALPHA REPORTING CORPORATION
                     Valerie Hall Gilliam, LCR
22               236 Adams Avenue
                 Memphis, Tennessee 38103
23               (901) 523-8974
                 www.alphareporting.com

24
```

## Page 4

```
 1              I N D E X

 2          EXAMINATION INDEX

 3
     JOHN RYDER
 4     BY MR. TOWNLEY . . . . . . . . . . .    5
       BY MR. BATES . . . . . . . . . . . .   38
 5     BY MS. SHAW . . . . . . . . . . . . .  69
       BY MR. BATES . . . . . . . . . . . . 114
 6     BY MR. TOWNLEY . . . . . . . . . . . 116

 7

 8          EXHIBIT INDEX

 9   EXHIBIT NO.        DESCRIPTION        PAGE
10   EXHIBIT NO. 1   Transaction receipt (for  40
                     identification)
11   EXHIBIT NO. 2   Transaction form          45

12   EXHIBIT NO. 3   Handwritten note (for
                     identification)           66
13
14   EXHIBIT NO. 4   Printout                  67

15   EXHIBIT NO. 5   Printout                  68

16   EXHIBIT NO. 6   Report of Mr. Rosenberg   72

17   EXHIBIT NO. 7   Report of Mr. Butler      72

18          OBJECTION INDEX

19     BY MS. SHAW . . . . . . . . . . . . . 42
       BY MS. MARTIN . . . . . . . . . . . . 42
20     BY MS. SHAW . . . . . . . . . . . . . 42
       BY MS. SHAW . . . . . . . . . . . . . 42
21     BY MS. SHAW . . . . . . . . . . . . . 44
       BY MS. MARTIN . . . . . . . . . . . . 62
22     BY MR. TOWNLEY . . . . . . . . . . . . 66

23

24
```

DAMIAN ORLOWSKI vs.
LARRY BATES

JOHN RYDER
June 1, 2015

Page 5

1    JOHN RYDER,
2  having been called as a witness, was duly sworn
3  and testified as follows:
4    **EXAMINATION**
5    **BY MR. TOWNLEY:**
6  Q.  Good morning, Mr. Ryder.
7  **A.  Good morning.**
8  Q.  Will you give us your name for the -- go
9  off for 10 seconds.
10    (WHEREUPON, THERE WAS A SHORT DISCUSSION
11  HELD OFF THE RECORD.)
12    **BY MR. TOWNLEY:**
13  Q.  Give us your name for the record,
14  please.
15  **A.  John L. Ryder.**
16  Q.  Spell your last name.
17  **A.  R-Y-D-E-R.**
18  Q.  Mr. Ryder, by whom are you employed?
19  **A.  Harris Shelton Hanover Walsh.**
20  Q.  You're an attorney?
21  **A.  I am.**
22  Q.  Okay.  Have you ever given a deposition
23  before?
24  **A.  Yes, I have.**

Page 6

1  Q.  Okay.  All right.  That's fine.  And as
2  you know, we're here for the case of Orlowski
3  versus Bates.
4    Could you describe what your role in
5  this case is, please.
6  **A.  I was appointed by the Court as a**
7  **receiver.**
8  Q.  And when was that, please?
9  **A.  October of 2013.**
10  Q.  2013.  And are you still in that role
11  today?
12  **A.  I am.**
13  Q.  Okay.  And if you could, give us briefly
14  what your duties and responsibilities are as the
15  receiver.
16  **A.  Well, they're spelled out in the order**
17  **appointing receiver in some detail.  And there's**
18  **a second order then that I think confirms that.**
19  **But fundamentally, to take charge of the**
20  **receivership entities, which at that time were**
21  **FAMC, Inc. and IRN, Inc. and FAMCPM, LLC and to**
22  **secure those assets and to investigate the**
23  **company, examine their records and determine what**
24  **assets might be available for distribution to the**

Page 7

1  plaintiffs in this case.
2  Q.  Okay.  And between October 2013 and
3  today, you've done all of those things?
4  **A.  I've done quite a bit of it, yes.**
5  Q.  Okay.  And you mentioned three entities:
6  FAMC, Inc., IRN, Inc. and FAMCPM, LLC?
7  **A.  Correct.**
8  Q.  What is -- FAMCPM, what is "PM"?
9  **A.  I don't know.**
10  Q.  You don't know, okay.  And were you --
11  **A.  I know what the entity is.  I don't know**
12  **what the "PM" stands for.**
13  Q.  All right.  And it had, I assume, the
14  same ownership as the other entities?
15  **A.  No.  No.  FAMC, Inc. and IRN USA Radio**
16  **had different ownership structures than FAMCPM,**
17  **LLC.  FAMCPM, LLC had one member, Dr. Larry**
18  **Bates, and it was organized in the State of**
19  **Colorado to process orders from Tennessee**
20  **residents for precious metals so that they --**
21  **those orders would not be subject to taxation in**
22  **Tennessee.**
23    **The FAMC, Inc. was owned 50 percent by**
24  **Dr. Larry Bates and 50 percent by Barbara Bates.**

Page 8

1  **IRN, which stands for Information Radio Network**
2  **was purportedly owned 50 percent by Dr. Larry**
3  **Bates and 50 percent by Dr. Barbara Bates,**
4  **although the Maddoux family in Dallas asserted**
5  **some ownership interest in the company, which**
6  **they -- they made a loose claim to that, which**
7  **they never followed up on.**
8  Q.  The Maddoux family?
9  **A.  M-A-D-D-O-U-X, I believe.**
10  Q.  Okay.  They made a claim of ownership in
11  IRN, Inc.?
12  **A.  They asserted that -- their lawyer**
13  **notified me that his clients claimed an ownership**
14  **interest in IRN.  And we gave them an opportunity**
15  **to appear in court and assert that claim, and**
16  **they did not do so.**
17  Q.  Okay.  So their ownership interest is
18  not hammed out?  It's not --
19  **A.  IRN has been sold and -- the assets of**
20  **IRN have been sold and there is nothing to**
21  **distribute to the equity.  So if they have**
22  **anything, they don't have anything.**
23  Q.  All right.  And after you were appointed
24  the receiver in October of 2013, did any of the

DAMIAN ORLOWSKI vs.
LARRY BATES

JOHN RYDER
June 1, 2015

---

Page 9

1   entities continue to operate in any meaningful
2   way after --
3   **A.  Yes.  Yes.**
4   Q.  Okay.  And to what extent -- I mean, I
5   know you've talked about liquidating assets of
6   IRN.  IRN is not operating today, is it?
7   **A.  Well, the assets were sold --**
8   Q.  Okay.
9   **A.  -- to Cross Platform Media, LLC in, I**
10  **believe, it was May of 2014.  It may have been**
11  **June.  But in any event, last year.  Between**
12  **the -- my appointment and the date of sale,**
13  **Information Radio Network did operate.**
14  Q.  Okay.  And did FAMC continue to operate
15  in any way after October?
16  **A.  In a very, very limited fashion.  And**
17  **that is the only operations after the appointment**
18  **of receiver were the processing of IRA**
19  **transactions.  After I was appointed receiver,**
20  **FAMC did not accept orders for metals or process**
21  **orders directly for metals.  There may have been**
22  **one or two transactions that were in process that**
23  **we wrapped up.  But essentially, we stopped**
24  **taking orders for the purchase or sale of metals.**

---

Page 10

1   Q.  All right.  After you took over as
2   receiver in October of 2013, did you maintain any
3   of the employees or staff of any of those three
4   entities?
5   **A.  Yes.**
6   Q.  Who did you maintain beginning on or
7   after October 2013?
8   **A.  Well, at FAMC -- at FAMC, Sherry Barnett**
9   **remained in place who had been executive**
10  **assistant, I believe, operating in the executive**
11  **office.  At IRN, initially the entire employee**
12  **group -- nobody was -- nobody was terminated**
13  **immediately.  There were people terminated after**
14  **a while.  But immediately in October, everybody**
15  **remained in place.  There were employees who**
16  **worked both for IRN and for FAMC, and that would**
17  **be Chuck Bates, Robert Bates, Kenzie Brown Bates**
18  **and to the extent that she handled payroll, Cindy**
19  **Stanley.**
20  Q.  Okay.  To the extent she handled
21  payroll?
22  **A.  Right.**
23  Q.  Was her position reduced after the --
24  after you were appointed receiver?

---

Page 11

1   **A.  Well, she was terminated sometime after.**
2   Q.  Okay.  Do you remember when that was?
3   **A.  No.**
4   Q.  Okay.  All right.  All right.  So when
5   you took over these companies, you came into
6   possession of all their financial records; is
7   that right?
8   **A.  I came into the financial records that**
9   **existed, yes.**
10  Q.  Okay.  And did you conduct an
11  examination of those records similar to what the
12  CPA and the other expert have done?
13  **A.  No.  I retained the CPA and the other**
14  **expert to do that.**
15  Q.  All right.  In the course of exercising
16  your duties as receiver -- well, let me back up.
17     Let me ask you this:  Have you reviewed
18  the two reports of Mr. Butler and Mr. Rosenberg?
19  **A.  Yes.**
20  Q.  So you're familiar with the contents of
21  these reports somewhat?
22  **A.  Somewhat.**
23  Q.  Okay.  And part of the information
24  conveyed in these reports have to do with -- with

---

Page 12

1   company monies that were distributed to the
2   insiders for their own personal benefit and use.
3   Are you aware of that?
4   **A.  Yes.**
5   Q.  Okay.  And for example -- I only have
6   one copy of this -- in the report of Mr. Butler,
7   the CPA, he includes a schedule that purports to
8   be credit card charges for personal expenses for
9   various insiders including Larry Bates, Barbara
10  Bates, Robert Bates, Charles Bates, Kenzie Brown
11  Bates and Cindy Stanley.  It's his Exhibit H.
12     Did you review that or are you familiar
13  with it?
14  **A.  I've looked at it and I'm generally**
15  **familiar with --**
16  Q.  Okay.
17  **A.  -- that activity and --**
18  Q.  All right.  Do you have --
19  **A.  Yeah.**
20  Q.  Okay.  Do you have any personal
21  knowledge of the particulars of what these
22  charges pertain to, how these charges were
23  applied?
24  **A.  Only to the extent that Mr. Butler or**

---

Page 13

1   **Mr. Rosenberg have described to me the charges or**
2   **have shown me the credit card statements that**
3   **reflect those charges.**
4   Q.   Okay.  So any knowledge you have would
5   be by way of Mr. Rosenberg and Mr. Butler?
6   **A.   Their investigation revealed this**
7   **information, yes.**
8   Q.   Okay.  Other than what is contained in
9   the reports of Mr. Rosenberg and/or Mr. Butler,
10  do you have any personal knowledge of money or
11  property of the companies -- any of the three
12  entities diverted to Ms. Cindy Stanley for her
13  personal use?
14  **A.   No.**
15  Q.   Okay.  You mentioned Ms. Stanley was
16  terminated from her position after you were
17  appointed receiver.  Did you have any other
18  interactions with Ms. Stanley after she had been
19  terminated from her position?
20  **A.   Yes.  We discussed her continuing to**
21  **process the tax information for the W2s at the**
22  **end of the year.  And I believe we paid her some**
23  **amount to continue to handle that aspect of her**
24  **job through the end of December, possibly into**

Page 14

1   **January, but --**
2   Q.   December of 2013?
3   **A.   Correct.**
4   Q.   Would that have been a 1099-type
5   situation?
6   **A.   That's correct, yes.**
7   Q.   Was she fully cooperative with you in
8   that endeavor?
9   **A.   Yes, she was.**
10  Q.   Okay.  After that sort of independent
11  contractor situation at the end of 2013, did you
12  have any other interaction with Ms. Cindy Stanley
13  in your role as receiver?
14  **A.   No.**
15  Q.   I seem to remember there was a situation
16  about a company car.  Did she retain possession
17  of a company car?
18  **A.   She did.**
19  Q.   Okay.  Was that with your knowledge and
20  consent?
21  **A.   And I'm -- yes.  Yeah.**
22  Q.   Okay.
23  **A.   I'm trying to remember what the details**
24  **of that were.  I believe that there was a**

Page 15

1   **representation that Dr. Bates was going to take**
2   **care of it.**
3   Q.   What does that mean, "Dr. Bates was
4   going to take care of it"?
5   **A.   Well, there were only a couple payments**
6   **left on the car.  And I can't remember whether**
7   **Ms. Stanley or Dr. Bates made the representation,**
8   **but one or the other of them indicated that the**
9   **remaining payments would be made.**
10  Q.   Okay.  Do you know if she had possession
11  of this company car prior to the time that you
12  took over as receiver?
13  **A.   It is my understanding she did, yes.**
14  Q.   Okay.  Do you have any personal
15  knowledge of how long she had possession of that
16  car?
17  **A.   I do not.**
18  Q.   Okay.  Do you have any personal
19  knowledge of her role within the company prior to
20  you taking over as the receiver?
21  **A.   Well, from what we've examined in the**
22  **records, she ran the Colorado office.  She was a**
23  **signatory on the bank accounts that we were told**
24  **about and the ones that we discovered later that**

Page 16

1   **we weren't told about, which would be Wells**
2   **Fargo, Guaranty Bank and Verus, V-E-R-U-S.**
3   Q.   You discovered she was a signatory on
4   those other three accounts?
5   **A.   On those three accounts, yes.**
6   Q.   Can you say those again, please?
7   **A.   Wells Fargo.**
8   Q.   Okay.
9   **A.   I think it's Guaranty Bank and they are**
10  **successor to some other bank in Fort Collins.**
11  Q.   Okay.
12  **A.   And Verus, V-E-R-U-S.**
13  Q.   Okay.  And those -- were those all
14  Colorado office accounts?
15  **A.   Yes.**
16  Q.   Was anyone else a signatory on those
17  accounts?
18  **A.   I believe Dr. Bates and Barbara Bates**
19  **were signatories on those accounts.**
20  Q.   Okay.  Other than being a signatory, do
21  you have any personal knowledge as to
22  Ms. Stanley's authority over those accounts, in
23  other words, she would need other authority to
24  make a draw on those accounts?

DAMIAN ORLOWSKI vs.
LARRY BATES

JOHN RYDER
June 1, 2015

---

Page 17

1  A.  Well, she made deposits and she wrote
2  checks.
3  Q.  Okay.  All right.  Other than the bank
4  accounts that you mentioned, do you have any --
5  any other personal knowledge as to her role in
6  the company prior to taking over as a receiver?
7  A.  She held herself out to be vice
8  president of at least the Colorado LLC.
9  Q.  And this was the LLC referred to earlier
10  that would be for Tennessee residents?
11  A.  Correct.
12  Q.  That's Tennessee residents purchasing
13  gold from FAMC?
14  A.  That's correct.  Or selling gold to
15  FAMC.
16  Q.  Okay.
17  A.  And when I say "gold", that would
18  encompass any precious metals.
19  Q.  I understand.  And do you know if the
20  records bore that out in the Tennessee -- that
21  were Tennessee deposits made into that particular
22  account and not into the other ones or is that
23  beyond the scope of --
24  A.  No.  The records bear that out --

---

Page 18

1  Q.  Okay.
2  A.  -- that the Tennessee transactions were
3  through FAMCPM, LLC.
4  Q.  Okay.  I think you testified earlier
5  that you had seen the credit card statements that
6  were the back up.
7  A.  Yeah.  I can't say that I've seen all of
8  them, but I've certainly seen a number of
9  statements reflecting the charges that make up
10  part of Mr. Butler's report.
11  Q.  Okay.  And sitting here today, do you
12  have any present recollection as to the charges
13  pertaining to Ms. Stanley --
14  A.  I do not.
15  Q.  -- from these --
16  MR. TOWNLEY:  Okay.  I think that's all.
17  I'll pass the witness.
18  MR. BEASLEY:  I need to take a short
19  break, if y'all don't mind.
20  (WHEREUPON, A RECESS WAS TAKEN FROM
21  10:48 A.M. UNTIL 10:54 A.M., AT WHICH TIME THE
22  DEPOSITION CONTINUED AS FOLLOWS:)
23  BY MR. BEASLEY:
24  Q.  Mr. Ryder, I'm Tarry Beasley, and I

---

Page 19

1  represent Chuck Bates and Robert Bates.
2  A.  Yes, sir.
3  Q.  Let me pick up where you left off a few
4  moments ago in your testimony.  The three bank
5  accounts in Colorado, I think Verus Bank, a Wells
6  Fargo and another one --
7  A.  Guaranty.
8  Q.  Guaranty?
9  A.  Uh-huh.
10  Q.  Okay.
11  A.  Yes.
12  Q.  On those three accounts, did Mr. Charles
13  Bates have any signing authority?
14  A.  No.
15  Q.  What about Mr. Robert Bates, did he have
16  any signing authority --
17  A.  No.
18  Q.  -- on any of the three accounts?
19  A.  No, sir.  Neither had -- neither Charles
20  Bates nor Robert Bates had signing authority on
21  any bank account that I have located for any of
22  the receivership entities.
23  Q.  Okay.  Stated in another way, they
24  couldn't sign a check for anything of those

---

Page 20

1  corporations; is that correct?
2  A.  I don't want to mince words with you,
3  Mr. Beasley, but they could sign a check; it just
4  wouldn't be any good.
5  Q.  They had no authority to --
6  A.  They had no authority.  They had no --
7  they were not signatories to any of the accounts
8  that we have found.
9  Q.  Very good.  And you have done a thorough
10  investigation for other accounts, have you not?
11  A.  We've done as thorough an investigation
12  as we could.
13  Q.  Okay.  Have you found in the course of
14  your function any documents that you believe --
15  lead you to believe that Mr. Charles Bates had
16  any authority to fine this company or act for the
17  company?
18  MS. MARTIN:  Can we clarify which
19  company we're talking about?
20  BY MR. BEASLEY:
21  Q.  Any of the three.
22  A.  Yes.
23  Q.  Okay.  What did you find, which company?
24  A.  Mr. -- we're talking about Charles

---

DAMIAN ORLOWSKI vs.
LARRY BATES

JOHN RYDER
June 1, 2015

---

Page 21

1   Bates?
2   Q.   Charles Bates.
3   A.   Charles Bates was the senior vice
4   president for Information Radio Network and
5   essentially ran the radio network.
6   Q.   Okay.  What did that encompass?
7   A.   Managing the -- serving as news
8   director, supervising the sales operations.  So
9   he -- the sales operation solicited advertising
10  and largely worked through reps rather than
11  direct advertising, although there was some of
12  that as well.  But he supervised the sales
13  operation, which of course, is the source of the
14  revenue.  In addition, he supervised the news
15  function, which was the content that went out to
16  the subscribers to the network.
17  Q.   Okay.  And in that capacity, he couldn't
18  sign checks?
19  A.   That's correct.
20  Q.   He could bind the company as far as the
21  sale of a advertising slot to someone or
22  something of that nature?
23  A.   I believe he had that authority, yes.
24  Q.   All right.  What about the content of

---

Page 22

1   the programming and advertising?  Did he control
2   that?
3   A.   I believe he did.
4   Q.   Okay.  In what manner would he have
5   controlled that?
6   A.   He would have said to an anchor, no, I
7   don't approve this story or I think you need to
8   include a story on this.  He could have -- he
9   would have that scope of authority.
10  Q.   Okay.  All right.  Did you find -- of
11  the three corporations, did you find that he had
12  any direct control over the manner in which --
13  let's take them individually, the three
14  companies.  What direct control did he have over
15  IRN?
16  A.   Well, the control I've just described --
17  Q.   Do you have --
18  A.   -- over news --
19  Q.   And sales?
20       Okay.  Have any others that you could
21  find?  Any other --
22  A.   I'm not following your question.
23  Q.   Did he have any other authority that you
24  can find other than those two areas?

---

Page 23

1   A.   There are some handwritten notes that
2   record a -- what purports to be a board of
3   directors meeting for IRN, which included
4   representatives with the Maddox family.  And I
5   think it also reflects that Charles may have been
6   a participant in that board meeting.
7   Q.   In what capacity?
8   A.   The notes are not clear.
9   Q.   So you aren't contending that he was a
10  director of the corporation, are you?
11  A.   I'm not sure.
12  Q.   Okay.  Now in reference to FAMCPM, LLC,
13  did you find any records anywhere that indicated
14  that he was a director of that corporation?
15  A.   No.  It's an LLC, and the sole member
16  was Dr. Larry Bates.
17  Q.   All right.  In reference to IRN, are
18  there any records that reflect that Mr. Charles
19  Bates was a director?
20  A.   Just the handwritten notes I just
21  described to you.
22  Q.   Okay.  But they don't say one way or the
23  other?
24  A.   That's correct.

---

Page 24

1   Q.   Okay.  Do you know who made the notes?
2   A.   I do not.
3   Q.   In reference to FAMC, did Mr. Charles
4   Bates -- did you find any records of him being
5   listed anywhere as a director of the corporation?
6   A.   I did not.
7   Q.   Okay.  And did Mr. Charles Bates file a
8   claim for funds that were due him either in funds
9   he had lent to the company or in payroll?
10  A.   I'm sorry.  What is the question?
11  Q.   Did he file a claim with you for either
12  payroll or funds that he had loaned to the
13  company, any of the three?
14  A.   As I sit here today, I don't recall.  I
15  think he may have.
16  Q.   Did you pay that claim?
17  A.   I don't think so.  We may have paid some
18  of the payroll claims, some.  But I don't -- I'm
19  pretty confident that we have not paid any claim
20  in which any member of the Bates family has
21  alleged that funds are due them from the company.
22  Q.   All right.
23       MS. SHAW: The company being FAMC?
24       THE WITNESS: FAMC.

---

DAMIAN ORLOWSKI vs.
LARRY BATES

JOHN RYDER
June 1, 2015

Page 25

1    MS. SHAW: I'm sorry, Tarry.  I know
2  that's improper, but I wanted to make sure.
3    THE WITNESS: But to clarify that,
4  Charles Bates had some claims arising out of his
5  service at IRN, and some of those claims, I
6  believe, have been paid to the extent they relate
7  to salary, commissions, payroll, that type of
8  activity.  As to claims for funds that -- and I
9  also -- I do have a distinct recollection of
10  reimbursing Mr. Bates for some expenses that he
11  incurred in connection with IRN where he had used
12  his personal credit card to pay for certain
13  supplies or materials or services that were
14  rendered to IRN.
15    BY MR. BEASLEY:
16  Q.  Okay.  Did you find Mr. Charles Bates
17  cooperative in working with you when you were
18  appointed by the Court?
19  A.  For the most part, yes.
20  Q.  Okay.  Did you find any documents in any
21  of the three corporations related to Mr. Charles
22  Bates that showed that he managed any of these
23  companies?
24  A.  Well, I've described his role as I

Page 26

1  believe it to have existed and as he held himself
2  out at IRN.
3  Q.  Right.  Is there any document that
4  says --
5  A.  I don't -- I don't recall seeing any
6  document that says what his scope of authority
7  was at IRN.
8  Q.  What about the other two corporations?
9  A.  There is no document that reflects that
10  he had any management authority either at FAMC or
11  FAMCPM, LLC.
12  Q.  Do you have any document that shows that
13  he did make -- "he" being Charles Bates -- any
14  corporate decisions?
15  A.  I think with respect to IRN, there are
16  probably some e-mails that would reflect that.
17  Q.  And what area are we talking about?
18  A.  The areas we've already discussed:
19  Content, news and sales.
20  Q.  All right.  At the risk of being
21  redundant, in your search in dealing with the
22  records of the three corporations, you did not
23  find any checks written by Mr. Charles Bates, did
24  you?

Page 27

1  A.  I found no checks signed by Mr. Charles
2  Bates.
3  Q.  Right.  Did you find any document in any
4  of the three corporations that said or relate
5  similar language that would say that he had the
6  authority to purchase gold, silver or precious
7  metals?
8  A.  I do not think I have found any document
9  that would give him that authority.
10  Q.  Did you find any document that would
11  give him the authority to determine who was
12  shipped what order or when that might be shipped?
13  A.  I don't know that there's any document
14  that would indicate that.
15  Q.  Did you find any document that would
16  give him the authority to decide when a customer
17  was to be shipped a given order?
18  A.  No.  There are e-mails between
19  Mr. Charles Bates and customers dealing with
20  their complaints about not receiving the product,
21  but I don't know of any corporate document that
22  gives him the authority to determine when the
23  shipments are made.
24  Q.  What, if any, loans were made to

Page 28

1  Mr. Charles Bates from either of the three
2  corporations?
3  A.  I think that's reflected in the
4  accountant's reports.  I mean, there were ledgers
5  that were kept that reflected transactions
6  between the insiders and the corporation.
7  Q.  Okay.  Do you know what record that
8  might be?
9  A.  No.
10  Q.  So from your recollection today, you
11  can't say that there was such a document, it's
12  just you think there's something?
13  A.  I have seen -- I have seen a handwritten
14  ledger that reflects the transactions between
15  each of the members of the Bates family and the
16  corporation.  I don't recall the contents of that
17  ledger.
18  Q.  Okay.
19  A.  And I don't know the accuracy of the
20  ledger.
21  Q.  Do you know whether it was used in the
22  preparation of the reports that you received from
23  the accountant?
24  A.  I know it was examined by the

---

**Page 29**

1 accountant, yes.

2 Q. Do you know if it was used, though?

3 **A. It was examined, and I don't know the**

4 **extent to which it was used.**

5 Q. Okay. From your examination of the

6 probably ton or more of paper that you received

7 in these three corporations, did you determine

8 who owned those corporations?

9 **A. Well, yes. As I've previously stated,**

10 **FAMC was owned by Dr. Larry Bates and Barbara**

11 **Bates 50/50. FAMCPM, LLC was a single member LLC**

12 **of which Dr. Larry Bates was the sole member.**

13 **And the ownership structure of IRN USA Radio**

14 **Network is a little fuzzier. It appears to be**

15 **that it was owned also by Dr. Larry Bates and**

16 **Barbara Bates.**

17 Q. Okay. So in none of that did

18 Mr. Charles Bates' name appear as owner?

19 **A. That is correct.**

20 Q. Mr. Charles Bates made a claim for a

21 healthcare savings account that had not been

22 funded by the corporation. Do you recall that?

23 **A. Not specifically, no.**

24 Q. Okay.

---

**Page 30**

1 **A. I recall that the health care savings**

2 **accounts of the employees were not funded --**

3 Q. Okay.

4 **A. -- for all employees after January of**

5 **2013, notwithstanding the fact that the company**

6 **had made the deductions from the payroll.**

7 Q. Were any of those paid to any of the

8 employees?

9 **A. Yes.**

10 Q. Why would Mr. Charles Bates have not

11 been paid?

12 **A. Well, I'm not -- I can't tell you right**

13 **now. I don't have -- I don't recall why we made**

14 **that decision or whether we did.**

15 Q. Okay. Mr. Ryder, I would like to go

16 back through that same series of questions on

17 Robert.

18 **A. Somehow I suspected you might be getting**

19 **ready to do that.**

20 Q. What documents, if any, did you find

21 that would indicate that Mr. Robert Bates was a

22 owner or director of any of these three

23 corporations?

24 **A. I found no records that indicate that**

---

**Page 31**

1 **Mr. Robert Bates was an owner or director of any**

2 **of the three receivership entities.**

3 Q. Did you find any documents that would

4 indicate control of any of these companies?

5 **A. I don't believe I have found any**

6 **documents which indicate control. Mr. Robert**

7 **Bates functioned as a sales director of IRN USA**

8 **Radio Network. And Mr. Robert Bates -- based on**

9 **my investigation, Mr. Robert Bates from time to**

10 **time directed that checks be paid from FAMC or**

11 **received the checks and filled them out.**

12 Q. Checks for what?

13 **A. Checks for payments to himself.**

14 Q. Did he have authority to sign those

15 checks?

16 **A. No.**

17 Q. Okay. Someone else signed them?

18 **A. That's correct.**

19 Q. Okay. And why do you believe those

20 checks -- that he filled out some checks?

21 **A. That's what was reported to me by other**

22 **employees of FAMC.**

23 Q. Okay. Do you have -- can you identify

24 which checks you claim he wrote to himself?

---

**Page 32**

1 **A. I could not do so here today, no.**

2 Q. You don't think you could at all?

3 **A. Well, no. I think -- I think if you**

4 **examined the checks, you might be able to**

5 **determine that.**

6 Q. But at this point and today, you cannot?

7 **A. Today, no, I could not.**

8 Q. Did you find any documents that would

9 indicate and state on them that Mr. Robert Bates

10 managed any of these corporations?

11 **A. Except to the extent that he managed**

12 **sales at IRN, no.**

13 Q. Did you find any documents that

14 indicated he had the authority to make corporate

15 decisions?

16 **A. No.**

17 Q. I believe we've already established that

18 he could not sign checks on any of the three

19 corporations.

20 **A. That is correct.**

21 Q. Did you find any documents that said he

22 had the authority to purchase gold, silver or

23 other precious metals?

24 **A. I did not find any corporate document**

---

Page 33

1  that gave anybody the authority to buy gold or
2  silver.
3  Q.  Did you find that most of the purchases
4  had been executed by Mr. Larry -- Dr. Larry
5  Bates?
6  A.  That's correct.
7  Q.  As a matter of fact, were there any by
8  anyone else?
9  A.  Well, the way the records were kept,
10  it's hard to determine who actually placed the
11  order.  But, you know, the investigation has
12  indicated that all of the orders were placed by
13  Dr. Larry Bates.
14  Q.  Okay.
15  A.  That doesn't mean that there couldn't
16  have been some order that was placed by somebody
17  else, but we haven't found that any of the metal
18  vendors reported to us that somebody other than
19  Dr. Larry Bates placed an order with them.
20  Q.  Okay.  Did you find any documents that
21  would show that Mr. Robert Bates had the
22  authority to determine who was shipped a given
23  order or when?
24  A.  Similar to the situation with Charles

Page 34

1  Bates, there may be e-mails which reflect his
2  response to inquiries regarding delay.  But
3  again, there's no corporate document that says he
4  had such authority.
5  Q.  And likewise, you did not find any
6  document that gave him the authority to decide
7  when a customer was to be shipped?
8  A.  I didn't find any documentation that
9  gave anybody the authority to make that decision,
10  but people did make those decisions.
11  Q.  But your investigation doesn't say who;
12  is that correct -- well, other than Dr. Larry
13  Bates?
14  A.  Other than Dr. Bates, no.
15  Q.  Again, this is kind of redundant for
16  what we had asked about Charles.  But in Robert
17  Bates' case, did he likewise file a claim for
18  salary or health savings account and loans to the
19  corporation?
20  A.  I don't recall a claim for loans from
21  the corporation.
22  Q.  All right.
23  A.  I do recall that he sought his
24  commissions and the override he was receiving on

Page 35

1  sales during his period at IRN.  And I believe
2  that was paid.
3  Q.  What loans, if any, were made to Robert
4  Bates?
5  A.  I don't recall.  The answer would be the
6  same.  It's reflected in a handwritten ledger
7  that was generated internally, which has been
8  reviewed by the accountant.
9  Q.  Okay.  And in your examination of
10  paperwork that you received on the three
11  corporations, did you determine who owned those
12  corporations?  And were any of the owners of
13  those three corporations Robert Bates?
14  A.  I think we've already described the
15  ownership, and Robert Bates was not an owner of
16  any of the three corporations.
17  Q.  Okay.  Out of an abundance of caution,
18  did you find any document that stated that
19  Mr. Robert Bates or Mr. Charles Bates were
20  officers of the corporation?
21  A.  They were both shown as vice presidents
22  of IRN.
23  Q.  Is that authority delineated anywhere in
24  any document?

Page 36

1  A.  I don't recall seeing any document that
2  delineated their authorities as vice president.
3  Q.  I am looking for something I obviously
4  cannot find.
5     (WHEREUPON, THERE WAS A DISCUSSION HELD
6  OFF THE RECORD.)
7     BY MR. BEASLEY:
8  Q.  Mr. Ryder, in the report of findings and
9  related exhibits by Mr. Rhett Butler, there is a
10  Schedule G that is a list of unearned
11  commissions.  Did you define for Mr. Butler what
12  an unearned commission was?
13  A.  No.
14  Q.  Okay.  Do you know then how he compiled
15  this as to what was earned and what was unearned?
16  A.  Not in detail, no.
17  Q.  Okay.
18  A.  I know conceptually what he is
19  describing there.
20  Q.  Tell me conceptually what the deal is.
21  A.  Well, as the reports indicate, there's
22  approximately 16 million dollars in outstanding
23  amounts due to customers for metals that were not
24  delivered.  Nonetheless, Mr. Charles Bates and

DAMIAN ORLOWSKI vs.
LARRY BATES

JOHN RYDER
June 1, 2015

Page 37

1  **Mr. Robert Bates received commissions on metals,**
2  **on orders that were never fulfilled.**
3  Q.  Okay.  So it's your understanding then,
4  when a salesman sells an item and the funds are
5  paid in for that, his commission is not earned at
6  that point?
7  **A.  Yes.  I mean, they have -- you have a**
8  **significant gap between the orders that were**
9  **placed and the orders that were filled.**
10  Q.  I understand that.
11  **A.  And this company has failed to fill**
12  **orders to the extent of 16 million dollars.**
13  Q.  I understand that.  The question,
14  though, dealt with when is a commission earned.
15  And so your definition of it would mean after
16  delivery of the product?
17  **A.  After the order is filled.**
18  Q.  Okay.  Likewise, on that same report in
19  Exhibit 8, there's a schedule of personal
20  expenses included in the operating expenses of
21  the company.  Can you tell me what those are
22  today?
23  **A.  No, I couldn't tell you what those are**
24  **today.**

Page 38

1  Q.  Okay.  Those were compiled by the
2  accountant --
3  **A.  That's correct.**
4  Q.  -- and so forth?
5  That would be true of both Charles and
6  Robert; is that correct?
7  **A.  That's correct.**
8  **MR. BEASLEY:** I pass the witness.
9  **EXAMINATION**
10  **BY MR. BATES:**
11  Q.  Mr. Ryder, for the record, I'm Larry
12  Bates, pro se.
13  On this unearned commission that you
14  just testified to, did you go to other economists
15  or consultants and reclaim that commission from
16  them?
17  **A.  No.  We haven't reclaimed it from**
18  **anyone.**
19  Q.  What about when they've been paid?  I
20  mean --
21  **A.  No.  We haven't reclaimed unearned**
22  **commissions from any of the economists yet.**
23  Q.  Mr. Ryder, on November 3rd, 2013, did
24  you make a trip to Bates farm and residence?

Page 39

1  A.  Yes, I did.
2  Q.  And what was the purpose of that?
3  **A.  To meet with you and to examine the**
4  **property out there for corporate records.**
5  Q.  Did the Bates cooperate?
6  **A.  Did you cooperate?**
7  Q.  Yes, sir.
8  **A.  Yes.**
9  Q.  Was there any way that I was not
10  cooperative?
11  **A.  Not on that day, no, sir.**
12  Q.  Did I give you precious metals to carry
13  back with you?
14  **A.  Yes, you did.**
15  Q.  And what was the records of that?  What
16  do you show that I gave you?
17  **A.  I don't recall.**
18  Q.  But was it gold?  Was it silver?  Was it
19  both or --
20  **A.  It was a mixture of different kinds of**
21  **coins or precious metals in different forms.**
22  Q.  But you didn't keep a record?
23  **A.  No.  I think there is a record.  I just**
24  **don't recall what it is.**

Page 40

1  Q.  Don't recall what it is.
2  Let me introduce this right here as an
3  exhibit.
4  (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
5  WAS MARKED AS EXHIBIT NO. 1 FOR IDENTIFICATION TO
6  THE TESTIMONY OF THE WITNESS AND IS HERETO
7  ATTACHED.)
8  **THE WITNESS:** No.  I may have seen it,
9  but I don't recall it specifically, no.
10  **BY MR. BATES:**
11  Q.  It would be a yellow copy slip --
12  **A.  Right.**
13  Q.  -- in with 50 Silver Eagles.
14  **A.  I don't -- I do not specifically recall**
15  **this specific document.**
16  Q.  Okay.  Do you recall nine 20-dollar
17  Liberties, which I mentioned was for Carl and
18  Shirley Little?
19  **A.  No.**
20  Q.  You do not?
21  Where would the records be from what you
22  received from me on that date?
23  **A.  They would be in our offices.**
24  Q.  In your offices.  Identified as what you

Page 41

1  picked up that day --
2  **A. Yes, sir.**
3  Q. -- specifically?
4  **A. I believe that -- I believe we did check**
5  **those out in some way, shape or form.**
6  Q. So --
7  **A. I don't recall what the record looks**
8  **like at this point.**
9  Q. What is the capacity with the US
10  receiver of Laura Martin?
11  **A. She's my attorney.**
12  Q. She's your attorney?
13  **A. One of my attorneys.**
14  Q. Your attorney. Does she act on her own
15  or does she act at your direction?
16  **A. She's one of my attorneys.**
17  Q. At a hearing before Judge McCalla to add
18  Kenzie Brown Bates as a defendant, Ms. Martin
19  testified as a witness for Plaintiff's attorney
20  stating that you did not receive precious metals
21  from me on that day.
22  **MS. SHAW:** Object to the form of the
23  question.
24  **THE WITNESS:** Okay. And what is your

Page 42

1  question?
2  **BY MR. BATES:**
3  Q. My question is: Why would she testify
4  to that?
5  **A. I don't recall that testimony.**
6  **MS. MARTIN:** It calls for speculation.
7  Mr. Ryder -- I don't think Mr. Ryder was there
8  that day.
9  **BY MR. BATES:**
10  Q. So why would she testify that --
11  **A. I don't know.**
12  Q. Would she have access to your records?
13  **MS. SHAW:** Object --
14  **THE WITNESS:** That's probably privileged
15  and so I'm going to decline to answer that.
16  **MS. SHAW:** Let me go ahead and pose a
17  standing objection to this line of questioning so
18  I don't have to interrupt.
19  **MR. BATES:** You're objecting to my
20  question?
21  **MS. SHAW:** I put an objection on the
22  record so I didn't object after each one, so you
23  can ask your questions relating to Ms. Martin
24  without needing to object to each one.

Page 43

1  **BY MR. BATES:**
2  Q. Did you investigate the missing precious
3  metals from HSBC Bank in New York?
4  **A. Yes, we did.**
5  Q. And did you recover them?
6  **A. We determined that there were no metals**
7  **to be recovered there.**
8  Q. And what led you to that conclusion?
9  **A. I don't recall the evidence that led me**
10  **to that conclusion, but I recall reaching that**
11  **conclusion.**
12  Q. Who did the investigation of that?
13  **A. Well, there are a number of people.**
14  **That would be people on the -- various attorneys**
15  **at Harris Shelton, and I'm not sure who else.**
16  Q. Do you recall my giving you a file on
17  HSBC and delineating what was missing?
18  **A. Yes, I do.**
19  Q. And you didn't follow up on that?
20  **A. We did follow up on that.**
21  Q. Are you familiar with hedging of
22  precious metals?
23  **A. In a general sense, yes.**
24  Q. How would you define hedging of precious

Page 44

1  metals?
2  **MS. SHAW:** Object to the form of the
3  question.
4  **THE WITNESS:** You would acquire a
5  position in the market that would protect you
6  against fluctuations in the market.
7  **BY MR. BATES:**
8  Q. In your opinion, who would be
9  responsible for the losses in that market?
10  **A. FAMC.**
11  Q. Are you familiar with the transaction
12  form of FAMC?
13  **A. I have seen many of those transaction**
14  **forms.**
15  Q. Have you ever seen on a transaction
16  form, on the left-hand column a note, hedging
17  loss?
18  **A. Yes.**
19  Q. How would you define the hedging loss?
20  What does that mean?
21  **A. I think it was a way to get extra money**
22  **out of the transaction.**
23  Q. A way to get extra money out of
24  transaction is what you're saying?

Page 45

1   A.   Yeah, that's what I'm saying.
2       MS. SHAW: Can we mark that as Exhibit 2
3   so everybody knows what you're referring to?
4       MR. BATES: Sure.
5       MR. BEASLEY: Do you want to say you
6   recognize it first?
7       THE WITNESS: Yes.  I recognize this as
8   the form of -- the transaction form used by FAMC.
9       (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
10  WAS MARKED AS EXHIBIT NO. 2 TO THE TESTIMONY OF
11  THE WITNESS AND IS HERETO ATTACHED.)
12      BY MR. BATES:
13  Q.   And how would it be possible in your
14  opinion to get extra money out of a transaction?
15  A.   Well, it would be a method of charging
16  the customers additional money to cover that
17  so-called loss.
18  Q.   Charging?  Are you saying charging the
19  customers additional money?
20  A.   Correct.
21  Q.   Are you familiar that the left-hand
22  column of the transaction form has nothing to do
23  with the customer?
24  A.   You'd have to show me the form with such

Page 46

1   an entry on it before I could tell you whether I
2   thought it was a credit or debit.
3   Q.   On the right-hand side of the form is
4   the amount charged to the customer.  Would you
5   agree?
6   A.   I can look at the exhibit and let's see.
7   Not sure that's entirely the case.  I'd have to
8   see a filled-out form.
9   Q.   So you really don't know?
10  A.   Not looking at Exhibit 2, no.
11  Q.   Are you familiar with RJ O'Brien
12  Company?
13  A.   I have learned something about RJ
14  O'Brien Company, yes.
15  Q.   What is your understanding of the
16  relationship?
17  A.   Commodities trading company.
18  Q.   And the account at RJ O'Brien, whose
19  name was it in?
20  A.   Larry Bates d/b/a FAMC, Inc.
21  Q.   So it was an individual account, not a
22  corporate account?
23  A.   It appears to be that way, yes.
24  Q.   Okay.  Any losses or gains on that

Page 47

1   account, who was responsible for the taxes on
2   that?
3   A.   Well, I would assume the individual in
4   whose account the account existed -- in whose
5   name the account existed.
6   Q.   You as receiver, were you aware that I
7   allowed the company to use that account, my
8   personal account?
9   A.   There is a transaction wherein
10  approximately $2.6 million was transferred from
11  FAMC to RJ O'Brien, yes.
12  Q.   In your response to -- the response of
13  the Bates regarding the lien and its pendency,
14  you noted that $2,590,000 were transferred to RJ
15  O'Brien from FAMC.
16  A.   Correct.
17  Q.   And you also note in that response that
18  4,351,500 was wired to LB individual.
19  A.   To who?
20  Q.   To myself from RJ O'Brien.
21  A.   Ultimately, yes.
22  Q.   Why do you lay claim to my assets in
23  your filings?
24  A.   The RJ O'Brien transaction took place in

Page 48

1   this general fashion:  Approximately 2.6 million
2   dollars was transferred from First American
3   Monetary Corporation at a time when it was
4   insolvent to your account at RJ O'Brien.  As a
5   result of that transaction, an additional almost
6   five million dollars in profits were made on the
7   transactions.  That money, those profits, those
8   gains were properly the property of FAMC whose
9   money had been used to generate those profits.
10  Q.   So how do you come to that conclusion?
11  A.   Dr. Bates, you took money out of a
12  company that was insolvent of which you were
13  president, you put it into a brokerage account
14  and generated an enormous return and then,
15  pocketed the return for your own benefit.
16  Q.   So why did FAMC send the money to RJ
17  O'Brien?
18  A.   Because you directed it to do so.
19  Q.   And why was it directed to go to RJ
20  O'Brien?
21  A.   I don't know why you would do that.
22  Q.   So again, would it be a fair conclusion
23  that you don't understand hedging?
24  A.   No.  It would be a fair assessment to

DAMIAN ORLOWSKI vs.
LARRY BATES

JOHN RYDER
June 1, 2015

Page 49

1  say that I understand that you took $2.6 million
2  out of an insolvent company in which you were in
3  control, used it to generate five million dollars
4  in profits and then did not use those profits to
5  offset the unfilled orders and the losses in the
6  company which was insolvent, but rather used them
7  to acquire personal assets.
8  Q.  Back to Exhibit Number 2, the
9  transaction form.  The right-hand side is what
10  the client is charged.  Would you agree?
11  A.  Not today, no.  I've told you not based
12  on Exhibit 2.
13  Q.  Okay.  So you really don't know?
14  A.  No.  I want to see a filled-out
15  transaction form before I answer that question.
16  Q.  Has your auditor audited all of those
17  transaction forms?
18  A.  They've been through a ton of them.
19  Q.  A ton, all or a part or a test or what?
20  A.  You'll have to ask them that question as
21  to the extent of their testing.
22  Q.  On the visit on November 3rd, 2013, did
23  you receive a checkbook to FAMCPM, LLC?
24  A.  I don't recall.

Page 50

1  Q.  And what state is your understanding
2  that FAMCPM, LLC was organized in?
3  A.  Colorado.
4  Q.  Are you sure?
5  A.  No.
6  Q.  For the record, it's Nevada.
7      You testified under question from
8  Mr. Beasley that IRN was owned 50 percent, Larry
9  Bates and 50 percent by Barbara Bates and you did
10  not know the Maddoux situation.  Is that your
11  testimony?
12  A.  I think my testimony was that I was
13  given to understand that the company was owned 50
14  percent by Larry Bates, 50 percent by Barbara
15  Bates, that at some point during the
16  receivership, an attorney for the Maddoux family
17  raised the issue of whether or not the Maddoux
18  family had a claim to ownership.  That claim was
19  abandoned in the course of the litigation.
20  Q.  Do you recall my sitting down with you
21  and explaining to you the IRN ownership
22  situation?
23  A.  I recall that you did so.  I don't
24  recall what we discussed at that time.

Page 51

1  Q.  If you recall -- do you recall my
2  telling you that IRN was owned one-third by Larry
3  Bates, one-third by Barbara Bates and a third by
4  the Maddoux family?
5  A.  No, I specifically recall -- no.  My
6  specific recollection is that you did not mention
7  the third interest of the Maddoux family.
8  Until -- until their lawyer raised that claim, I
9  was unaware that they had an asserted claim.
10  Q.  You don't recall my telling you that the
11  Maddoux stock was encumbered due to loans --
12  A.  Yes.
13  Q.  -- to them?
14  A.  Yes.
15  Q.  You recall that?
16  A.  Yes.
17  Q.  So you now recall that they -- I
18  explained that to you?
19  A.  You explained that whatever stock they
20  had was encumbered by loans.  You did not explain
21  what stock they had and you did not explain what
22  loans they owed.
23  Q.  You say FAMC is still processing IRN
24  transactions?

Page 52

1  A.  Yes.
2  Q.  Is it profitable?
3  A.  On a very -- yes.
4  Q.  You kept one employee, Sherry Barnett.
5  You say she was an executive assistant.  Wasn't
6  her title office manager?
7  A.  It may have been, yes.
8  Q.  Referred to today were two reports of
9  Butler and Rosenberg.  Why was I not sent copies
10  of those reports?
11      MS. MARTIN:  I'm going to interject
12  here.  You were sent copies of those reports,
13  Dr. Bates.  I received notification from your
14  e-mail system over the weekend that the message
15  was rejected because it was full.  We can supply
16  those for you here today.
17      MR. BATES:  I would appreciate that.
18  Thank you.
19      BY MR. BATES:
20  Q.  You refer in the reports of Butler and
21  Rosenberg money distributed to insiders, American
22  Express card for their use, credit card charges.
23  Explain that for the record.
24  A.  There were credit card charges that

Page 53

1 appeared to be for personal use rather than for
2 company benefit.
3 Q. Do you have an example?
4 A. Let's see. I think there was a trip to
5 New York by Robert Bates. There was a trip to
6 the Virgin Islands by Robert Bates. There were
7 some lunches at Holiday Ham.
8 Q. Are you familiar with employees being
9 taken to lunch?
10 A. Yes.
11 Q. And how did you come to that conclusion
12 that they were for personal use?
13 A. Didn't appear that it was a company
14 lunch.
15 Q. And what led you to that conclusion?
16 A. Time, date and place of the lunch.
17 Q. Do you know that Holiday Ham is just
18 right down the road from the offices?
19 A. No. Didn't know that.
20 Q. Now that you know it, would you come to
21 a different conclusion?
22 A. Maybe; maybe not.
23 Q. I noticed in your report of expenses
24 that you were -- investigation of American

Page 54

1 Express petty theft. Explain that.
2 A. I don't recall that.
3 Q. It was in your billing.
4 A. Right. I don't recall that.
5 Q. How much have you billed totally to the
6 receivership?
7 A. It's quite a bit. I don't remember the
8 exact number.
9 Q. You don't know the total? Quite a bit
10 meaning a million? Less than a million?
11 A. Something in the neighborhood of
12 500,000.
13 Q. 500,000. Why would American Express be
14 calling Larry Bates and Barbara Bates, trying to
15 collect individually on those accounts?
16 A. I don't know. I mean, they haven't been
17 paid or some portions of them haven't been paid.
18 Q. So would it not indicate to you as a
19 learned attorney that perhaps the account was a
20 personal account with the company's name on it
21 that allowed them to use that account guaranteed
22 by --
23 A. No. Actually -- actually not. Because
24 I've dealt with this situation before on behalf

Page 55

1 of other clients. And American Express takes the
2 position that even if the account is in a company
3 name, when you sign it individually, you accept
4 individual responsibility for that charge.
5 Q. So it really leaves the purview of the
6 receiver and becomes the responsibility of the
7 individual; is that correct?
8 A. No, I don't think so.
9 Q. And why would that not be?
10 A. Well, I think the claim is still -- the
11 claim by American Express is still against the
12 corporate account. But that doesn't mean that
13 there are not others who may be liable on that
14 account.
15 Q. So how could it be petty theft if a
16 person is guaranteed on the account?
17 A. I'm not sure what that references to.
18 Q. Was your billing not mentioned that
19 investigating petty theft from American Express?
20 Did you not see the billings that go out?
21 A. I suspect that it does say that, yes. I
22 just don't recall what specifically -- what
23 specific transaction or transactions that phrase
24 refers to.

Page 56

1 Q. You testified that you weren't told
2 about the signatory of Cindy Stanley on Verus
3 Bank and Guaranty Bank and Trust.
4 A. No. I was not told that Verus Bank had
5 an account for the receivership entities.
6 Q. The Verus Bank checkbook that you were
7 given on November 3rd, does that not
8 indicate that --
9 A. I don't recall receiving a Verus Bank
10 checkbook on November 3rd.
11 Q. Do you remember the container that you
12 left with?
13 A. I remember leaving with a container.
14 Q. Do you remember what that container
15 looked like?
16 A. No.
17 Q. But you don't remember seeing a
18 checkbook?
19 A. No, I don't.
20 Q. Are you sure that Cindy Stanley was on
21 the account at Verus Bank?
22 A. No.
23 Q. So you really don't know?
24 A. I know she was on Wells Fargo and I know

Page 57

1  she was on Guaranty.  I don't recall whether or
2  not she was on Verus.
3  Q.   And you said that we weren't -- weren't
4  told about accounts at Verus or Guaranty Bank and
5  Trust; is that --
6  A.   No, that's not what I said.  I don't
7  think we were told about Verus.  We were told
8  about Guaranty and Wells Fargo.
9  Q.   So getting the checkbook of Verus would
10  not be telling you about the account?
11  A.   I don't recall receiving the checkbook
12  from Verus.
13  Q.   Who would have that checkbook now?
14  A.   I don't know.
15  Q.   As a receiver, are you aware that
16  Guaranty Bank and Trust Company was where the
17  payroll checks were issued?
18  A.   I believe that to be correct, yes.
19  Q.   And that Cindy Stanley was on that
20  account for the purpose of signing payroll
21  checks?
22  A.   I don't know why she was on the account,
23  but I know that she signed the payroll checks and
24  she handled the payroll out of the Colorado

Page 58

1  office.
2  Q.   You testified that Chuck was senior vice
3  president of IRN.
4  A.   That's what was represented to me.
5  Q.   Did you not see his card that said
6  executive vice president, news director of IRN?
7  A.   I probably did see that card.  I may
8  have -- and I may have -- I may have converted in
9  my own mind executive vice president to senior
10  vice president.  He may have only been an
11  executive vice president.
12  Q.   Are you aware that Robert Bates was
13  senior vice president of IRN?
14  A.   I knew that both of them were vice
15  presidents of IRN.  And the specific modifiers to
16  the term vice president, I'm not certain of.
17  Q.   And you testified that Chuck was in
18  charge of advertising and sales function?
19  A.   Chuck had supervision generally over IRN
20  is -- was what I observed.
21  Q.   Who did you pay commissions to on
22  advertising sales as receiver?
23  A.   Robert Bates.
24  Q.   Are you aware now that Robert was senior

Page 59

1  vice president and he ran the advertising sales?
2  A.   Robert was a vice president and he was
3  in charge of sales and he received commissions
4  for sales.
5  Q.   So you're really not sure?
6  A.   No.  I'm very certain about that, that
7  Robert was a vice president and he was in charge
8  of sales and he received commissions for sales.
9  Q.   You testified that you do not recall if
10  Chuck Bates' claims were paid.
11  A.   Some of his claims were not paid; some
12  of his claims were paid.
13  Q.   You testified that he was, quote,
14  cooperative for the most part, closed quote.
15  A.   That's correct.
16  Q.   What part was he not cooperative in?
17  A.   I'd have to go back and think some more
18  about that.
19  Q.   What about Chuck's -- Chuck Bates' claim
20  for precious metals owed to him?
21  A.   For --
22  Q.   Precious metals owed.
23  A.   I'm not sure I recall that claim.  I
24  don't know -- it doesn't mean he didn't make one.

Page 60

1  I just don't recall it right now.
2  Q.   On the ledgers kept that you say
3  reflects transfer from each member of Bates
4  Family Incorporation, explain that.
5  A.   There were handwritten ledgers that
6  reflected the transactions to and from the
7  insiders.
8  Q.   Did you ever see any ledgers on people
9  who were not, in your definition, insiders?
10  A.   No.
11  Q.   What about on people like Ken Williams?
12  A.   No, I don't -- I don't recall ever
13  seeing one on Ken Williams.
14  Q.   You don't recall seeing a ledger on Ken
15  Williams?
16  A.   Yes.  That's what I said.
17  Q.   Are you aware that Ken Williams owed
18  FAMC in excess of $20,000?
19  A.   I think I am aware that some of the
20  economists and employees had amounts -- and
21  employees at IRN as well had amounts due to
22  receivership entities.  As I sit here today, I
23  couldn't tell you how much was asserted in claims
24  against any of them.

Page 61

1  Q.  Have you collected that money for the
2  receivership entity?
3  **A.  Not yet.**
4  Q.  Do you intend to?
5  **A.  We will collect everything that is due**
6  **the receivership entities to the extent we're**
7  **able to do so.**
8  Q.  Are you aware that people like Ken
9  Williams, Tracy Hightower, any other staff person
10 that had a ledger, that their ledgers looks like
11 exactly like Bates family members'?
12 **A.  No, I couldn't say that.**
13 Q.  So you really don't know?
14 **A.  Really don't know what?**
15 Q.  That they weren't all alike, the same
16 form.
17 **A.  As I sit here today, no, I couldn't say**
18 **that I know that.**
19 Q.  Did Barbara Bates have a ledger?
20 **A.  I believe she did.**
21 Q.  Are you certain that she didn't have a
22 ledger?
23 **A.  No, I'm not.**
24 Q.  Why would she have a ledger?

Page 62

1  **A.  Because there might have been payments**
2  **going in and out that she might have advanced**
3  **money for the company.**
4  Q.  So this would be pure speculation on
5  your part; is that correct?
6  **MS. MARTIN:** Object to the form.
7  **THE WITNESS:** Today, I would have to
8  speculate.  I don't recall specifically.
9  **BY MR. BATES:**
10 Q.  You testified, I can't tell you if Chuck
11 Bates' HSA was paid, but other employees' were
12 paid, closed quote.
13 **A.  Yes.**
14 Q.  Why were other employees being paid and
15 Chuck Bates not being paid?
16 **A.  You know, thinking about it further, I**
17 **believe all the HSA accounts were settled up when**
18 **IRN was sold, I believe.**
19 Q.  Are you aware that HSA accounts in the
20 Bates family are frozen?
21 **A.  No.**
22 Q.  Are you aware that a recent Employee
23 Retirement Income Security Act prohibits that?
24 **A.  No, can't say that I am.**

Page 63

1  Q.  You said that Robert Bates directed
2  checks from FAMC to be made to himself?
3  **A.  That's what I was given to understand,**
4  **yes.**
5  Q.  And who told you that?
6  **A.  And I can't remember which specific**
7  **former employees told me that, but I heard that**
8  **from multiple sources.**
9  Q.  Do you believe that?
10 **A.  Yes, sir.**
11 Q.  And why do you believe that?
12 **A.  It seems to be -- it would seem**
13 **accurate.**
14 Q.  And why would it seem accurate?
15 **A.  Consistent with the way the business was**
16 **being run at that point in time.**
17 Q.  Are you aware that the, quote,
18 handwritten ledgers were not kept by the
19 employees, not compiled by the employees?
20 **A.  My understanding is they were maintained**
21 **by Barbara Bates.**
22 Q.  And how did you arrive at that
23 understanding?
24 **A.  I believe I was told that by employees,**

Page 64

1  and I believe the handwriting matches up with
2  hers.
3  Q.  Would it surprise you to know that those
4  were kept by Cindy Stanley?
5  **A.  It would.**
6  Q.  And that it was a function of payroll?
7  **A.  I can see how some of that would be a**
8  **function of payroll.**
9  Q.  So you as receiver, there are a lot of
10 things you really don't know.  Would that be a
11 fair statement?
12 **A.  There are many things I don't know.**
13 Q.  Okay.  But you billed a half a million
14 dollars.
15 **A.  Yes.**
16 Q.  So has the entity gotten their money's
17 worth?
18 **A.  I believe so.**
19 Q.  Are you holding a piece of personal
20 property that belongs to Larry Bates in the form
21 of a firearm?
22 **A.  No, I don't believe I am.**
23 Q.  Was a firearm not given to you by Steven
24 Graves?

Page 65

1 A.  Yes.
2 Q.  And where is that firearm today?
3 A.  In my office.
4 Q.  You just testified you're not holding
5 it.
6 A.  No.  I testified I was not holding a
7 firearm that is a personal property of Larry
8 Bates.
9 Q.  And how did you come to that conclusion?
10 A.  It is owned by FAMC.
11 Q.  And how did you come to that conclusion?
12 A.  From Mr. Graves and from the records of
13 the company, which indicate the firearm was
14 purchased by FAMC.
15 Q.  And what records show it was purchased
16 by FAMC?
17 A.  I would have to go back and check.  I
18 don't know.
19    MR. BATES: This will be Exhibit 3.
20    (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
21 WAS MARKED AS EXHIBIT NO. 3 FOR IDENTIFICATION TO
22 THE TESTIMONY OF THE WITNESS AND IS HERETO
23 ATTACHED.)
24    MR. BATES: Did Ms. Shaw look at it?

Page 66

1    MS. SHAW: I'll look at it in a minute.
2 It's fine.  Thanks.
3    BY MR. BATES:
4 Q.  Looking at Exhibit 3, what does that
5 say, Mr. Ryder?
6 A.  It is a handwritten note that says FN 57
7 owned by Larry Bates, assigned to Steven Graves,
8 received by, and there's a signature.
9 Q.  And --
10    MR. TOWNLEY: Hang on.  Do you recognize
11 that?
12    THE WITNESS: No.
13    MR. TOWNLEY: I'm going to object to
14 that being marked as an exhibit.  We can mark it
15 for ID if he doesn't recognize it.
16    BY MR. BATES:
17 Q.  Does FAMC own a federal firearms
18 license?
19 A.  Not to my knowledge.
20 Q.  As a learned attorney, are you aware
21 that it is illegal for a corporation to own a
22 firearm without a federal firearm license?
23 A.  No, I can't say that I know that.
24    MR. BATES: Mark this as Exhibit 4.

Page 67

1    (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
2 WAS MARKED AS EXHIBIT NO. 4 TO THE TESTIMONY OF
3 THE WITNESS AND IS HERETO ATTACHED.)
4    BY MR. BATES:
5 Q.  Let the record show that this is a
6 print off from the ATF, Alcohol Tobacco and
7 Firearms web site.  And it refers to 27 CFR
8 478.11 and 478.124(c) of the Federal Firearms
9 Regulations.
10    Mr. Ryder, looking at that exhibit,
11 doesn't it say a purchaser may be identified by
12 any combination of government issued documents
13 which together establish all of the required
14 information, name, residence, address, date of
15 birth and photograph of the holder?
16    What picture would a corporation use?
17 A.  Well, it wouldn't have one.
18    MR. BATES: Let's mark this as the next
19 exhibit.
20    (WHEREUPON, THE ABOVE-MENTIONED DOCUMENT
21 WAS MARKED AS EXHIBIT NO. 5 TO THE TESTIMONY OF
22 THE WITNESS AND IS HERETO ATTACHED.)
23    BY MR. BATES:
24 Q.  Exhibit 5.  Why did ATF amend Form 4473,

Page 68

1 firearms transaction record to include
2 information on race and ethnicity?
3    Mr. Ryder, are you familiar with ATF
4 Form 4473?
5 A.  No, I'm not.
6 Q.  For the record, it's a form that you
7 have to fill out to purchase a firearm.
8    A corporation has to have a federal
9 firearms license.  You still -- with this
10 evidence still maintain that it was purchased by
11 FAMC?
12 A.  I think it was purchased with FAMC
13 funds.
14 Q.  And what evidence do you have of that,
15 sir?
16 A.  That would be in the bank records.
17 Q.  Okay.  Do you know where it was
18 purchased?
19 A.  I don't recall.
20 Q.  Would it surprise you that it was
21 purchased by personal funds of Larry Bates?
22 A.  That would surprise me very much.
23 Q.  Mr. Ryder, how would you respond to a
24 theft claim being filed by Larry Bates on theft

Case 2:11-cv-01396-SHL-cgc   Document 433-1   Filed 07/29/15   Page 19 of 47   PageID
6040

DAMIAN ORLOWSKI vs.
LARRY BATES

JOHN RYDER
June 1, 2015

Page 69

1 of firearm?
2 A. Well, I don't know.
3 Q. Are you willing to give me my property
4 back?
5 A. I'll certainly consider your request.
6 Q. But you're going to hold it in the
7 meantime?
8 A. We'll reach that conclusion, but not in
9 a deposition.
10 MR. BATES: No further questions.
11 MS. SHAW: Y'all want to break for lunch
12 or keep going?
13 (WHEREUPON, THERE WAS A DISCUSSION HELD
14 OFF THE RECORD.)
15 EXAMINATION
16 BY MS. SHAW:
17 Q. Mr. Ryder, I'm Amber Shaw. I represent
18 the plaintiff in this matter.
19 When you were appointed as the receiver
20 in October of 2013, at that time, did you give
21 the Court your background and qualifications?
22 A. Yes.
23 Q. Since that time, has anything changed?
24 A. Well, I'm older.

Page 70

1 Q. Besides being a tiny bit older. I
2 understand that you are not just a receiver for
3 this action, but you've served as the receiver in
4 other actions as well, correct?
5 A. I've got two other receiverships in
6 which I'm active now. One is a Regions
7 Commercial Finance versus Richards Aviation,
8 which is in Chancery Court here in Memphis. And
9 the other is Suntrust Bank versus Avery Outdoors,
10 Inc., which is also in Chancery Court here.
11 Q. So would it be fair to say that you're
12 familiar with evaluating and reconciling the
13 assets of businesses that need to go into
14 receivership?
15 A. I have experience in doing that and also
16 derived from having spent 41 years doing business
17 bankruptcy work.
18 Q. And in reviewing the reports of the
19 accountants, the reports prepared by Mr. Butler
20 and Mr. Rosenberg, are you familiar with
21 reviewing those types of reports in other cases?
22 A. Yes.
23 Q. And have you worked with either of those
24 two accountants in previous cases?

Page 71

1 A. I worked with Mr. Rosenberg in 12 cases
2 prior to this. One was Beale Street Historic
3 District. I was the receiver for the Beale
4 Street Historic District for five years, and
5 Mr. Rosenberg assisted me in that. Previously, I
6 had worked with Mr. Rosenberg in connection with
7 the bankruptcy of BEP Services, Inc.
8 Mr. Butler and -- Mr. Rosenberg is assisting me
9 in the Avery case presently as is Mr. Butler.
10 But I had not worked with Mr. Butler prior to
11 this.
12 Q. And so in the other cases that you've
13 had experience with Mr. Rosenberg, did you find
14 his work to be reliable?
15 A. I did.
16 Q. And accurate?
17 A. Yes.
18 Q. And in the case that you're working on,
19 I think you said the Avery Outdoors case where
20 Mr. Butler's involved, have you also found his
21 work to be reliable?
22 A. Yes. Mr. Butler is an accountant with a
23 local accounting firm that used to be known as
24 Thompson Dunavant and is now part of a national

Page 72

1 network called CBIZ, C-B-I-Z, all caps. And both
2 Thompson Dunavant and CBIZ have an excellent
3 reputation in the accounting field. And I have
4 found Mr. Butler to be very thorough.
5 Q. And so are you relying on the reports of
6 Mr. Rosenberg and Mr. Butler in this case?
7 A. Yes, I am.
8 Q. And what I would like to do maybe at the
9 next break is get a clean copy of the two reports
10 and make them the next two exhibits.
11 Have you reviewed those?
12 A. Yes, I have.
13 (WHEREUPON, THE ABOVE-MENTIONED
14 DOCUMENTS WERE MARKED AS EXHIBIT NOS. 6 AND 7 TO
15 THE TESTIMONY OF THE WITNESS AND ARE HERETO
16 ATTACHED.)
17 BY MS. SHAW:
18 Q. I apologize. I'm probably going to jump
19 around a little bit, but I'll do my best not to.
20 As the receiver in this case, after you
21 were appointed in October of 2013, did you visit
22 the premises of FAMC?
23 A. Yes, I did.
24 Q. Did you find any equipment or company

DAMIAN ORLOWSKI vs.
LARRY BATES

JOHN RYDER
June 1, 2015

---

Page 73

1 property to have been removed from the property?
2 A.  I would have -- I don't recall specific
3 equipment that had been removed.
4 Q.  Was it your understanding from talking
5 with other employees and trying to look into the
6 equipment and property that was there that
7 property had been removed by members of the Bates
8 family?
9 A.  I may have had that understanding at
10 that time, yes.
11 Q.  And do you recall being told by any of
12 the FAMC or IRN employees that computers had been
13 removed from the property?
14 A.  Yes.  Specifically I had been advised
15 that computers had been removed.
16 Q.  And were those computers used in the
17 course of business?
18 A.  Yes, they were.
19 Q.  And were the computers owned by FAMC?
20 A.  I'm not sure about that.
21 Q.  But they were computers that e-mail
22 correspondence with clients would have been
23 transacted on, correct?
24 A.  That is correct.

---

Page 74

1 Q.  Were you also advised that other
2 electronic equipment such as televisions had been
3 removed from the property?
4 A.  I don't recall that.
5 Q.  Do you recall if -- do you recall in the
6 IRN part of the office if there was a room with a
7 lot of electronic equipment for taping and things
8 like that?
9 MR. TOWNLEY: Can we clarify which
10 property we're talking about?  The Memphis
11 property?
12 MS. SHAW: The Memphis property.
13 BY MS. SHAW:
14 Q.  All these questions are directed as to
15 the Memphis property.
16 A.  In the IRN offices, there was what had
17 been initially planned to be a video recording
18 studio, and there was screens and there was video
19 equipment and so on.
20 Q.  And did you find in the course of your
21 investigation records for some generators that
22 were purchased by either FAMC or IRN?
23 A.  Yes, I did.
24 Q.  Were those generators found at either

---

Page 75

1 the Memphis office or the Colorado office?
2 A.  They were not.
3 Q.  Is it your understanding that those
4 generators were removed by members of the Bates
5 family?
6 A.  I don't know if they were ever delivered
7 to the Memphis office, so "removed" may not be
8 the correct word.
9 Q.  Is it your understanding that those
10 generators, as far as you know, are in the
11 custody of members of the Bates family?
12 A.  Yes.
13 Q.  Okay.  You traveled to the Colorado
14 office of FAMC; is that correct?
15 A.  Yes.
16 Q.  And met with Cindy Stanley?
17 A.  Yes, I did.
18 Q.  And was she in possession of the tax
19 records of FAMC?
20 A.  She was in possession of some of the tax
21 records.  No tax returns had been filed for
22 either corporation for a number of years.  And I
23 got various stories about what had happened to
24 the accountant who had prepared the previous tax

---

Page 76

1 returns.
2 Q.  That's Ms. Gross-Prawn; is that correct?
3 A.  I think that's correct, yes.
4 Q.  And when you met with Ms. Stanley, did
5 she tell you if there was any other person in
6 management at the Colorado office in Colorado
7 besides her?
8 A.  There was no other person at the
9 Colorado office --
10 Q.  Okay.
11 A.  -- other than her.
12 Q.  Okay.  And did she tell you --
13 A.  When I say that, I mean, there was no
14 other person in management.  Her daughter served
15 as receptionist in the Colorado office, and there
16 were economists who had been employed by FAMC who
17 reported to the Colorado office but were no
18 longer employed at the time of the receivership.
19 Q.  And when you say "reported to the
20 Colorado office", do you mean to Ms. Stanley?
21 A.  I can't tell exactly what that chain of
22 authority is.  They would check in with
23 Ms. Stanley.  And what her capacity was, I don't
24 know that she had authority to direct them with

---

Page 77

1    regards to sales.
2    Q.   Okay.  And am I correct that Ms. Stanley
3    would receive checks into the Colorado office for
4    the FAMCPM, LLC?
5    A.   That is my understanding, yes.
6    Q.   And then she would be responsible for
7    depositing those checks into the Verus account or
8    another account, correct?
9    A.   That's correct.
10   Q.   And then she had check signing authority
11   on the Guaranty account, correct?
12   A.   Correct.
13   Q.   And then she also had check signing
14   authority on the Wells Fargo account?
15   A.   That's correct.
16   Q.   And there were multiple accounts at
17   Wells Fargo, correct?
18   A.   There were.
19   Q.   There was an account for the sales of
20   books and media, right?
21   A.   That -- I believe that those records
22   were kept separately, yes.
23   Q.   Okay.  But those records were kept by
24   Ms. Stanley, correct?

Page 78

1    A.   That's correct.
2    Q.   And then, is it your understanding based
3    on the depositions that have been taken in this
4    case and all of the investigation and
5    conversations that you've had that Ms. Stanley
6    interacted with the Memphis office on a daily
7    basis?
8    A.   Yes.  She had frequent contact with
9    Dr. Bates or Barbara Bates or other people in the
10   Memphis office.
11   Q.   And am I correct that she's one of three
12   people that would have had the ability to move
13   money within the FAMC or IRN companies either by
14   deposit or withdrawal?
15   A.   Well, she had the authority to sign
16   checks on the Wells Fargo and the Guaranty
17   account.  And she made deposits to all three
18   Colorado accounts.
19   Q.   Okay.
20   A.   I'm not aware that she had any authority
21   over the Memphis accounts.
22   Q.   Okay.  So with the exception of the
23   First Tennessee Bank accounts that were in
24   Memphis, she had the ability to move money within

Page 79

1    those other three accounts, meaning check signing
2    authority so that she could write checks for
3    money to be withdrawn out of the two --
4    A.   That would be true as to Wells Fargo and
5    Guaranty.  I do not know -- as I sit here today,
6    I couldn't tell you about Verus.
7    Q.   And did you see evidence that she had
8    written checks out of the two accounts that she
9    was authorized to do so?
10   A.   Yes.
11   Q.   And were any of those checks to herself?
12   A.   They may have been, yes.
13   Q.   You would not have found that to be
14   unusual, correct?
15   A.   Well, there were -- no.  I wouldn't have
16   found it unusual in a number of respects.  Number
17   1, she was a salaried employee, so she would have
18   signed her own paycheck since she issued the
19   payroll.  Number 2, there are some -- the
20   practice of the company was that there were
21   certain items that were purchased, legitimate
22   expenditures for company purposes for supplies
23   and petty cash and that sort of thing that
24   individuals in the company would have advanced

Page 80

1    and then been reimbursed for.
2    Q.   And Cindy Stanley did that, correct?
3    A.   That's correct.
4    Q.   And she also had a company credit card,
5    correct?
6    A.   That is correct.
7    Q.   And a company vehicle?
8    A.   Yes.
9    Q.   And that company vehicle is still in her
10   possession?
11   A.   So far as I know, yes.
12   Q.   And with the exception of the last few
13   payments that were to be paid by either she or
14   Dr. Bates, was it your understanding that the
15   company had paid the rest of the payments due and
16   owing?
17   A.   That is my understanding, yes.
18   Q.   So the majority of the payments made on
19   that vehicle were made by FAMC, correct?
20   A.   That's correct.
21   Q.   Okay.  Is it your understanding that she
22   also received coins for disbursement or -- well,
23   let me ask this.  Let me rephrase that question.
24       Is it also your understanding that

Case 2:11-cv-01396-SHL-cgc  Document 433-1  Filed 07/29/15  Page 22 of 47  PageID
6043
DAMIAN ORLOWSKI vs.
LARRY BATES
JOHN RYDER
June 1, 2015

Page 81

1 Ms. Stanley would have received coins into the
2 Colorado office periodically?
3 **A. Yes.**
4 Q. And not only that, but she took coins in
5 from customers that were selling coins back to
6 the company?
7 **A. I believe that to be the case, yes.**
8 Q. And there was a small area in the
9 Colorado office that was used to store small
10 amounts of coins, correct?
11 **A. It was a very small safe in the Colorado**
12 **office, yes.**
13 Q. And when you traveled there, that safe
14 was -- was that safe empty or do you remember?
15 **A. There was a very small amount of**
16 **material in the Colorado safe. Very little of it**
17 **were coins or precious metals. The bulk of it**
18 **was silver and jewelry and coils of silver.**
19 Q. Okay.
20 **A. But sort of -- there was some -- I think**
21 **there was some kitchenware. But it was really**
22 **kind of odds and ends of precious metals. It was**
23 **not -- the bulk of it was not the coins that we**
24 **saw in other transactions, the Swiss Francs,**

Page 82

1 **Silver Eagles, Canadian Maple Leafs and that sort**
2 **of thing.**
3 Q. And is it your understanding that
4 Ms. Stanley would have been responsible for
5 generating the customer invoice that went out to
6 all of the customers from the Colorado office?
7 **A. I don't recall.**
8 Q. Okay. And is it your understanding that
9 she was listed as an officer of the FAMC
10 corporation on the incorporation documents?
11 **A. I seem -- I do recall that she was**
12 **listed as an officer. I don't recall what office**
13 **it was.**
14 Q. And then the other two people listed on
15 the incorporation documents for FAMC,
16 Incorporated would have been Larry Bates and
17 Barbara Bates, correct?
18 **A. Yes, that's correct.**
19 Q. And then, the two listed on their IRN
20 incorporation documents are Larry Bates and
21 Barbara Bates, correct?
22 **A. That is my recollection, yes.**
23 Q. And then the only person listed on the
24 LLC documents for FAMCPM is Larry Bates?

Page 83

1 **A. That's correct. That's my recollection,**
2 **yes.**
3 Q. Is it your understanding that FAMCPM,
4 LLC was created for Tennessee residents to place
5 orders with the company and avoid the sales tax
6 payment on those orders?
7 **A. That's correct.**
8 Q. When you undertook to investigate and
9 try to collect the records that existed at the
10 FAMC Memphis office, did you find there to be
11 records missing?
12 **A. Yes.**
13 Q. Did that include customer records?
14 **A. Yes.**
15 Q. Did that include credit card records?
16 **A. Yes.**
17 Q. Did that include bank records?
18 **A. Yes.**
19 Q. As a result of that, did you have to
20 undertake to re-create many of the records?
21 **A. Yes.**
22 Q. And would it be fair to say that a
23 substantial portion of the bill that you've
24 submitted so far deals with having to re-create

Page 84

1 the business of the company since those records
2 were missing?
3 **A. That was certainly a large element.**
4 Q. Okay. And do you have -- from your
5 interviews and investigation with other
6 employees, do you know who took those records
7 from the office?
8 **A. No.**
9 Q. Okay. Do you know who had access to
10 those records?
11 **A. Yes.**
12 Q. Who?
13 **A. Well, there were only six people who**
14 **were allowed into the executive suite. And the**
15 **way the office was set up, a person would come**
16 **into the reception area and to the right were the**
17 **IRN offices and then to the left and back were**
18 **the FAMC offices. And the first hallway was**
19 **where Chuck Bates' office was. And then, you**
20 **went down the hallway and there were offices for**
21 **the various economists. And then, Robert Bates'**
22 **office was at the end of the hall.**
23 **Then there was a separate executive**
24 **suite, and that had a separate lock and code that**

Page 85

1   you had to use to get in.  The only people
2   allowed in the executive suites were Larry Bates,
3   Barbara Bates, Chuck Bates, Robert Bates, Kenzie
4   Brown Bates and Sherry Barnett.
5   Q.   Okay.  And so were the documents that --
6   the categories of documents that I just asked you
7   about that were missing, would they have been
8   located within the executive suite?
9   A.   Yes.
10  Q.   So one of those six people -- or more
11  than one -- among those six people, they would
12  have been the people with access to those
13  records?
14  A.   If the records were ever received in the
15  executive office, then those would be the only
16  people who would have had access to the records.
17  Q.   Okay.  So those would have been the only
18  people that could have removed them from the
19  premises in theory?
20  A.   Under the procedure in that office, yes.
21  Q.   Okay.  And then, the records that were
22  sent to Colorado, the only person that would have
23  been responsible for those records would have
24  been Cindy Stanley, correct?

Page 86

1   A.   That's correct.
2   Q.   So any bank statements or customer
3   records that would have been shipped there would
4   have been within her possession and control?
5   A.   That's correct.  Anything we needed from
6   the Colorado office, we had to go through Cindy
7   to get.
8   Q.   Okay.  And were there also documents
9   missing from the Colorado office?
10  A.   I believe there were.
11  Q.   Okay.  Is it your understanding that
12  Kenzie Brown Bates, Robert Bates, Chuck Bates or
13  Barbara Bates or Larry Bates would take company
14  materials to the residence of Barbara Bates and
15  Larry Bates from time to time?
16  A.   Yes.
17  Q.   And did that include customer checks?
18  A.   I can't tell you exactly what they took
19  at what time to the personal residence.  But I do
20  know that when I met with Dr. Bates at the
21  personal residence, there were some limited
22  amount of company records on the premises.
23  Q.   Okay.  And speaking of your visit to the
24  Bates farm in November, were you allowed to go to

Page 87

1   any part of the property?
2   A.   Well, no.  But the parts of the property
3   that I was allowed to go to is Dr. Bates showed
4   me the barn.  There are actually two barns, and I
5   examined both of those.  And there is an office
6   in one of the two barns.  And I was offered an
7   opportunity to look through that office.  And
8   then, he had a personal office in the front part
9   of the house, and I met with him in that personal
10  office in the house.  I did not look at any other
11  part of the property other than those, the two
12  barns, the office in the barn and the office in
13  the house.
14  Q.   Okay.  And so the records that were
15  provided to you by Dr. Bates would have been
16  given to you by him at that point?
17  A.   That is correct.  I did not make -- I
18  did not independently go through his desk.
19  Q.   Or inspect any other part of the
20  property for any company property or records?
21  A.   That's correct.
22  Q.   So there may be records out there that
23  you did not have access to, correct?
24  A.   I don't know one way or the other.

Page 88

1   Q.   Okay.  Exhibit -- I'm going to pass you
2   Exhibit 1 marked for ID, Exhibit 2 and Exhibit 3.
3   I know you told us that you had not seen
4   Exhibit 1 or Exhibit 3 before; is that correct?
5   A.   No.  I said I don't recall seeing
6   Exhibit 1.  I may have seen it, but I don't
7   recall seeing Exhibit 1 before.
8   Q.   Okay.  So you don't independently recall
9   that specific document?
10  A.   That's correct.
11  Q.   Okay.
12  A.   Exhibit 2, I'm familiar with.  I said I
13  was familiar with the transaction form, and I
14  have seen that.
15      Exhibit 3, I have never seen before and
16  I have no knowledge of when and how it was
17  created.
18  Q.   Okay.  Would that suggest to you that
19  Dr. Bates is still in possession of some company
20  material at this time?
21  A.   Well, that's certainly one possible
22  conclusion.
23  Q.   Okay.
24      MR. BEASLEY: That's speculation anyway.

Page 89

1  Good speculation anyway.
2      BY MS. SHAW:
3  Q.  I want to ask you about some things that
4  Mr. Beasley talked with you about during the
5  questioning that he asked.
6      He asked you if there were any documents
7  that existed for various different things.  Do
8  you recall that line of questions?
9  A.  Yes, I do.
10 Q.  Okay.  All of them dealt with the
11 premise that there were no documents that existed
12 that reflected that either Chuck Bates or Robert
13 Bates were management or had any control over the
14 company?
15 A.  Well, let's distinguish "management" and
16 "control" and "officer status".  Those are all
17 very different things.
18 Q.  Okay.  I want to talk about each of
19 those things.
20 A.  Okay.
21 Q.  Is it your understanding that Dr. Bates
22 was absent from the company for a long, extended
23 period of time?
24 A.  Yes.  It's my understanding that

Page 90

1  Dr. Bates began experiencing some -- experiencing
2  some health issues in 2011 and again in 2012.  I
3  think there was a hip surgery and there was a
4  heart surgery, and I can't remember which one
5  came first.  But that left him out of the office
6  for substantial periods of time during that
7  two-year period.
8  Q.  Okay.  And who would have been
9  responsible for the running and the day-to-day
10 operations of the company in his absence?
11 A.  Well, as near as I could tell from my
12 interviews with the FAMC employees is management
13 of FAMC really devolved on Chuck and to a lesser
14 extent, Bob.
15 Q.  And I'm going to ask the same question
16 as to IRN.
17 A.  Well, they're much more -- clearly and
18 obviously, Chuck was very much in charge and to a
19 lesser extent, Bob.
20 Q.  And in fact, as far as IRN was
21 concerned even after you took over as receiver,
22 Charles Bates and Robert Bates had control of the
23 employees, correct?
24 A.  And we've called them Charles and Robert

Page 91

1  and Chuck and Bob.  I mean, when -- I knew them
2  as Chuck and Bob, so.
3  Q.  Okay.  So we're talking about the same
4  people when we're talking about Chuck and Bob and
5  Robert and Charles?
6  A.  Right.
7  Q.  Is it my -- is it correct that after you
8  were appointed as the receiver that Chuck and Bob
9  attempted to fire an IRN employee?
10 A.  Yes.
11 Q.  And was it your understanding that
12 before you were appointed as the receiver, they
13 had the ability to fire employees if they so
14 wished?
15 A.  Yes.
16 Q.  Okay.  And that was an employee of IRN,
17 correct?
18 A.  That's correct.
19 Q.  As to FMAC, you've testified that the
20 management in the absence of Larry Bates fell
21 mainly to Chuck and to a lesser extent, Bob.
22 Would that have been true with control of the
23 company as well?
24 A.  I don't know that I could say that.

Page 92

1  Q.  Okay.  But you can say that as to the
2  management of the company, correct?
3  A.  Well, I'm not sure I understand how
4  you're using the term "management".
5  Q.  Let me define it more clearly.  As far
6  as the day-to-day operations, answering the
7  phone, talking to customers, representing to
8  customers when orders would be filled, taking
9  client orders, calculating commissions,
10 reprimanding or hiring of employees, making sure
11 that employees' commissions were paid,
12 communicating with Dr. Bates, e-mailing or
13 transacting business as far as receiving coins,
14 for instance, or signing for coins that would be
15 received at the company, is it your understanding
16 that Chuck and to a lesser extent, Bob,
17 participated in all of those actions?
18 A.  Would have participated, but would not
19 have necessarily controlled some aspects of that.
20 Q.  Okay.
21 A.  My understanding was that the receipt
22 and delivery of precious metals, the control of
23 those decisions rested with Dr. Larry Bates.
24 Q.  So would it be fair to say that as far

Page 93

1  as ordering or placing orders of the coins, that
2  rested solely with Dr. Larry Bates?
3  **A.  That is my understanding.**
4  Q.  Okay.  But if those coins had been
5  delivered, for instance, to the Memphis office
6  and Dr. Larry Bates was absent, did you see
7  evidence in the file that Chuck Bates had signed
8  for delivery?
9  **A.  Yes.**
10 Q.  And did you see evidence that Robert
11 Bates had signed for delivery?
12 **A.  I think so.**
13 Q.  And so to the extent that they had the
14 authority to do that, even though it's not
15 reflected in the documents, it's reflected in
16 their actions, correct?
17 **A.  That would be correct.  And let me add**
18 **one detail, is that within the executive suite,**
19 **there was a separate locked room, which had a**
20 **different code which was the shipping room, and**
21 **that's where metals were prepared for shipment**
22 **out.  Shipping materials were in there and there**
23 **were two large safes.  And Bob and Chuck were the**
24 **ones who had access to the code to get into the**

Page 94

1  **shipping room and they had the combinations to**
2  **the safes.**
3  Q.  And is it correct that Bob Bates also
4  kept some guns in there as well, some personal
5  property?
6  **A.  I don't recall seeing any guns in the**
7  **FAMC office.**
8  Q.  Okay.
9  **A.  There may have been some -- well, no.  I**
10 **take that back.  There was a shotgun.**
11 Q.  And that was represented to you to
12 belong to Bob Bates, correct?
13 **A.  No, I don't recall that.**
14 Q.  Okay.  But there would have been a
15 shotgun back there, but the only people with
16 access to the shipping room would have been Larry
17 Bates, Barbara Bates, Chuck Bates and Robert
18 Bates; is that correct?
19 **A.  Sherry Barnett went in and out of that**
20 **office, but I don't recall that she -- I don't**
21 **think she had the combinations to the safes.  And**
22 **I can't recall whether she had the combination to**
23 **the shipping room.**
24 Q.  Okay.  Are there any other persons other

Page 95

1  than a member of the Bates family that have made
2  claims for loans to the company, to your
3  recollection?
4  **A.  We have -- I don't recall.  We have,**
5  **obviously, a large number of plaintiffs who claim**
6  **that they ordered -- placed orders with FAMC and**
7  **those orders were not filled.  Then we have a**
8  **certain limited amount of trade creditors, just**
9  **the kinds of expenses incurred in the ordinary**
10 **course of business.**
11 Q.  Well, let me rephrase my question.  Is
12 there any other consultant other than Robert
13 Bates or Chuck Bates with FAMC that has turned in
14 a claim to you stating that they loaned money to
15 the company?
16 **A.  I actually -- I simply don't recall.**
17 Q.  Okay.  You testified that after you took
18 over as receiver that you left Bob and Chuck
19 Bates employed by FAMC and IRN; is that correct?
20 **A.  They both continued to work for IRN**
21 **until early December.  And I can't remember how**
22 **we left their status with FAMC.  But at that**
23 **point in time, FAMC was not conducting any**
24 **further metal sales, not taking orders, so there**

Page 96

1  **would have been no activity for them to do other**
2  **than to help assemble records.**
3  Q.  And in early December, did you terminate
4  Chuck Bates?
5  **A.  Yes.**
6  Q.  Why?
7  **A.  There were -- I think we had some**
8  **disagreements over how IRN should be managed.**
9  Q.  Okay.  And in early December, did you
10 terminate Bob Bates?
11 **A.  Yes.**
12 Q.  Why?
13 **A.  Same answer.**
14 Q.  Okay.  I noted that Mr. Beasley asked
15 you if Chuck Bates was cooperative.  I did not
16 hear him ask that question with regard to Bob
17 Bates.
18     Did you find Robert Bates to be
19 cooperative?
20 **A.  He -- Bob Bates was not as cooperative**
21 **as Chuck.**
22 Q.  Okay.  When he was terminated from the
23 company, did he maintain a professional attitude
24 at that time?

Page 97

1  A.  No.  He became quite angry.
2  Q.  Okay.  Do you recall any specifics
3  around -- about that encounter?
4  A.  Well, yeah.  I mean, he -- he was very
5  angry and he made a very angry statement.
6  Q.  What was that statement?
7  A.  He said, in an earlier time, I would
8  have taken you out and whipped your ass.
9  Q.  Did he make any other statements to that
10  line?
11  A.  No.  I don't recall that.  Then he
12  marched down the hall and slammed his door rather
13  violently.
14  Q.  Okay.  Did Chuck Bates have a company
15  credit card?
16  A.  I don't recall.
17  Q.  If it's reflected in the report of
18  Mr. Butler that he did, would you have any reason
19  to disagree with that?
20  A.  No.  That's -- that was one of
21  Mr. Butler's duties to look at those things.
22  Q.  And in fact, he identified company
23  credit cards for Larry Bates, Robert Bates, Chuck
24  Bates -- give me just a second to find his

Page 98

1  chart -- and Barbara Bates --
2     MS. MARTIN: I think it is the last one,
3  Amber.
4     MS. SHAW: Thank you.
5     BY MS. SHAW:
6  Q.  -- Kenzie Bates and Cindy Stanley
7  reflected in Exhibit H.
8  A.  That sounds correct.
9  Q.  Okay.  And Mr. Butler also reported that
10  there were personal expenses that were charged on
11  those cards; is that correct?
12  A.  Yes.
13  Q.  Okay.  I understand that Mr. Butler also
14  reported that there were legal fees -- personal
15  legal fees paid out of company funds.  Were those
16  for Mr. Robert Bates?  Do you recall?
17  A.  Yes. Yes.
18  Q.  Okay.  And am I correct that there was a
19  check written directly from FAMC to -- well, let
20  me rephrase that question.
21     Am I correct that there was a check
22  written out of an FAMC account specifically for
23  the use of charges brought against Mr. Robert
24  Bates in Arizona?

Page 99

1  A.  There appears to be a check written out
2  of the FAMC account for, I believe, it's $250,000
3  to post bond in a county in Arizona.
4  Q.  Was that related to criminal charges
5  against Robert Bates?
6  A.  Yes.
7  Q.  Did you find any evidence that that
8  money was repaid to the company?
9  A.  I believe it was.
10  Q.  Okay.  And am I correct that FAMC was
11  responsible for the payment of the rent of Robert
12  Bates for 197 Ivy Lane in Memphis, Tennessee?
13  A.  It was an interesting relationship
14  between Mr. Robert Bates' housing and FAMC.  FAMC
15  at one time paid rent and then at another time
16  paid what appears to be the mortgage note for
17  property occupied by Mr. Bates.
18  Q.  Mr. Robert Bates?
19  A.  Robert Bates, yeah.  Sorry.  We have
20  many, many Bates.
21  Q.  Have you had an opportunity to interact
22  with any of the customers of FAMC that have made
23  claims as part of a class?
24  A.  I have not -- well, yes, I've had a

Page 100

1  number of phone conversations with -- with
2  customers.
3  Q.  Okay.  During those conversations, did
4  you receive information that Charles Bates or
5  Robert Bates made representations on behalf of
6  the company as to the status of orders?
7  A.  I don't specifically recall
8  conversations dealing with that subject.
9  Q.  Okay.  Is it your understanding from
10  either conversations you've had or conversations
11  that members of your staff have had that Charles
12  Bates or Robert Bates when they interacted with
13  customers would make representations about the
14  status of orders?
15  A.  Yes.
16  Q.  And if I can give you an example that
17  they would -- is it true that they would give
18  advice about what types of metals to purchase and
19  the quantities of those types of metals?
20  A.  There was a period of time when it
21  appeared to be the policy of FAMC to encourage
22  people to convert their silver holdings into
23  gold.
24  Q.  And did you find evidence that Robert

Page 101

1   Bates and Charles Bates, among others, had given
2   advice to that degree?
3   **A.  Yes.**
4   Q.   Okay.  And then, did you also receive
5   information that Charles Bates or Robert Bates
6   would have made representations about when the
7   orders would be filled?
8   **A.  I think there are some e-mails -- I seem**
9   **to recall some e-mails that dealt with that.**
10  Q.   Okay.  And in addition to some e-mails,
11  did you also understand that they would routinely
12  tell customers that they could expect their coins
13  to be delivered within, for example, 90 days or
14  six months or when somebody would call to
15  complain, that they would find out for them what
16  the status was and call them back?
17  **A.  They did make statements in an effort to**
18  **keep hope alive.**
19  Q.   Is it your understanding that Chuck
20  Bates also calculated the commissions for all of
21  the consultants?
22  **A.  I don't know whether he did it for all**
23  **of them and I don't know to the extent to which**
24  **he may have been directed by Mr. Larry Bates in**

Page 102

1   **calculating those commissions.  But yes, he did**
2   **mark up commissions often.**
3   Q.   So you're not sure if he came up --
4   well, let me rephrase it.
5       If Dr. Larry Bates told him how -- what
6   percentage of commission that a consultant was to
7   receive off of an order, is it your understanding
8   he would calculate that up and send that over to
9   Cindy Stanley to be paid?
10  **A.  Yes.**
11  Q.   And am I correct that you testified that
12  the FAMC had made deductions for health savings
13  account from the payroll, but that that money had
14  not been deposited into the accounts of the
15  employees at the time that you took over as
16  receiver?
17  **A.  That is correct.**
18  Q.   Do you know where that money had gone?
19  **A.  Been used in operations of the company.**
20  Q.   Okay.  And am I correct that payroll
21  taxes had not been paid for either FAMC or IRN --
22  **A.  That is correct.**
23  Q.   -- at the time you took over?
24      And although you testified that there

Page 103

1   are no, quote, documents that reflect the
2   authority of either Robert Bates or Chuck Bates
3   to act in any management capacity, do you have
4   testimony or evidence that reflects that they
5   did?
6   **A.  Well, to the extent that we've already**
7   **addressed that when we discussed management and**
8   **direction and control, yes.  Particularly in the**
9   **period when Dr. Bates was going through his**
10  **health issues, it appeared that Bob and Chuck**
11  **exercised a good deal of authority.  And to**
12  **the -- I don't know the extent to which they were**
13  **being directly guided by Dr. Bates or were acting**
14  **independently.**
15  Q.   Is it your understanding that Robert
16  Bates accepted checks from FAMC or wrote out
17  checks to himself signed by either Barbara Bates
18  or Larry Bates by from FAMC?
19  **A.  Yes.**
20  Q.   And he converted those monies to
21  personal use?
22  **A.  No.  My testimony is that it is my**
23  **understanding that he caused checks to be made**
24  **out to himself.**

Page 104

1   Q.   Okay.
2   **A.  And that they were signed by Barbara**
3   **Bates or Larry Bates.**
4   Q.   And let me ask it a different way.  Do
5   you recall if they were deposited into an account
6   that was owned by him individually?
7   **A.  Yes.**
8   Q.   Okay.  Is it your understanding that
9   Chuck Bates continued to sell coins to customers
10  despite knowing that the orders were not being
11  filled timely?
12      **MR. TOWNLEY:** Run that question by me
13  again.
14      **MS. SHAW:** Can you read it back?
15      (WHEREUPON, THE REQUESTED PORTION WAS
16  READ BY THE COURT REPORTER.)
17      **THE WITNESS:** It would be my
18  understanding that Chuck Bates continued to
19  accept orders at a time when he knew or should
20  have known that orders were routinely not being
21  filled.
22      **BY MS. SHAW:**
23  Q.   Okay.  And is that also your
24  understanding as to Robert Bates?

Page 105

1  A.  Yes.
2  Q.  Is that also your understanding as to
3  Larry Bates?
4  A.  Yes.
5  Q.  Dr. Bates asked you several questions
6  about hedging.
7  A.  Yes.
8  Q.  From your investigation, did the hedging
9  fees added to the transaction form for a customer
10  order appear to be legitimate fees to be added?
11  A.  I couldn't say that they did.
12  Q.  Is it your understanding that company
13  credit cards were used by Larry Bates for
14  personal transactions?
15  A.  Yes.
16  Q.  Is it your understanding that company
17  credit cards were used by Robert Bates for
18  personal transactions?
19  A.  Yes.
20  Q.  Is it your understanding that company
21  cards were used by Charles Bates for personal
22  transactions?
23  A.  Yes.
24  Q.  Same question as to Kenzie Bates?

Page 106

1  A.  Yes.
2  Q.  And Barbara Bates?
3  A.  Yes, but much more limited.
4  Q.  Okay.  And then Cindy Stanley?
5  A.  Yes.  But also very limited.
6  Q.  And when you say "limited", do you mean
7  to a lesser extent?
8  A.  To a lesser extent.
9  Q.  Are you aware of any other employee at
10  FAMC other than Robert Bates that was allowed to
11  use the company's credit cards at the Ritz
12  Carlton Hotel in New York for a personal trip?
13  A.  No, I am not.
14  Q.  What about any other employee other than
15  Robert Bates that was allowed to use the company
16  credit card for a trip to Saint Thomas in the
17  Virgin Islands for he and his spouse, Candy
18  Bates?
19  A.  I'm not aware of any other employee who
20  got that benefit.
21  Q.  Okay.  Was there any other employee that
22  received the benefit of the company paying for
23  his divorce attorney other than Robert Bates?
24  A.  No.

Page 107

1  Q.  In your experience as serving as the
2  receiver for different types of businesses where
3  different corporate documents exist and then in
4  some instances where they don't exist, did you
5  find FAMC to be more of a family run business as
6  opposed to a very formal corporate office
7  environment?
8  A.  Those are extremely vague terms.
9  Q.  Okay.  Let me see if I can ask that
10  question a little bit differently.  The way that
11  FMAC was run, let me ask you a question about
12  that.  Were there a set of formal corporate
13  documents that governed everyone's position?
14  A.  Yeah.  No.  It was extremely loose.
15  Q.  Okay.  So would it have been unusual in
16  the loose atmosphere of FAMC for there to have
17  been a document that existed that defined the
18  parameters of Chuck Bates' authority?
19  A.  No.  Given the way FAMC and IRN
20  operated, I would not expect to find a document
21  clearly defining the scope of authority of either
22  Chuck or Bob or Larry or Barbara or any other --
23  or Cindy.
24  Q.  Okay.  And I've heard you refer to

Page 108

1  "insiders" several times.  Do you define
2  "insiders" to include Cindy Stanley?
3  A.  Yes.  Because she had authority in the
4  Colorado office.
5  Q.  Do you define "insiders" to includes
6  Chuck Bates?
7  A.  Yes.
8  Q.  Robert Bates?
9  A.  Yes.
10  Q.  Barbara Bates?
11  A.  Yes.
12  Q.  Kenzie Brown Bates?
13  A.  Yes.
14  Q.  And Larry Bates?
15  A.  Yes.
16  Q.  Dr. Bates asked you some questions about
17  the firearm given to you by Steven Graves.
18  A.  Yes.
19  Q.  Is it your understanding that those
20  firearms were purchased for use by FAMC
21  employees?
22  A.  They were.
23  Q.  Is it your recollection that Ms. Stanley
24  was listed as the vice president of FAMC?

Page 109

1 A. That's my recollection.

2 Q. Okay. Not the LLC, but FAMC, Inc.?

3 A. Yes.

4 Q. Okay.

5 A. On some of the original corporate

6 documents.

7 Q. Okay. And is it your understanding that

8 she -- she, along with Barbara Bates, managed the

9 books for FAMC, Inc.?

10 A. For the most part, yes.

11 Q. And that she and -- Cindy Stanley

12 and Barbara Bates managed the books for IRN; is

13 that correct?

14 A. Yes.

15 Q. And that Cindy Stanley, Barbara Bates

16 and Larry Bates managed the books for FAMCPM,

17 LLC?

18 A. Yes.

19 Q. Okay. In your investigation, did you

20 find evidence that Larry Bates had converted

21 company funds to accounts owned by him

22 individually?

23 A. In the course of my investigation, it

24 appears that money came from FAMC, which

Page 110

1 ultimately found its way into Dr. Bates' personal

2 accounts, yes.

3 Q. And can I ask you the same question as

4 to Barbara Bates?

5 A. To -- I'm not sure that I've -- we've

6 got any tracing that traces it to her except to

7 the extent that they had joint accounts.

8 Q. Okay. What about with regard to Chuck

9 Bates?

10 A. Yes.

11 Q. With regard to Bob Bates?

12 A. Yes.

13 Q. With regard to Cindy Stanley?

14 A. I don't recall.

15 Q. Okay. With regard to Kenzie Bates?

16 A. I don't recall.

17 Q. Okay. Would it be true if she and Bob

18 had joint accounts together?

19 A. Yes.

20 Q. Okay. Do you recall finding any

21 documentation about the purchase of a diamond

22 ring for Kenzie Bates with company money during

23 your investigation?

24 A. I recall having that discussion and

Page 111

1 perhaps seeing those records, but I don't recall

2 the details of the transaction.

3 Q. Is it your understanding that -- I

4 realize that earlier I asked you about the

5 interaction of Robert Bates and Chuck Bates with

6 regard to customers and representations that were

7 made. Would those questions also be true as to

8 Larry Bates?

9 A. As to who?

10 Q. Larry Bates.

11 A. Yes.

12 Q. Okay. And then do you recall the

13 testimony of Ms. Cindy Stanley where she

14 testified that she had also represented to

15 customers as to the status of orders or

16 interacted with customers?

17 A. Yes.

18 Q. And then, do you recall any -- during

19 the course of your investigation, do you recall

20 receiving any information that Kenzie Brown Bates

21 also interacted with customers?

22 A. Yes. She tended to be the one who

23 fielded the complaints that came into the FAMC

24 office.

Page 112

1 Q. And based on your conversations of the

2 conversations of your staff, is it your

3 understanding that Kenzie Bates also made

4 representations about the status of orders to

5 customers?

6 A. Yes.

7 Q. And I understand that although the

8 preliminary report in November reflected that

9 there was about a 26 million-dollar deficit

10 between orders placed and orders filled that the

11 revised deficit is about 18-and-a-half million;

12 is that correct?

13 A. That's correct.

14 Q. Dr. Bates asked you some questions about

15 the RJ O'Brien account. Do you recall those

16 questions?

17 A. Yes.

18 Q. I see on Page 6 of Mr. Butler's report

19 that he states, the company used the funds that

20 should have been used to fulfill customer orders

21 to pay operating expenses for benefit of IRN

22 provided advance to Larry Bates for commodities

23 trading upon which he earned a significant

24 profit, open paren, see removed party transaction

Case 2:11-cv-01396-SHL-cgc  Document 433-1  Filed 07/29/15  Page 30 of 47  PageID
6051
DAMIAN ORLOWSKI vs.
LARRY BATES
JOHN RYDER
June 1, 2015

Page 113

1    section of this report, closed paren, and to pay
2    operating expenses of the company, which include
3    expenses that were potentially nonbusiness
4    related and unearned commissions.
5        Do you agree with that statement based
6    on your investigation?
7  A.  Yes.
8  Q.  Is it your understanding that according
9    to Page 8 of Mr. Butler's report that Larry Bates
10   had the company advance him $2,652,000 to be used
11   for commodities trading with brokerage firms RJ
12   O'Brien and Associates, LLC and ADM Investors,
13   Inc.?  is that consistent with what you found?
14 A.  Yes.
15 Q.  There's also a statement from Mr. Butler
16   that says, Mr. Bates principally used the
17   proceeds from RJ O'Brien and ADM Investors for
18   the benefit of himself and his family.
19       Do you agree with that statement?
20 A.  Yes.
21 Q.  He purchased automobiles, which included
22   a new Ford F150, Chevy Traverse and Chevrolet
23   Suburban and loaned $265,769 to members of his
24   family.

Page 114

1        Do you agree with that statement?
2  A.  All the details are in there and I --
3  Q.  Agree with all of them?
4  A.  Yes.
5      MS. SHAW: Those are all the questions I
6    have.
7      THE WITNESS: Very good.
8      MR. BATES: I have one more question.
9      EXAMINATION
10     BY MR. BATES:
11 Q.  Ms. Shaw mentioned 18.5 million and
12   earlier you testified it was 16 million.  Which
13   is it?
14 A.  No, no, no.  Earlier -- the initial
15   reports to the Court based on our initial
16   investigation were that there was 26 million
17   dollars in unfilled orders.  As you will find out
18   when you talk to Mr. Butler and Mr. Rosenberg,
19   when they went back and tested that and had
20   access to more records and more time to review
21   everything, it appears that the amount -- total
22   amount of unfilled orders is approximately  18
23   million dollars.
24 Q.  So what was the 16 million you testified

Page 115

1    to earlier today?
2  A.  I don't recall testifying to 16 million.
3    I mean, it's 18 million is what's in the report.
4    And earlier, there was -- we had reported 26
5    million dollars.  We've refined that based on our
6    investigation down to 18 million.
7  Q.  So the 26 million narrative that was
8    reported to the Court is not correct?
9  A.  No.  It's an 18-million-dollar
10   narrative.
11 Q.  18.5 million?
12 A.  That's correct.
13 Q.  But you testified earlier 16 million,
14   so --
15 A.  I don't recall -- Dr. Bates, I do not
16   recall testifying to 16 million.  If I said 16
17   million, I meant to rely on the 18.5 million
18   dollars in the report.
19 Q.  If we have records --
20 A.  If I said 16 million, I misspoke myself.
21   It's 18.5.
22 Q.  Do you have records of where myself and
23   Barbara Bates have loaned the company money?
24 A.  Only -- only the handwritten ledgers

Page 116

1    that reflect that.
2  Q.  And what about the wire --
3  A.  There are no notes -- there are no
4    promissory notes.  There are no corporate
5    documents authorizing such a transaction.
6  Q.  What about the wire transfers in from
7    personal accounts to the company?
8  A.  I think we have some of those, too.
9  Q.  But is that reflected in the report?
10 A.  Yes.
11     MR. BATES: No further questions.
12     EXAMINATION
13     BY MR. TOWNLEY:
14 Q.  I have a couple of follow-ups.  I want
15   to make these exhibits because I now have copies,
16   thanks be to God.
17       I'm going to show you this document
18   which purports to be the report of Mark F.
19   Rosenberg.
20 A.  Yes.
21 Q.  Take a look at that and let me know if
22   you recognize that.
23 A.  Yes, I do.
24     MR. TOWNLEY: If we can mark that as the

Case 2:11-cv-01396-SHL-cgc   Document 433-1   Filed 07/29/15   Page 31 of 47   PageID
6052
DAMIAN ORLOWSKI vs.
LARRY BATES
JOHN RYDER
June 1, 2015

Page 117

1    next exhibit.
2        BY MR. TOWNLEY:
3    Q.   And I'm also going to show you a copy of
4    what purports to be report of findings related
5    exhibits of Rhett Butler CPA and ask you if you
6    recognize that --
7    A.   Yes.
8    Q.   -- to be the report of Mr. Butler you
9    described in your earlier testimony?
10       MR. TOWNLEY: If we could have that
11   marked as the next numbered exhibit.
12       THE COURT REPORTER: She's already
13   marked them.
14       BY MR. TOWNLEY:
15   Q.   I just have a couple of follow-up
16   questions.  It will only take a minute.
17       With respect to the handwritten ledgers
18   which you described as showing -- is it insider
19   transactions?  Is that how you described that?
20   A.   Yeah.  Those are the only handwritten
21   ledgers I've looked at.
22   Q.   Where were those found?
23   A.   My recollection is they came out of
24   Barbara Bates' office, but they may have come

Page 118

1    from another source.
2    Q.   And would those insider transactions,
3    would those be the same as the loans that are
4    reflected in Mr. Butler's report?
5    A.   I have to take a look at that.
6    Q.   Please do.  Review whatever you need to.
7    A.   I think Mr. Butler reviewed those
8    handwritten ledgers and then examined the other
9    documents.  But you'll have to ask him as
10   specifically what he examined and how he compared
11   it to the two.
12   Q.   So your recollection -- your own
13   recollection -- you've looked at the handwritten
14   ledgers?
15   A.   That's correct.
16   Q.   And your own recollection of those
17   handwritten ledgers, would that be consistent
18   with the loans that he described in his report?
19   A.   The loans he described in his report
20   would be -- would match up with the ledgers to
21   some extent.  There may be some variance because
22   there may be other transactions that he's
23   included.
24   Q.   Okay.  And in any of those handwritten

Page 119

1    ledgers, did those indicate any --
2    A.   And excuse me.  And there may be
3    transactions in handwritten ledgers, which were
4    excluded because the ultimate documentation
5    didn't match.
6    Q.   Okay.  I understand.  In the handwritten
7    ledgers that you reviewed or that you saw, was
8    there any indication of loans or other
9    transactions from the company to Cindy Stanley
10   in those ledgers to your recollection?
11   A.   I don't recall any loan transactions
12   with Cindy Stanley.
13   Q.   Okay.  Were there any transactions in
14   the handwritten ledgers, the insider ledgers that
15   indicated any type of transactions from the
16   company to Cindy Stanley, to your recollection?
17   A.   I don't recall seeing any, no.
18   Q.   All right.  And with respect to the
19   credit card purchases which are described as
20   personal transaction, was there a criteria to
21   determine what type of transactions would be
22   categorized as personal transactions from the
23   credit card statements?
24       MR. TOWNLEY: I don't remember what I

Page 120

1    said.  Can you read back what I said?
2        (WHEREUPON, THE REQUESTED PORTION WAS
3    READ BY THE COURT REPORTER.)
4        THE WITNESS: Those criteria would have
5    been established by Mr. Butler.
6        BY MR. TOWNLEY:
7    Q.   Okay.  Was that with your input?
8    A.   No.
9    Q.   Okay.  Do you know what type of criteria
10   he used?
11   A.   We've had brief discussions, but no.
12   Q.   Okay.  So the types of transactions that
13   were described in the report would seem to
14   meals, travel, I think there was a divorce
15   attorney, things of that nature?
16   A.   Yeah.  There are some that are pretty
17   clearly personal.  I mean, things like an
18   excursion to New York and theater tickets in New
19   York, travel to Saint Thomas, payment for a
20   divorce attorney, those are pretty clearly
21   personal expenditures.  Meals, some are
22   personal -- some would appear to be personal;
23   some there may be an argument about.
24   Q.   Clothing and shoes would be personal?

Case 2:11-cv-01396-SHL-cgc   Document 433-1   Filed 07/29/15   Page 32 of 47   PageID
6053

DAMIAN ORLOWSKI vs.                                                      JOHN RYDER
LARRY BATES                                                              June 1, 2015

Page 121

1  A.  Those would be personal.

2  Q.  Okay.  Do you have any present

3  recollection of the type of transactions

4  applicable to Ms. Stanley --

5  A.  No.

6  Q.  -- that were categorized as personal?

7  A.  No, I do not.

8  Q.  You don't know if any of those were

9  travel, shoes, divorce attorneys?

10  A.  I don't believe any of them relate t

11  divorce attorneys.

12  Q.  Okay.  All right.

13      MR. TOWNLEY: And I believe that's all I

14  have.

15      MS. MARTIN: The witness is going to

16  read and sign.

17      (WHEREUPON, THE DEPOSITION WAS CONCLUDED

18      AT 1:25 P.M.)

19      (SIGNATURE IS NOT WAIVED.)

20

21

22

23

24

Page 122

1                C E R T I F I C A T E

2  STATE OF TENNESSEE    )
                         )
3  COUNTY OF SHELBY      )

4          I, Valerie Hall Gilliam, LCR #456,
5  Licensed Court Reporter, in and for the State of
   Tennessee, do hereby certify that the above
6  deposition was reported by me, and the transcript
   is a true and accurate record to the best of my
7  knowledge, skills, and ability.

8          I further certify that I am not related
   to nor an employee of counsel or any of the
9  parties to the action, nor am I in any way
   financially interested in the outcome of this
10 case.

11         I further certify that I am duly licensed
   by the Tennessee Board of Court Reporting as a
12 Licensed Court Reporter as evidenced by the LCR
   number and expiration date following my name
13 below.

14         I further certify that this transcript is
   the work product of this court reporting agency
15 and any unauthorized reproduction and/or transfer
   of it will be in violation of Tennessee Code
16 Annotated 39-14-104, Theft of Services.

17

18                     Valerie Hall Gilliam, LCR 456
                       Expiration Date June 30, 2016
19                     ALPHA REPORTING CORPORATION
                       236 Adams Avenue
20                     Memphis, Tennessee 38103

21

22

23

24

Page 123

1       ERRATA SHEET FOR THE TRANSCRIPT OF:

2  Deponent: JOHN RYDER
   Case Name: ORLOWSKI VS. BATES
3  Case Number: 2:11-cv-01396
   Job Date: June 1, 2015
4  Place: Memphis, Tennessee

5                   CORRECTIONS

6  Page Line   Should Read        Reasons Therefore

7  ____ ____   _____      _____

8  ____ ____   _____      _____

9  ____ ____   _____      _____

10 ____ ____   _____      _____

11 ____ ____   _____      _____

12 ____ ____   _____      _____

13 ____ ____   _____      _____

14 ____ ____   _____      _____

15 ____ ____   _____      _____

16 ____ ____   _____      _____

17 ____ ____   _____      _____

18 ____ ____   _____      _____

19 ____ ____   _____      _____

20 ____ ____   _____      _____

21 ____ ____   _____      _____

22                            _____
                               Signature of Deponent
23 _____
        (Date)
24

Case 2:11-cv-01396-SHL-cgc   Document 433-1   Filed 07/29/15   Page 33 of 47   PageID
6054

DAMIAN ORLOWSKI vs.
LARRY BATES

JOHN RYDER
June 1, 2015

**$**

**$2,590,000 (1)**
47:14
**$2,652,000 (1)**
113:10
**$2.6 (2)**
47:10;49:1
**$20,000 (1)**
60:18
**$250,000 (1)**
99:2
**$265,769 (1)**
113:23

**A**

**abandoned (1)**
50:19
**ability (3)**
78:12,24;91:13
**able (2)**
32:4;61:7
**ABOVE-MENTIONED (6)**
40:4;45:9;65:20;67:1,20;
72:13
**absence (2)**
90:10;91:20
**absent (2)**
89:22;93:6
**abundance (1)**
35:17
**accept (3)**
9:20;55:3;104:19
**accepted (1)**
103:16
**access (8)**
42:12;84:9;85:12,16;87:23;
93:24;94:16;114:20
**according (1)**
113:8
**account (38)**
17:22;19:21;29:21;34:18;
46:18,21,22;47:1,4,4,5,7,8;
48:4,13;54:19,20,21;55:2,12,
14,16;56:5,21;57:10,20,22;
77:7,8,11,14,19;78:17;98:22;
99:2;102:13;104:5;112:15
**accountant (6)**
28:23;29:1;35:8;38:2;
71:22;75:24
**accountants (2)**
70:19,24
**accountant's (1)**
28:4
**accounting (2)**
71:23;72:3
**accounts (31)**
15:23;16:4,5,14,17,19,22,
24;17:4;19:5,12,18;20:7,10;
30:2;54:15;57:4;62:17,19;
77:16;78:18,21,23;79:1,8;

102:14;109:21;110:2,7,18;
116:7
**accuracy (1)**
28:19
**accurate (3)**
63:13,14;71:16
**acquire (2)**
44:4;49:7
**act (5)**
20:16;41:14,15;62:23;
103:3
**acting (1)**
103:13
**action (1)**
70:3
**actions (3)**
70:4;92:17;93:16
**active (1)**
70:6
**activity (3)**
12:17;25:8;96:1
**actually (5)**
33:10;54:23,23;87:4;95:16
**add (2)**
41:17;93:17
**added (2)**
105:9,10
**addition (2)**
21:14;101:10
**additional (3)**
45:16,19;48:5
**address (1)**
67:14
**addressed (1)**
103:7
**ADM (2)**
113:12,17
**advance (2)**
112:22;113:10
**advanced (2)**
62:2;79:24
**advertising (7)**
21:9,11,21;22:1;58:18,22;
59:1
**advice (2)**
100:18;101:2
**advised (2)**
73:14;74:1
**again (6)**
16:6;34:3,15;48:22;90:2;
104:13
**against (5)**
44:6;55:11;60:24;98:23;
99:5
**ago (1)**
19:4
**agree (6)**
46:5;49:10;113:5,19;114:1,
3
**ahead (1)**
42:16
**Alcohol (1)**
67:6

**alike (1)**
61:15
**alive (1)**
101:18
**alleged (1)**
24:21
**allowed (8)**
47:7;54:21;84:14;85:2;
86:24;87:3;106:10,15
**almost (1)**
48:5
**along (1)**
109:8
**although (4)**
8:4;21:11;102:24;112:7
**Amber (2)**
69:17;98:3
**amend (1)**
67:24
**American (7)**
48:2;52:21;53:24;54:13;
55:1,11,19
**among (1)**
85:11;101:1
**amount (7)**
13:23;46:4;81:15;86:22;
95:8;114:21,22
**amounts (4)**
36:23;60:20,21;81:10
**anchor (1)**
22:6
**and/or (1)**
13:9
**angry (3)**
97:1,5,5
**apologize (1)**
72:18
**appear (5)**
8:15;29:18;53:13;105:10;
120:22
**appeared (3)**
53:1;100:21;103:10
**appears (6)**
29:14;46:23;99:1,16;
109:24;114:21
**applicable (1)**
121:4
**applied (1)**
12:23
**appointed (10)**
6:6;8:23;9:19;10:24;13:17;
25:18;69:19;72:21;91:8,12
**appointing (1)**
6:17
**appointment (2)**
9:12,17
**appreciate (1)**
52:17
**approve (1)**
22:7
**approximately (4)**
36:22;47:10;48:1;114:22
**area (3)**

26:17;81:8;84:16
**areas (2)**
22:24;26:18
**argument (1)**
120:23
**arising (1)**
25:4
**Arizona (1)**
98:24;99:3
**around (2)**
72:19;97:3
**arrive (1)**
63:22
**aspect (1)**
13:23
**aspects (1)**
92:19
**ass (1)**
97:8
**assemble (1)**
96:2
**assert (1)**
8:15
**asserted (4)**
8:4,12;51:9;60:23
**assessment (1)**
48:24
**assets (6)**
6:22,24;8:19;9:5,7;47:22;
49:7;70:13
**assigned (1)**
66:7
**assistant (2)**
10:10;52:5
**assisted (1)**
71:5
**assisting (1)**
71:8
**Associates (1)**
113:12
**assume (2)**
7:13;47:3
**ATF (3)**
67:6,24;68:3
**atmosphere (1)**
107:16
**ATTACHED (6)**
40:7;45:11;65:23;67:3,22;
72:16
**attempted (1)**
91:9
**attitude (1)**
96:23
**attorney (11)**
5:20;41:11,12,14,19;50:16;
54:19;66:20;106:23;120:15,
20
**attorneys (5)**
41:13,16;43:14;121:9,11
**audited (1)**
49:16
**auditor (1)**
49:16

**authorities (1)**
36:2
**authority (40)**
16:22,23;19:13,16,20;20:5,
6,16;21:23;22:9,23;26:6,10;
27:6,9,11,16,22;31:14;32:14,
22;33:1,22;34:4,6,9;35:23;
76:22,24;77:10,14;78:15,20;
79:2;93:14;103:2,11;107:18,
21;108:3
**authorized (1)**
79:9
**authorizing (1)**
116:5
**automobiles (1)**
113:21
**available (1)**
6:24
**Avery (3)**
70:9;71:9,19
**Aviation (1)**
70:7
**avoid (1)**
83:5
**aware (15)**
12:3;47:6;57:15;58:12,24;
60:17;19;61:8;62:19,22;
63:17;66:20;78:20;106:9,19

**B**

**back (16)**
11:16;18:6;30:16;39:13;
49:8;59:17;65:17;69:4;81:5;
84:17;94:10,15;101:16;
104:14;114:19;120:1
**background (1)**
69:21
**bank (22)**
15:23;16:2,9,10;17:3;19:4,
5,21;43:3;56:3,3,4,6,9,21;
57:4,16;68:16;70:9;78:23;
83:17;86:2
**bankruptcy (2)**
70:17;71:7
**Barbara (31)**
7:24;8:3;12:9;16:18;29:10,
16;50:9,14;51:3;54:14;61:19;
63:21;78:9;82:17,21;85:3;
86:13,14;94:17;98:1;103:17;
104:2;106:2;107:22;108:10;
109:8,12,15;110:4;115:23;
117:24
**barn (2)**
87:4,12
**Barnett (4)**
10:8;52:4;85:4;94:19
**barns (3)**
87:4,6,12
**based (7)**
31:8;49:11;78:2;112:1;
113:5;114:15;115:5
**basis (1)**

78:7
**Bates (260)**
6:3;7:18,24,24;8:3,3;10:17,
17,17;12:9,10,10,10,11;15:1,
3,7;16:18,18;19:1,1,13,15,20,
20;20:15;21:1,2,3;23:16,19;
24:4,7,20;25:4,10,16,22;
26:13,23;27:2,19;28:1,15;
29:10,11,12,15,16,20;30:10,
21;31:1,7,8,9;32:9;33:5,13,19,
21;34:1,13,14;35:4,13,15,19,
19;36:24;37:1;38:10,12,24;
39:5;40:10;41:18;42:2,9,19;
43:1;44:7;45:4,12;46:20;
47:13;48:11;50:9,9,14,15;
51:3,3;52:13,17,19;53:5,6;
54:14,14;58:12,23;60:3;
61:11,19;62:9,15,20;63:1,21;
64:20;65:8,19,24;66:3,7,16,
24;67:4,18,23;68:21,24;
69:10;73:7;75:4,11;78:9,9;
80:14;82:16,17,20,21,24;85:2,
3,3,3,4;86:12,12,12,13,13,14,
15,20,24;87:3,15;88:19;
89:12,13,21;90:1,22,22;
91:20;92:12,23;93:2,6,7,11;
94:3,12,17,17,17,18;95:1,13,
13,19;96:4,10,15,17,18,20;
97:14,23,23,24;98:1,6,16,24;
99:5,12,17,18,19,20;100:4,5,
12,12;101:1,1,5,5,20,24;
102:5;103:2,2,9,13,16,17,18;
104:3,3,9,18,24;105:3,5,13,
17,21,24;106:2,10,15,18,23;
108:6,8,10,12,14,16;109:8,12,
15,16,20;110:4,9,11,15,22;
111:5,5,8,10,20;112:3,14,22;
113:9,16;114:8,10;115:15,23;
116:11
**Bates' (11)**
29:18;34:17;59:10,19;
62:11;84:19,21;99:14;107:18;
110:1;117:24
**Beale (2)**
71:2,3
**bear (1)**
17:24
**BEASLEY (13)**
18:18,23,24;20:3,20;25:15;
36:7;38:8;45:5;50:8;88:24;
89:4;96:14
**became (1)**
97:1
**becomes (1)**
55:6
**began (1)**
90:1
**beginning (1)**
10:6
**behalf (2)**
54:24;100:5
**belong (1)**
94:12

**belongs (1)**
64:20
**benefit (7)**
12:2;48:15;53:2;106:20,22;
112:21;113:18
**BEP (1)**
71:7
**Besides (1)**
70:1;76:7
**best (1)**
72:19
**beyond (1)**
17:23
**bill (1)**
83:23
**billed (2)**
54:5;64:13
**billing (2)**
54:3;55:18
**billings (1)**
55:20
**bind (1)**
21:20
**birth (1)**
67:15
**bit (6)**
7:4;54:7,9;70:1;72:19;
107:10
**board (2)**
23:2,6
**Bob (7)**
90:14,19;91:1,2,4,8,21;
92:16;93:23;94:3,12;95:18;
96:10,16,20;103:10;107:22;
110:11,17
**bond (1)**
99:3
**books (4)**
77:20;109:9,12,16
**bore (1)**
17:20
**both (8)**
10:16;35:21;38:5;39:19;
58:14;72:1;87:5;95:20
**break (3)**
18:19;69:11;72:9
**brief (1)**
120:11
**briefly (1)**
6:13
**brokerage (2)**
48:13;113:11
**brought (1)**
98:23
**Brown (7)**
10:17;12:10;41:18;85:4;
86:12;108:12;111:20
**bulk (2)**
81:17,23
**business (7)**
63:15;70:16;73:17;84:1;
92:13;95:10;107:5
**businesses (2)**

70:13;107:2
**Butler (25)**
11:18;12:6,24;13:5,9;36:9,
11;52:9,20;70:19;71:8,9,10,
22;72:4,6;97:18;98:9,13;
113:15;114:18;117:5,8;118:7;
120:5
**Butler's (6)**
18:10;71:20;97:21;112:18;
113:9;118:4
**buy (1)**
33:1

**C**

**calculate (1)**
102:8
**calculated (1)**
101:20
**calculating (2)**
92:9;102:1
**call (2)**
101:14,16
**called (3)**
5:2;72:1;90:24
**calling (1)**
54:14
**calls (1)**
42:6
**came (7)**
11:5;8;90:5;102:3;109:24;
111:23;117:23
**Can (19)**
16:6;20:18;22:24;31:23;
37:21;42:23;45:2;46:6;52:15;
64:7;66:14;74:9;92:1;100:16;
104:14;107:9;110:3;116:24;
120:1
**Canadian (1)**
82:1
**Candy (1)**
106:17
**capacity (5)**
21:17;23:7;41:9;76:23;
103:3
**caps (1)**
72:1
**car (5)**
14:16,17;15:6,11,16
**card (15)**
12:8;13:2;18:5;25:12;
52:22,22,24;58:5,7;80:4;
83:15;97:15;106:16;119:19,
23
**cards (6)**
97:23;98:11;105:13,17,21;
106:11
**care (3)**
15:2,4;30:1
**Carl (1)**
40:17
**Carlton (1)**
106:12

**carry (1)**
39:12
**case (12)**
6:2,5;7:1;34:17;46:7;71:9,
18,19;72:6,20;78:4;81:7
**cases (4)**
70:21,24;71:1,12
**cash (1)**
79:23
**categories (1)**
85:6
**categorized (2)**
119:22;121:6
**caused (1)**
103:23
**caution (1)**
35:17
**CBIZ (2)**
72:1,2
**C-B-I-Z (1)**
72:1
**certain (6)**
25:12;58:16;59:6;61:21;
79:21;95:8
**certainly (4)**
18:8;69:5;84:3;88:21
**CFR (1)**
67:7
**chain (1)**
76:21
**Chancery (2)**
70:8,10
**changed (1)**
69:23
**charge (6)**
6:19;55:4;58:18;59:3,7;
90:18
**charged (3)**
46:4;49:10;98:10
**charges (11)**
12:8,22,22;13:1,3;18:9,12;
52:22,24;98:23;99:4
**charging (3)**
45:15,18,18
**Charles (35)**
12:10;19:12,19;20:15,24;
21:2,3;23:5,18;24:3,7;25:4,
16,21;26:13,23;27:1,19;28:1;
29:18,20;30:10;33:24;34:16;
35:19;36:24;38:5;90:22,24;
91:5;100:4,11;101:1,5;105:21
**chart (1)**
98:1
**check (11)**
19:24;20:3;41:4;65:17;
76:22;77:10,13;79:1;98:19,
21;99:1
**checkbook (7)**
49:23;56:6,10,18;57:9,11,
13
**checks (28)**
17:2;21:18;26:23;27:1;
31:10,11,12,13,15,20,20,24;

32:4,18;57:17,21,23;63:2;
77:3;7;78:16;79:2,8,11;86:17;
103:16,17,23
**Chevrolet (1)**
113:22
**Chevy (1)**
113:22
**Chuck (41)**
10:17;19:1;58:2,17,19;
59:10,19;62:10,15;84:19;
85:3;86:12;89:12;90:13,18;
91:1,2,4,8,21;92:16;93:7,23;
94:17;95:13,18;96:4,15,21;
97:14,23;101:19;103:2,10;
104:9,18;107:18,22;108:6;
110:8;111:5
**Chuck's (1)**
59:19
**Cindy (24)**
10:18;12:11;13:12;14:12;
56:2,20;57:19;64:4;75:16;
80:2;85:24;86:6;98:6;102:9;
106:4;107:23;108:2;109:11,
15;110:13;111:13;119:9,12,
16
**claim (23)**
8:6,10,15;24:8,11,16,19;
29:20;31:24;34:17,20;47:22;
50:18,18;51:8,9;55:10,11;
59:19,23;68:24;95:5,14
**claimed (1)**
8:13
**claims (10)**
24:18;25:4,5,8;59:10,11,12;
60:23;95:2;99:23
**clarify (3)**
20:18;25:3;74:9
**class (1)**
99:23
**clean (1)**
72:9
**clear (1)**
23:8
**clearly (5)**
90:17;92:5;107:21;120:17,
20
**client (2)**
49:10;92:9
**clients (3)**
8:13;55:1;73:22
**closed (3)**
59:14;62:12;113:1
**Clothing (1)**
120:24
**code (3)**
84:24;93:20,24
**coils (1)**
81:18
**coins (14)**
39:21;80:22;81:1,4,5,10,17,
23;92:13,14;93:1,4;101:12;
104:9
**collect (3)**

54:15;61:5;83:9
**collected (1)**
61:1
**Collins (1)**
16:10
**Colorado (26)**
7:19;15:22;16:14;17:8;
19:5;50:3;57:24;75:1,13;76:6,
6,9,15,17,20;77:3;78:18;81:2,
9,11,16;82:6;85:22;86:6,9;
108:4
**column (2)**
44:16;45:22
**combination (1)**
67:12;94:22
**combinations (2)**
94:1,21
**Commercial (1)**
70:7
**commission (6)**
36:12;37:5,14;38:13,15;
102:6
**commissions (14)**
25:7;34:24;36:11;37:1;
38:22;58:21;59:3,8;92:9,11;
101:20;102:1,2;113:4
**Commodities (3)**
46:17;112:22;113:11
**communicating (1)**
92:12
**companies (6)**
11:5;13:11;22:14;25:23;
31:4;78:13
**company (78)**
6:23;8:5;12:1;14:16,17;
15:11,19;17:6;20:16,17,19,
23;21:20;24:9,13,21,23;30:5;
37:11,21;46:12,14,17;47:7;
48:12;49:2,6;50:13;53:2,13;
55:2;57:16;62:3;65:13;72:24;
79:20,22,24;80:4,7,9,15;81:6;
83:5;84:1;86:13,22;87:20;
88:19;89:14,22;90:10;91:23;
92:2,15;95:2,15;96:23;97:14,
22;98:15;99:8;100:6;102:19;
105:12,16,20;106:15,22;
109:21;110:22;112:19;113:2,
10;115:23;116:7;119:9,16
**company's (2)**
54:20;106:11
**compared (1)**
118:10
**compiled (3)**
36:14;38:1;63:19
**complain (1)**
101:15
**complaints (2)**
27:20;111:23
**computers (5)**
73:12,15,16,19,21
**conceptually (2)**
36:18,20
**concerned (1)**

90:21
**CONCLUDED (1)**
121:17
**conclusion (12)**
43:8,10,11;48:10,22;53:11,
15,21;65:9,11;69:8;88:22
**conduct (1)**
11:10
**conducting (1)**
95:23
**confident (1)**
24:19
**confirms (1)**
6:18
**connection (2)**
25:11;71:6
**consent (1)**
14:20
**consider (1)**
69:5
**Consistent (3)**
63:15;113:13;118:17
**consultant (2)**
95:12;102:6
**consultants (2)**
38:15;101:21
**contact (1)**
78:8
**contained (1)**
13:8
**container (3)**
56:11,13,14
**contending (1)**
23:9
**content (3)**
21:15,24;26:19
**contents (2)**
11:20;28:16
**continue (3)**
9:1,14;13:23
**CONTINUED (1)**
18:22;95:20;104:9,18
**continuing (1)**
13:20
**contractor (1)**
14:11
**control (14)**
22:1,12,14,16;31:4,6;49:3;
86:4;89:13,16;90:22;91:22;
92:22;103:8
**controlled (2)**
22:5;92:19
**conversations (8)**
78:5;100:1,3,8,10,10;112:1,
2
**convert (1)**
100:22
**converted (3)**
58:8;103:20;109:20
**conveyed (1)**
11:24
**cooperate (2)**
39:5,6

**cooperative (8)**
14:7;25:17;39:10;59:14,16;
96:15,19,20
**copies (3)**
52:9,12;116:15
**copy (4)**
12:6;40:11;72:9;117:3
**corporate (13)**
26:14;27:21;32:14,24;34:3;
39:4;46:22;55:12;107:3,6,12;
109:5;116:4
**corporation (15)**
23:10,14;24:5;28:6,16;
29:22;34:19,21;35:20;48:3;
66:21;67:16;68:8;75:22;
82:10
**corporations (16)**
20:1;22:11;25:21;26:8,22;
27:4;28:2;29:7,8;30:23;32:10,
19;35:11,12,13,16
**correspondence (1)**
73:22
**county (1)**
99:3
**couple (3)**
15:5;116:14;117:15
**course (9)**
11:15;20:13;21:13;50:19;
73:17;74:20;95:10;109:23;
111:19
**Court (11)**
6:6;8:15;25:18;69:21;70:8,
10;104:16;114:15;115:8;
117:12;120:3
**cover (1)**
45:16
**CPA (4)**
11:12,13;12:7;117:5
**created (2)**
83:4;88:17
**credit (17)**
12:8;13:2;18:5;25:12;46:2;
52:22,24;80:4;83:15;97:15,
23;105:13,17;106:11,16;
119:19,23
**creditors (1)**
95:8
**criminal (1)**
99:4
**criteria (3)**
119:20;120:4,9
**Cross (1)**
9:9
**custody (1)**
75:11
**customer (10)**
27:16;34:7;45:23;46:4;
82:5;83:13;86:2,17;105:9;
112:20
**customers (18)**
27:19;36:23;45:16,19;81:5;
82:6;92:7,8;99:22;100:2,13;
101:12;104:9;111:6,15,16,21;

112:5

# D

**d/b/a (1)**
46:20
**daily (1)**
78:6
**Dallas (1)**
8:4
**date (4)**
9:12;40:22;53:16;67:14
**daughter (1)**
76:14
**day (4)**
39:11;41:1,21;42:8
**days (1)**
101:13
**day-to-day (2)**
90:9;92:6
**deal (2)**
36:20;103:11
**dealing (3)**
26:21;27:19;100:8
**deals (1)**
83:24
**dealt (4)**
37:14;54:24;89:10;101:9
**debit (1)**
46:2
**December (5)**
13:24;14:2;95:21;96:3,9
**decide (2)**
27:16;34:6
**decision (2)**
30:14;34:9
**decisions (4)**
26:14;32:15;34:10;92:23
**decline (1)**
42:15
**deductions (2)**
30:6;102:12
**defendant (1)**
41:18
**deficit (2)**
112:9,11
**define (6)**
36:11;43:24;44:19;92:5;
108:1,5
**defined (1)**
107:17
**defining (1)**
107:21
**definition (2)**
37:15;60:9
**degree (1)**
101:2
**delay (1)**
34:2
**delineated (2)**
35:23;36:2
**delineating (1)**
43:17

**delivered (4)**
36:24;75:6;93:5;101:13
**delivery (4)**
37:16;92:22;93:8,11
**deposit (1)**
78:14
**deposited (2)**
102:14;104:5
**depositing (1)**
77:7
**deposition (4)**
5:22;18:22;69:9;121:17
**depositions (1)**
78:3
**deposits (3)**
17:1,21;78:17
**derived (1)**
70:16
**describe (1)**
6:4
**described (12)**
13:1;22:16;23:21;25:24;
35:14;117:9,18,19;118:18,19;
119:19;120:13
**describing (1)**
36:19
**desk (1)**
87:18
**despite (1)**
104:10
**detail (3)**
6:17;36:16;93:18
**details (3)**
14:23;111:2;114:2
**determine (9)**
6:23;27:11,22;29:7;32:5;
33:10,22;35:11;119:21
**determined (1)**
43:6
**devolved (1)**
90:13
**diamond (1)**
110:21
**different (10)**
7:16;39:20,21;53:21;89:7,
17;93:20;104:4;107:2,3
**differently (1)**
107:10
**direct (4)**
21:11;22:12,14;76:24
**directed (6)**
31:10;48:18,19;63:1;74:14;
101:24
**direction (2)**
41:15;103:8
**directly (3)**
9:21;98:19;103:13
**director (9)**
21:8;23:10,14,19;24:5;
30:22;31:1,7;58:6
**directors (1)**
23:3
**disagree (1)**

97:19
**disagreements (1)**
96:8
**disbursement (1)**
80:22
**discovered (2)**
15:24;16:3
**discussed (3)**
13:20;26:18;50:24;103:7
**DISCUSSION (4)**
5:10;36:5;69:13;110:24
**discussions (1)**
120:11
**distinct (1)**
25:9
**distinguish (1)**
89:15
**distribute (1)**
8:21
**distributed (2)**
12:1;52:21
**distribution (1)**
6:24
**District (2)**
71:3,4
**diverted (1)**
13:12
**divorce (5)**
106:23;120:14,20;121:9,11
**document (27)**
26:3,6,9,12;27:3,8,10,13,15,
21;28:11;32:24;34:3,6;35:18,
24;36:1;40:4,15;45:9;65:20;
67:1,20;88:9;107:17,20;
116:17
**documentation (3)**
34:8;110:21;119:4
**documents (27)**
20:14;25:20;30:20;31:3,6;
32:8,13,21;33:20;67:12;
72:14;82:10,15,20,24;85:5,6;
86:8;89:6,11;93:15;103:1;
107:3,13;109:6;116:5;118:9
**dollars (10)**
36:22;37:12;48:2,6;49:3;
64:14;114:17,23;115:5,18
**done (5)**
7:3,4;11:12;20:9,11
**door (1)**
97:12
**down (5)**
50:20;53:18;84:20;97:12;
115:6
**Dr (39)**
7:17,24;8:2,3;15:1,3,7;
16:18;23:16;29:10,12,15;
33:4,13,19;34:12,14;48:11;
52:13;78:9;80:14;86:20;87:3,
15;88:19;89:21;90:1;92:12,
23;93:2,6;102:5;103:9,13;
105:5;108:16;110:1;112:14;
115:15
**draw (1)**

16:24
**due (7)**
24:8,21;36:23;51:11;60:21;
61:5;80:15
**duly (1)**
5:2
**Dunavant (2)**
71:24;72:2
**during (7)**
35:1;50:15;89:4;90:6;
100:3;110:22;111:18
**duties (3)**
6:14;11:16;97:21

**E**

**Eagles (2)**
40:13;82:1
**earlier (10)**
17:9;18:4;97:7;111:4;
114:12,14;115:1,4,13;117:9
**early (3)**
95:21;96:3,9
**earned (4)**
36:15;37:5,14;112:23
**economists (5)**
38:14,22;60:20;76:16;
84:21
**effort (1)**
101:17
**either (16)**
24:8,11;26:10;28:1;70:23;
74:22,24;75:22;78:13;80:13;
89:12;100:10;102:21;103:2,
17;107:21
**electronic (2)**
74:2,7
**element (1)**
84:3
**else (5)**
16:16;31:17;33:8,17;43:15
**e-mail (2)**
52:14;73:21
**e-mailing (1)**
92:12
**e-mails (6)**
26:16;27:18;34:1;101:8,9,
10
**employed (4)**
5:18;76:16,18;95:19
**employee (10)**
10:11;52:4;62:22;79:17;
91:9,16;106:9,14,19,21
**employees (23)**
10:3,15;30:2,4,8;31:22;
53:8;60:20,21;62:14;63:7,19,
19,24;73:5,12;84:6;90:12,23;
91:13;92:10;102:15;108:21
**employees' (2)**
62:11;92:11
**empty (1)**
81:14
**encompass (2)**

17:18;21:6
**encounter (1)**
97:3
**encourage (1)**
100:21
**encumbered (2)**
51:11,20
**end (4)**
13:22,24;14:11;84:22
**endeavor (1)**
14:8
**ends (1)**
81:22
**enormous (1)**
48:14
**entire (1)**
10:11
**entirely (1)**
46:7
**entities (11)**
6:20;7:5,14;9:1;10:4;13:12;
19:22;31:2;56:5;60:22;61:6
**entity (3)**
7:11;61:2;64:16
**entry (1)**
46:1
**environment (1)**
107:7
**equipment (6)**
72:24;73:3,6;74:2,7,19
**equity (1)**
8:21
**essentially (2)**
9:23;21:5
**establish (1)**
67:13
**established (2)**
32:17;120:5
**ethnicity (1)**
68:2
**evaluating (1)**
70:12
**even (3)**
55:2;90:21;93:14
**event (1)**
9:11
**everybody (2)**
10:14;45:3
**everyone's (1)**
107:13
**evidence (10)**
43:9;68:10,14;79:7;93:7,
10;99:7;100:24;103:4;109:20
**exact (1)**
54:8
**exactly (3)**
61:11;76:21;86:18
**EXAMINATION (8)**
5:4;11:11;29:5;35:9;38:9;
69:15;114:9;116:12
**examine (2)**
6:23;39:3
**examined (7)**

15:21;28:24;29:3;32:4;
87:5;118:8,10
**example (4)**
12:5;53:3;100:16;101:13
**excellent (1)**
72:2
**Except (2)**
32:11;110:6
**exception (2)**
78:22;80:12
**excess (1)**
60:18
**excluded (1)**
119:4
**excursion (1)**
120:18
**excuse (1)**
119:2
**executed (1)**
33:4
**executive (12)**
10:9,10;52:5;58:6,9,11;
84:14,23;85:2,8,15;93:18
**exercised (1)**
103:11
**exercising (1)**
11:15
**Exhibit (34)**
12:11;37:19;40:3,5;45:2,
10;46:6,10;49:8,12;65:19,21;
66:4,14,24;67:2,10,19,21,24;
72:14;88:1,2,2,2,4,4,6,7,12,
15;98:7;117:1,11
**exhibits (4)**
36:9;72:10;116:15;117:5
**exist (2)**
107:3,4
**existed (8)**
11:9;26:1;47:4,5;83:9;89:7,
11;107:17
**expect (2)**
101:12;107:20
**expenditures (2)**
79:22;120:21
**expenses (10)**
12:8;25:10;37:20,20;53:23;
95:9;98:10;112:21;113:2,3
**experience (3)**
70:15;71:13;107:1
**experiencing (2)**
90:1,1
**expert (2)**
11:12,14
**explain (5)**
51:20,21;52:23;54:1;60:4
**explained (2)**
51:18,19
**explaining (1)**
50:21
**Express (6)**
52:22;54:1,13;55:1,11,19
**extended (1)**
89:22

**extent (22)**
9:4;10:18,20;12:24;25:6;
29:4;32:11;37:12;49:21;61:6;
90:14,19;91:21;92:16;93:13;
101:23;103:6,12;106:7,8;
110:7;118:21
**extra (3)**
44:21,23;45:14
**extremely (2)**
107:8,14

**F**

**F150 (1)**
113:22
**fact (4)**
30:5;33:7;90:20;97:22
**failed (1)**
37:11
**fair (6)**
48:22,24;64:11;70:11;
83:22;92:24
**FAMC (78)**
6:21;7:6,15,23;9:14,20;
10:8,8,16;17:13,15;24:3,23,
24;26:10;29:10;31:10,22;
44:10,12;45:8;46:20;47:11,
15;48:8,16;51:23;60:18;63:2;
65:10,14,16;66:17;68:11,12;
72:22;73:12,19;74:22;75:14,
19;76:16;78:13;80:19;82:9,
15;83:10;84:18;90:12,13;
94:7;95:6,13,19,22,23;98:19,
22;99:2,10,14,14,22;100:21;
102:12,21;103:16,18;106:10;
107:5,16,19;108:20,24;109:2,
9,24;111:23
**FAMCPM (15)**
6:21;7:6,8,16,17;18:3;
23:12;26:11;29:11;49:23;
50:2;77:4;82:24;83:3;109:16
**familiar (13)**
11:20;12:12,15;43:21;
44:11;45:21;46:11;53:8;68:3;
70:12,20;88:12,13
**family (19)**
8:4,8;23:4;24:20;28:15;
50:16,18;51:4,7;60:4;61:11;
62:20;73:8;75:5,11;95:1;
107:5;113:18,24
**far (8)**
21:20;75:10;80:11;83:24;
90:20;92:5,13,24
**Fargo (7)**
16:2,7;19:6;56:24;57:8;
77:14,17;78:16;79:4
**farm (2)**
38:24;86:24
**fashion (2)**
9:16;48:1
**federal (4)**
66:17,22;67:8;68:8
**fees (4)**

DAMIAN ORLOWSKI vs.
LARRY BATES

JOHN RYDER
June 1, 2015

98:14,15;105:9,10
**fell (1)**
91:20
**few (2)**
19:3;80:12
**field (1)**
72:3
**fielded (1)**
111:23
**file (5)**
24:7,11;34:17;43:16;93:7
**filed (2)**
68:24;75:21
**filings (1)**
47:23
**fill (2)**
37:11;68:7
**filled (10)**
31:11,20;37:9,17;92:8;
95:7;101:7;104:11,21;112:10
**filled-out (2)**
46:8;49:14
**Finance (1)**
70:7
**financial (2)**
11:6,8
**find (38)**
20:23;22:10,11,21,24;
23:13;24:4;25:16,20;26:23;
27:3,10,15;30:20;31:3;32:8,
13,21,24;33:3,20;34:5,8;
35:18;36:4;71:13;72:24;
74:20;83:10;96:18;97:24;
99:7;100:24;101:15;107:5,20;
109:20;114:17
**finding (1)**
110:20
**findings (2)**
36:8;117:4
**fine (3)**
6:1;20:16;66:2
**fire (2)**
91:9,13
**firearm (10)**
64:21,23;65:2,7,13;66:22,
22;68:7;69:1;108:17
**firearms (6)**
66:17;67:7,8;68:1,9;108:20
**firm (1)**
71:23
**firms (1)**
113:11
**first (5)**
45:6;48:2;78:23;84:18;90:5
**five (3)**
48:6;49:3;71:4
**fluctuations (1)**
44:6
**FMAC (2)**
91:19;107:11
**FN (1)**
66:6
**follow (2)**

43:19,20
**followed (1)**
8:7
**following (1)**
22:22
**follows (2)**
5:3;18:22
**follow-up (1)**
117:15
**follow-ups (1)**
116:14
**Ford (1)**
113:22
**form (21)**
41:5,22;44:2,12,16;45:8,8,
22,24;46:3,8;49:9,15;61:16;
62:6;64:20;67:24;68:4,6;
88:13;105:9
**formal (2)**
107:6,12
**former (1)**
63:7
**forms (3)**
39:21;44:14;49:17
**Fort (1)**
16:10
**forth (1)**
38:4
**found (15)**
20:8,13;27:1,8;30:24;31:5;
33:17;71:20;72:4;74:24;
79:13,16;110:1;113:13;
117:22
**Francs (1)**
81:24
**frequent (1)**
78:8
**front (1)**
87:8
**frozen (1)**
62:20
**fulfill (1)**
112:20
**fulfilled (1)**
37:2
**full (1)**
52:15
**fully (1)**
14:7
**function (5)**
20:14;21:15;58:18;64:6,8
**functioned (1)**
31:7
**fundamentally (1)**
6:19
**funded (2)**
29:22;30:2
**funds (11)**
24:8,8,12,21;25:8;37:4;
68:13,21;98:15;109:21;
112:19
**further (4)**
62:16;69:10;95:24;116:11

fuzzier (1)
29:14

## G

**gains (2)**
46:24;48:8
**gap (1)**
37:8
**gave (5)**
8:14;33:1;34:6,9;39:16
**general (2)**
43:23;48:1
**generally (2)**
12:14;58:19
**generate (2)**
48:9;49:3
**generated (2)**
35:7;48:14
**generating (1)**
82:5
**generators (4)**
74:21,24;75:4,10
**given (11)**
5:22;27:17;33:22;50:13;
56:7;63:3;64:23;87:16;101:1;
107:19;108:17
**gives (1)**
27:22
**giving (1)**
43:16
**God (1)**
116:16
**gold (8)**
17:13,14,17;27:6;32:22;
33:1;39:18;100:23
**Good (7)**
5:6,7;20:4,9;89:1;103:11;
114:7
**governed (1)**
107:13
**government (1)**
67:12
**Graves (4)**
64:24;65:12;66:7;108:17
**Gross-Prawn (1)**
76:2
**group (1)**
10:12
**guaranteed (2)**
54:21;55:16
**Guaranty (12)**
16:2,9;19:7,8;56:3;57:1,4,8,
16;77:11;78:16;79:5
**guided (1)**
103:13
**guns (2)**
94:4,6

## H

**half (1)**
64:13

**hall (2)**
84:22;97:12
**hallway (2)**
84:18,20
**Ham (2)**
53:7,17
**hammed (1)**
8:18
**handle (1)**
13:23
**handled (3)**
10:18,20;57:24
**handwriting (1)**
64:1
**handwritten (17)**
23:1,20;28:13;35:6;60:5;
63:18;66:6;115:24;117:17,20;
118:8,13,17,24;119:3,6,14
**Hang (1)**
66:10
**Hanover (1)**
5:19
**happened (1)**
75:23
**hard (1)**
33:10
**Harris (2)**
5:19;43:15
**health (5)**
30:1;34:18;90:2;102:12;
103:10
**healthcare (1)**
29:21
**hear (1)**
96:16
**heard (2)**
63:7;107:24
**hearing (1)**
41:17
**heart (1)**
90:4
**hedging (7)**
43:21,24;44:16,19;48:23;
105:6,8
**HELD (5)**
5:11;17:7;26:1;36:5;69:13
**help (1)**
96:2
**HERETO (6)**
40:6;45:11;65:22;67:3,22;
72:15
**herself (2)**
17:7;79:11
**Hightower (1)**
61:9
**himself (7)**
26:1;31:13,24;63:2;103:17,
24;113:18
**hip (1)**
90:3
**hiring (1)**
92:10
**Historic (2)**

71:2,4
**hold (1)**
69:6
**holder (1)**
67:15
**holding (3)**
64:19;65:4,6
**holdings (1)**
100:22
**Holiday (2)**
53:7,17
**hope (1)**
101:18
**Hotel (1)**
106:12
**house (3)**
87:9,10,13
**housing (1)**
99:14
**HSA (3)**
62:11,17,19
**HSBC (2)**
43:3,17

**I**

**ID (2)**
66:15;88:2
**IDENTIFICATION (2)**
40:5;65:21
**Identified (3)**
40:24;67:11;97:22
**identify (1)**
31:23
**illegal (1)**
66:21
**immediately (2)**
10:13,14
**improper (1)**
25:2
**Inc (13)**
6:21,21;7:6,6,15,23;8:11;
46:20;70:10;71:7;109:2,9;
113:13
**include (8)**
22:8;68:1;83:13,15,17;
86:17;108:2;113:2
**included (4)**
23:3;37:20;113:21;118:23
**includes (2)**
12:7;108:5
**including (1)**
12:9
**Income (1)**
62:23
**Incorporated (1)**
82:16
**Incorporation (4)**
60:4;82:10,15,20
**incurred (2)**
25:11;95:9
**independent (1)**
14:10

**independently (3)**
87:18;88:8;103:14
**indicate (11)**
27:14;30:21,24;31:4,6;
32:9;36:21;54:18;56:8;65:13;
119:1
**indicated (5)**
15:8;23:13;32:14;33:12;
119:15
**indication (1)**
119:8
**individual (5)**
46:21;47:3,18;55:4,7
**individually (5)**
22:13;54:15;55:3;104:6;
109:22
**individuals (1)**
79:24
**Information (11)**
8:1;9:13;11:23;13:7,21;
21:4;67:14;68:2;100:4;101:5;
111:20
**initial (2)**
114:14,15
**initially (2)**
10:11;74:17
**input (1)**
120:7
**inquiries (1)**
34:2
**insider (3)**
117:18;118:2;119:14
**insiders (9)**
12:2,9;28:6;52:21;60:7,9;
108:1,2,5
**insolvent (4)**
48:4,12;49:2,6
**inspect (1)**
87:19
**instance (2)**
92:14;93:5
**instances (1)**
107:4
**intend (1)**
61:4
**interact (1)**
99:21
**interacted (4)**
78:6;100:12;111:16,21
**interaction (2)**
14:12;111:5
**interactions (1)**
13:18
**interest (4)**
8:5,14,17;51:7
**interesting (1)**
99:13
**interject (1)**
52:11
**internally (1)**
35:7
**interrupt (1)**
42:18

**interviews (2)**
84:5;90:12
**into (9)**
11:5,8;13:24;17:21,22;
48:13;70:13;73:5;77:3,7;
81:1;84:14,16;93:24;100:22;
102:14;104:5;110:1;111:23
**introduce (1)**
40:2
**investigate (3)**
6:22;43:2;83:8
**investigating (1)**
55:19
**investigation (19)**
13:6;20:10,11;31:9;33:11;
34:11;43:12;53:24;74:21;
78:4;84:5;105:8;109:19,23;
110:23;111:19;113:6;114:16;
115:6
**Investors (2)**
113:12,17
**invoice (1)**
82:5
**involved (1)**
71:20
**IRA (1)**
9:18
**IRN (55)**
6:21;7:6,15;8:1,11,14,19,
20;9:6,6;10:11,16;22:15;23:3,
17;25:5,11,14;26:2,7,15;
29:13;31:7;32:12;35:1,22;
50:8,21;51:2,23;58:3,6,13,15,
19;60:21;62:18;73:12;74:6,
16,22;78:13;82:19;84:17;
90:16,20;91:9,16;95:19,20;
96:8;102:21;107:19;109:12;
112:21
**Islands (2)**
53:6;106:17
**issue (1)**
50:17
**issued (3)**
57:17;67:12;79:18
**issues (2)**
90:2;103:10
**item (1)**
37:4
**items (1)**
79:21
**Ivy (1)**
99:12

**J**

**January (2)**
14:1;30:4
**jewelry (1)**
81:18
**job (1)**
13:24
**JOHN (2)**
5:1,15

**joint (2)**
110:7,18
**Judge (1)**
41:17
**jump (1)**
72:18
**June (1)**
9:11

**K**

**keep (3)**
39:22;69:12;101:18
**Ken (5)**
60:11,13,14,17;61:8
**Kenzie (12)**
10:17;12:10;41:18;85:3;
86:12;98:6;105:24;108:12;
110:15,22;111:20;112:3
**kept (9)**
28:5;33:9;52:4;60:2;63:18;
64:4;77:22,23;94:4
**kind (2)**
34:15;81:22
**kinds (2)**
39:20;95:9
**kitchenware (1)**
81:21
**knew (3)**
58:14;91:1;104:19
**knowing (1)**
104:10
**knowledge (10)**
12:21;13:4,10;14:19;15:15,
19;16:21;17:5;66:19;88:16
**known (2)**
71:23;104:20
**knows (1)**
45:3

**L**

**Lane (1)**
99:12
**language (1)**
27:5
**large (3)**
84:3;93:23;95:5
**largely (1)**
21:10
**Larry (50)**
7:17,24;8:2;12:9;23:16;
29:10,12,15;33:4,4,13,19;
34:12;38:11;46:20;50:8,14;
51:2;54:14;64:20;65:7;66:7;
68:21,24;82:16,20,24;85:2;
86:13,15;91:20;92:23;93:2,6;
94:16;97:23;101:24;102:5;
103:18;104:3;105:3,13;
107:22;108:14;109:16,20;
111:8,10;112:22;113:9
**last (4)**
5:16;9:11;80:12;98:2

**later (1)**
  15:24
**Laura (1)**
  41:10
**lawyer (2)**
  8:12;51:8
**lay (1)**
  47:22
**LB (1)**
  47:18
**lead (1)**
  20:15
**Leafs (1)**
  82:1
**learned (3)**
  46:13;54:19;66:20
**least (1)**
  17:8
**leaves (1)**
  55:5
**leaving (1)**
  56:13
**led (3)**
  43:8,9;53:15
**ledger (9)**
  28:14,17,20;35:6;60:14;
  61:10,19,22,24
**ledgers (19)**
  28:4;60:2,5,8;61:10;63:18;
  115:24;117:17,21;118:8,14,
  17,20;119:1,3,7,10,14,14
**left (7)**
  15:6;19:3;56:12;84:17;
  90:5;95:18,22
**left-hand (2)**
  44:16;45:21
**legal (2)**
  98:14,15
**legitimate (2)**
  79:21;105:10
**lent (1)**
  24:9
**Less (1)**
  54:10
**lesser (6)**
  90:13,19;91:21;92:16;
  106:7,8
**liable (1)**
  55:13
**Liberties (1)**
  40:17
**license (3)**
  66:18,22;68:9
**lien (1)**
  47:13
**likewise (3)**
  34:5;17;37:18
**limited (6)**
  9:16;86:21;95:8;106:3,5,6
**line (3)**
  42:17;89:8;97:10
**liquidating (1)**
  9:5

**list (1)**
  36:10
**listed (7)**
  24:5;82:9,12,14,19,23;
  108:24
**litigation (1)**
  50:19
**little (5)**
  29:14;40:18;72:19;81:16;
  107:10
**LLC (21)**
  6:21;7:6,17,17;9:9;17:8,9;
  18:3;23:12,15;26:11;29:11,
  11;49:23;50:2;77:4;82:24;
  83:4;109:2,17;113:12
**loan (1)**
  119:11
**loaned (4)**
  24:12;95:14;113:23;115:23
**loans (12)**
  27:24;34:18,20;35:3;51:11,
  20,22;95:2;118:3,18,19;119:8
**local (1)**
  71:23
**located (2)**
  19:21;85:8
**lock (1)**
  84:24
**locked (1)**
  93:19
**long (2)**
  15:15;89:22
**longer (1)**
  76:18
**look (9)**
  46:6;65:24;66:1;73:5;87:7,
  10;97:21;116:21;118:5
**looked (2)**
  12:14;56:15;117:21;118:13
**looking (4)**
  36:3;46:10;66:4;67:10
**looks (2)**
  41:7;61:10
**loose (3)**
  8:6;107:14,16
**loss (3)**
  44:17,19;45:17
**losses (3)**
  44:9;46:24;49:5
**lot (2)**
  64:9;74:7
**lunch (4)**
  53:9,14,16;69:11
**lunches (1)**
  53:7

---

## M

**Maddoux (9)**
  8:4,8;23:4;50:10,16,17;
  51:4,7,11
**M-A-D-D-O-U-X (1)**
  8:9

**mainly (1)**
  91:21
**maintain (4)**
  10:2,6;68:10;96:23
**maintained (1)**
  63:20
**majority (1)**
  80:18
**making (1)**
  92:10
**managed (7)**
  25:22;32:10,11;96:8;109:8,
  12,16
**management (11)**
  26:10;76:6,14;89:13,15;
  90:12;91:20;92:2,4;103:3,7
**manager (1)**
  52:6
**Managing (1)**
  21:7
**manner (2)**
  22:4,12
**many (5)**
  44:13;64:12;83:20;99:20,
  20
**Maple (1)**
  82:1
**marched (1)**
  97:12
**mark (7)**
  45:2;66:14,24;67:18;102:2;
  116:18,24
**MARKED (10)**
  40:5;45:10;65:21;66:14;
  67:2,21;72:14;88:2;117:11,13
**market (3)**
  44:5,6,9
**MARTIN (9)**
  20:18;41:10,18;42:6,23;
  52:11;62:6;98:2;121:15
**match (2)**
  118:20;119:5
**matches (1)**
  64:1
**material (2)**
  81:16;88:20
**materials (3)**
  25:13;86:14;93:22
**matter (2)**
  33:7;69:18
**May (27)**
  9:10,10,21;23:5;24:15,17;
  34:1;40:8;52:7;55:13;58:7,8,
  8,10;67:11;73:9;75:7;79:12;
  87:22;88:6;94:9;101:24;
  117:24;118:21,22;119:2;
  120:23
**maybe (3)**
  53:22,22;72:8
**McCalla (1)**
  41:17
**meals (2)**
  120:14,21

**mean (18)**
  9:4;15:3;28:4;33:15;37:7,
  15;38:20;44:20;54:16;55:12;
  59:24;76:13,20;91:1;97:4;
  106:6;115:3;120:17
**meaning (2)**
  54:10;79:1
**meaningful (1)**
  9:1
**meant (1)**
  115:17
**meantime (1)**
  69:7
**Media (2)**
  9:9;77:20
**meet (1)**
  39:3
**meeting (2)**
  23:3,6
**member (7)**
  7:17;23:15;24:20;29:11,12;
  60:3;95:1
**members (6)**
  28:15;73:7;75:4,11;100:11;
  113:23
**members' (1)**
  61:11
**Memphis (13)**
  70:8;74:10,12,15;75:1,7;
  78:6,10,21,24;83:10;93:5;
  99:12
**mention (1)**
  51:6
**mentioned (6)**
  7:5;13:15;17:4;40:17;
  55:18;114:11
**message (1)**
  52:14
**met (3)**
  75:16;76:4;86:20;87:9
**metal (2)**
  33:17;95:24
**metals (24)**
  7:20;9:20,21,24;17:18;
  27:7;32:23;36:23;37:1;39:12,
  21;41:20;43:3,6,22;44:1;
  59:20,22;81:17,22;92:22;
  93:21;100:18,19
**method (1)**
  45:15
**might (7)**
  6:24;27:12;28:8;30:18;
  32:4;62:1,2
**million (27)**
  36:22;37:12;47:10;48:1,6;
  49:1,3;54:10,10;64:13;
  112:11;114:11,12,16,23,24;
  115:2,3,5,6,7,11,13,16,17,
  20
**million-dollar (1)**
  112:9
**mince (1)**
  20:2

**mind (2)**
  18:19;58:9
**minute (2)**
  66:1;117:16
**missing (6)**
  43:2,17;83:11;84:2;85:7;
  86:9
**misspoke (1)**
  115:20
**mixture (1)**
  39:20
**modifiers (1)**
  58:15
**moments (1)**
  19:4
**Monetary (1)**
  48:3
**money (23)**
  13:10;44:21,23;45:14,16,
  19;48:7,9,11,16;52:21;61:1;
  62:3;78:13,24;79:3;95:14;
  99:8;102:13,18;109:24;
  110:22;115:23
**money's (1)**
  64:16
**monies (2)**
  12:1;103:20
**months (1)**
  101:14
**more (10)**
  29:6;59:17;85:10;90:17;
  92:5;106:3;107:5;114:8,20,20
**morning (2)**
  5:6,7
**mortgage (1)**
  99:16
**most (4)**
  25:19;33:3;59:14;109:10
**move (2)**
  78:12,24
**much (6)**
  54:5;60:23;68:22;90:17,18;
  106:3
**multiple (2)**
  63:8;77:16
**myself (3)**
  47:20;115:20,22

**N**

**name (9)**
  5:8,13,16;29:18;46:19;
  47:5;54:20;55:3;67:14
**narrative (2)**
  115:7,10
**national (1)**
  71:24
**nature (2)**
  21:22;120:15
**near (1)**
  90:11
**necessarily (1)**
  92:19

**need (5)**
  16:23;18:18;22:7;70:13;
  118:6
**needed (1)**
  86:5
**needing (1)**
  42:24
**neighborhood (1)**
  54:11
**neither (2)**
  19:19,19
**Network (8)**
  8:1;9:13;21:4,5,16;29:14;
  31:8;72:1
**Nevada (1)**
  50:6
**New (6)**
  43:3;53:5;106:12;113:22;
  120:18,18
**news (5)**
  21:7,14;22:18;26:19;58:6
**next (5)**
  67:18;72:9,10;117:1,11
**nine (1)**
  40:16
**nobody (2)**
  10:12,12
**nonbusiness (1)**
  113:3
**none (1)**
  29:17
**Nonetheless (1)**
  36:24
**nor (1)**
  19:20
**NOS (1)**
  72:14
**note (4)**
  44:16;47:17;66:6;99:16
**noted (2)**
  47:14;96:14
**notes (6)**
  23:1,8,20;24:1;116:3,4
**noticed (1)**
  53:23
**notification (1)**
  52:13
**notified (1)**
  8:13
**notwithstanding (1)**
  30:5
**November (6)**
  38:23;49:22;56:7,10;86:24;
  112:8
**number (10)**
  18:8;43:13;49:8;54:8;
  75:22;79:16,16,19;95:5;100:1
**numbered (1)**
  117:11

**O**

**Object (7)**

41:22;42:13,22,24;44:2;
  62:6;66:13
**objecting (1)**
  42:19
**objection (2)**
  42:17,21
**O'Brien (13)**
  46:11,14,18;47:11,15,20,
  24;48:4,17,20;112:15;113:12,
  17
**observed (1)**
  58:20
**obviously (1)**
  36:3;90:18;95:5
**occupied (1)**
  99:17
**October (9)**
  6:9;7:2;8:24;9:15;10:2,7,
  14;69:20;72:21
**odds (1)**
  81:22
**off (7)**
  5:9,11;19:3;36:6;67:6;
  69:14;102:7
**offered (1)**
  87:6
**office (47)**
  10:11;15:22;16:14;52:6;
  58:1;65:3;74:6;75:1,1,7,14;
  76:6,9,15,17,20;77:3;78:6,10;
  81:2,9,12;82:6,12;83:10;84:7,
  15,19,22;85:15,20;86:6,9;
  87:5,7,8,10,12,12;90:5;93:5;
  94:7,20;107:6;108:4;111:24;
  117:24
**officer (3)**
  82:9,12;89:16
**officers (1)**
  35:20
**offices (1)**
  40:23,24;53:18;74:16;
  84:17,18,20
**offset (1)**
  49:5
**often (1)**
  102:2
**older (2)**
  69:24;70:1
**one (29)**
  7:17;9:22;12:6;15:8;19:6;
  23:22;41:13,16;42:22,24;
  52:4;59:24;60:13;67:17;70:6;
  71:2;78:11;85:10,11;87:6,24;
  88:21;90:4;93:18;97:20;98:2;
  99:15;111:22;114:8
**ones (3)**
  15:24;17:22;93:24
**one-third (2)**
  51:2,3
**only (17)**
  9:17;15:24;15:5;58:10;
  81:4;82:23;84:13;85:1,15,17,
  22;94:15;115:24,24;117:16,

20
**open (1)**
  112:24
**operate (3)**
  9:1,13,14
**operated (1)**
  107:20
**operating (5)**
  9:6;10:10;37:20;112:21;
  113:2
**operation (2)**
  21:9,13
**operations (5)**
  9:17;21:8;90:10;92:6;
  102:19
**opinion (2)**
  44:8;45:14
**opportunity (3)**
  8:14;87:7;99:21
**opposed (1)**
  107:6
**order (11)**
  6:16,18;27:12,17;33:11,16,
  19,23;37:17;102:7;105:10
**ordered (1)**
  95:6
**ordering (1)**
  93:1
**orders (32)**
  7:19,21;9:20,21,24;33:12;
  37:2,8,9,12;49:5;83:5,6;92:8,
  9;93:1;95:6,7,24;100:6,14;
  101:7;104:10,19,20;111:15;
  112:4,10,10,20;114:17,22
**ordinary (1)**
  95:9
**organized (2)**
  7:18;50:2
**original (1)**
  109:5
**Orlowski (1)**
  6:2
**others (3)**
  22:20;55:13;101:1
**out (38)**
  6:16;8:18;17:7,20,24;
  21:15;25:4;26:2;31:11,20;
  35:17;39:4;41:5;44:22,23;
  45:14;48:11;49:2;55:20;
  57:24;62:2;68:7;79:3,8;82:5;
  87:22;90:5;93:22;94:19;97:8;
  98:15,22;99:1;101:15;103:16,
  24;114:17;117:23
**Outdoors (2)**
  70:9;71:19
**outstanding (1)**
  36:22
**over (19)**
  10:1;11:5;15:12,20;16:22;
  17:6;22:12,14,18;52:14;
  58:19;78:21;89:13;90:21;
  95:18;96:8;102:8,15,23
**override (1)**

34:24
**owed (4)**
51:22;59:20,22;60:17
**owing (1)**
80:16
**own (9)**
12:2;41:14;48:15;58:9;
66:17,21;79:18;118:12,16
**owned (14)**
7:23;8:2;29:8,10,15;35:11;
50:8,13;51:2;65:10;66:7;
73:19;104:6;109:21
**owner (4)**
29:18;30:22;31:1;35:15
**owners (1)**
35:12
**ownership (10)**
7:14,16;8:5,10,13,17;29:13;
35:15;50:18,21

**P**

**Page (2)**
112:18;113:9
**paid (27)**
13:22;24:17,19;25:6;30:7,
11;31:10;35:2;37:5;38:19;
54:17,17;59:10,11,12;62:11,
12,14,15;80:13,15;92:11;
98:15;99:15,16;102:9,21
**paper (1)**
29:6
**paperwork (1)**
35:10
**parameters (1)**
107:18
**paren (2)**
112:24;113:1
**part (15)**
11:23;18:10;25:19;49:19;
59:14,16;62:5;71:24;74:6;
87:1,8,11,19;99:23;109:10
**participant (1)**
23:6
**participated (2)**
92:17,18
**particular (1)**
17:21
**Particularly (1)**
103:8
**particulars (1)**
12:21
**parts (1)**
87:2
**party (1)**
112:24
**pass (3)**
18:17;38:8;88:1
**pay (5)**
24:16;25:12;58:21;112:21;
113:1
**paycheck (1)**
79:18

**paying (1)**
106:22
**payment (3)**
83:6;99:11;120:19
**payments (7)**
15:5,9;31:13;62:1;80:13,15,
18
**payroll (16)**
10:18,21;24:9,12,18;25:7;
30:6;57:17,20,23,24;64:6,8;
79:19;102:13,20
**pendency (1)**
47:13
**people (20)**
10:13;34:10;43:13,14;60:8,
11;61:8;78:9,12;82:14;84:13;
85:1,10,11,12,16,18;91:4;
94:15;100:22
**percent (8)**
7:23,24;8:2,3;50:8,9,14,14
**percentage (1)**
102:6
**perhaps (2)**
54:19;111:1
**period (5)**
35:1;89:23;90:7;100:20;
103:9
**periodically (1)**
81:2
**periods (1)**
90:6
**person (8)**
55:16;61:9;76:5,8,14;
82:23;84:15;85:22
**personal (42)**
12:2,8,20;13:10,13;15:14,
18;16:21;17:5;25:12;37:19;
47:8;49:7;53:1,12;54:20;
64:19;65:7;68:21;86:19,21;
87:8,9;94:4;98:10,14;103:21;
105:14,18,21;106:12;110:11;
116:7;119:20,22;120:17,21,
22,22,24;121:1,6
**persons (1)**
94:24
**pertain (1)**
12:22
**pertaining (1)**
18:13
**petty (4)**
54:1;55:15,19;79:23
**phone (2)**
92:7;100:1
**photograph (1)**
67:15
**phrase (1)**
55:23
**pick (1)**
19:3
**picked (1)**
41:1
**picture (1)**
67:16

**piece (1)**
64:19
**place (5)**
10:9,15;47:24;53:16;83:4
**placed (7)**
33:10,12,16,19;37:9;95:6;
112:10
**placing (1)**
93:1
**plaintiff (1)**
69:18
**plaintiffs (2)**
7:1;95:5
**Plaintiff's (1)**
41:19
**planned (1)**
74:17
**Platform (1)**
9:9
**please (5)**
5:14;6:5,8;16:6;118:6
**PM (3)**
7:8,12;121:18
**pocketed (1)**
48:15
**point (7)**
32:6;37:6;41:8;50:15;
63:16;87:16;95:23
**policy (1)**
100:21
**portion (3)**
83:23;104:15;120:2
**portions (1)**
54:17
**pose (1)**
42:16
**position (6)**
10:23;13:16,19;44:5;55:2;
107:13
**possession (9)**
11:6;14:16;15:10,15;75:18,
20;80:10;86:4;88:19
**possible (2)**
45:13;88:21
**possibly (1)**
13:24
**post (1)**
99:3
**potentially (1)**
113:3
**practice (1)**
79:20
**precious (15)**
7:20;17:18;27:6;32:23;
39:12,21;41:20;43:2,22,24;
59:20,22;81:17,22;92:22
**preliminary (1)**
112:8
**premise (1)**
89:11
**premises (3)**
72:22;85:19;86:22
**preparation (1)**

**prepared (3)**
70:19;75:24;93:21
**present (2)**
18:12;121:2
**presently (1)**
71:9
**president (15)**
17:8;21:4;36:2;48:13;58:3,
6,9,10,11,13,16;59:1,2,7;
108:24
**presidents (2)**
35:21;58:15
**pretty (3)**
24:19;120:16,20
**previous (2)**
70:24;75:24
**previously (2)**
29:9;71:5
**principally (1)**
113:16
**print (1)**
67:6
**prior (5)**
15:11,19;17:6;71:2,10
**privileged (1)**
42:14
**pro (1)**
38:12
**probably (5)**
26:16;29:6;42:14;58:7;
72:18
**procedure (1)**
85:20
**proceeds (1)**
113:17
**process (4)**
7:19;9:20,22;13:21
**processing (2)**
9:18;51:23
**product (2)**
27:20;37:16
**professional (1)**
96:23
**profit (1)**
112:24
**profitable (1)**
52:2
**profits (5)**
48:6,7,9;49:4,4
**programming (1)**
22:1
**prohibits (1)**
62:23
**promissory (1)**
116:4
**properly (1)**
48:8
**property (23)**
13:11;39:4;48:8;64:20;
65:7;69:3;73:1,1,6,7,13;74:3,
10,11,12,15;87:1,2,11,20,20;
94:5;99:17

DAMIAN ORLOWSKI vs.
LARRY BATES

JOHN RYDER
June 1, 2015

**protect (1)**
44:5
**provided (2)**
87:15;112:22
**purchase (6)**
9:24;27:6;32:22;68:7;
100:18;110:21
**purchased (10)**
65:14,15;68:10,12,18,21;
74:22;79:21;108:20;113:21
**purchaser (1)**
67:11
**purchases (2)**
33:3;119:19
**purchasing (1)**
17:12
**pure (1)**
62:4
**purportedly (1)**
8:2
**purports (4)**
12:7;23:2;116:18;117:4
**purpose (2)**
39:2;57:20
**purposes (1)**
79:22
**purview (1)**
55:5
**put (2)**
42:21;48:13

**Q**

**qualifications (1)**
69:21
**quantities (1)**
100:19
**quite (4)**
7:4;54:7,9;97:1
**quote (5)**
59:13,14;62:12;63:17;
103:1

**R**

**race (1)**
68:2
**Radio (7)**
7:15;8:1;9:13;21:4,5;29:13;
31:8
**raised (2)**
50:17;51:8
**ran (3)**
15:22;21:5;59:1
**rather (4)**
21:10;49:6;53:1;97:12
**reach (1)**
69:8
**reaching (1)**
43:10
**read (5)**
104:14,16;120:1,3;121:16
**ready (1)**

30:19
**realize (1)**
111:4
**really (10)**
46:9;49:13;55:5;56:23;
59:5;61:13,14;64:10;81:21;
90:13
**reason (1)**
97:18
**recall (83)**
24:14;26:5;28:16;29:22;
30:1,13;34:20,23;35:5;36:1;
39:17,24;40:1,9,14,16;41:7;
42:5;43:9,10,16;49:24;50:20,
23,24;51:1,1,5,10,15,17;54:2,
4;55:22;56:9;57:1,11;59:9,23;
60:1,12,14;62:8;68:19;73:2,
11;74:4,5,5;82:7,11,12;88:5,7,
8;89:8;94:6,13,20,22;95:4,16;
97:2,11,16;98:16;100:7;
101:9;104:5;110:14,16,20,24;
111:1,12,18,19;112:15;115:2,
15,16;119:11,17
**receipt (1)**
92:21
**receive (6)**
41:20;49:23;77:3;100:4;
101:4;102:7
**received (15)**
28:22;29:6;31:11;35:10;
37:1;40:22;52:13;59:3,8;
66:8;80:22;81:1;85:14;92:15;
106:22
**receiver (31)**
6:7,15,17;8:24;9:18,19;
10:2,24;11:16;13:17;14:13;
15:12,20;17:6;41:10;47:6;
55:6;57:15;58:22;64:9;69:19;
70:2,3;71:3;72:20;90:21;91:8,
12;95:18;102:16;107:2
**receivership (11)**
6:20;19:22;31:2;50:16;
54:6;56:5;60:22;61:2,6;
70:14;76:18
**receiverships (1)**
70:5
**receiving (6)**
27:20;34:24;56:9;57:11;
92:13;111:20
**recent (1)**
62:22
**reception (1)**
84:16
**receptionist (1)**
76:15
**RECESS (1)**
18:20
**reclaim (1)**
38:15
**reclaimed (2)**
38:17,21
**recognize (6)**
45:6,7;66:10,15;116:22;

117:6
**recollection (16)**
18:12;25:9;28:10;51:6;
82:22;83:1;95:3;108:23;
109:1;117:23;118:12,13,16;
119:10,16;121:3
**reconciling (1)**
70:12
**RECORD (16)**
5:11,13;23:2;28:7;36:6;
38:11;39:22,23;41:7;42:22;
50:6;52:23;67:5;68:1,6;69:14
**recording (1)**
74:17
**records (49)**
6:23;11:6,8,11;15:22;17:20,
24;23:13,18;24:4;26:22;
30:24;33:9;39:4,15;40:21;
42:12;65:12,15;68:16;74:21;
75:19,21;77:21,23;83:9,11,13,
15,17,20;84:1,6,10;85:13,14,
16,21,23;86:3,22;87:14,20,22;
96:2;111:1;114:20;115:19,22
**recover (1)**
43:5
**recovered (1)**
43:7
**re-create (2)**
83:20,24
**reduced (1)**
10:23
**redundant (2)**
26:21;34:15
**refer (2)**
52:20;107:24
**reference (3)**
23:12,17;24:3
**references (1)**
55:17
**referred (2)**
17:9;52:8
**referring (1)**
45:3
**refers (2)**
55:24;67:7
**refined (1)**
115:5
**reflect (6)**
13:3;23:18;26:16;34:1;
103:1;116:1
**reflected (12)**
28:3,5;35:6;60:6;89:12;
93:15,15;97:17;98:7;112:8;
116:9;118:4
**reflecting (1)**
18:9
**reflects (5)**
23:5;26:9;28:14;60:3;103:4
**regard (6)**
96:16;110:8,11,13,15;111:6
**regarding (2)**
34:2;47:13
**regards (1)**

77:1
**Regions (1)**
70:6
**Regulations (1)**
67:9
**reimbursed (1)**
80:1
**reimbursing (1)**
25:10
**rejected (1)**
52:15
**relate (3)**
25:6;27:4;121:10
**related (5)**
25:21;36:9;99:4;113:4;
117:4
**relating (1)**
42:23
**relationship (2)**
46:16;99:13
**reliable (2)**
71:14,21
**rely (1)**
115:17
**relying (1)**
72:5
**remained (2)**
10:9,15
**remaining (1)**
15:9
**remember (14)**
11:2;14:15,23;15:6;54:7;
56:11,13,14,17;63:6;81:14;
90:4;95:21;119:24
**removed (10)**
73:1,3,7,13,15;74:3;75:4,7;
85:18;112:24
**rendered (1)**
25:14
**rent (2)**
99:11,15
**repaid (1)**
99:8
**rephrase (4)**
80:23;95:11;98:20;102:4
**report (20)**
12:6;18:10;36:8;37:18;
53:23;97:17;112:8,18;113:1,
9;115:3,18;116:9,18;117:4,8;
118:4,18,19;120:13
**reported (4)**
31:21;33:18;76:17,19;98:9,
14;115:4,8
**REPORTER (3)**
104:16;117:12;120:3
**reports (17)**
11:18,21,24;13:9;28:4,22;
36:21;52:8,10,12,20;70:18,19,
21;72:5,9;114:15
**represent (2)**
19:1;69:17
**representation (2)**
15:1,7

Alpha Reporting Corporation

**representations (5)**
100:5,13;101:6;111:6;
112:4
**representatives (1)**
23:4
**represented (3)**
58:4;94:11;111:14
**representing (1)**
92:7
**reprimanding (1)**
92:10
**reps (1)**
21:10
**reputation (1)**
72:3
**request (1)**
69:5
**REQUESTED (2)**
104:15;120:2
**required (1)**
67:13
**residence (5)**
38:24;67:14;86:14,19,21
**residents (4)**
7:20;17:10,12;83:4
**respect (3)**
26:15;117:17;119:18
**respects (1)**
79:16
**respond (1)**
68:23
**response (4)**
34:2;47:12,12,17
**responsibilities (1)**
6:14
**responsibility (2)**
55:4,6
**responsible (7)**
44:9;47:1;77:6;82:4;85:23;
90:9;99:11
**rest (1)**
80:15
**rested (2)**
92:23;93:2
**result (2)**
48:5;83:19
**retain (1)**
14:16
**retained (1)**
11:13
**Retirement (1)**
62:23
**return (2)**
48:14,15
**returns (2)**
75:21;76:1
**revealed (1)**
13:6
**revenue (1)**
21:14
**review (3)**
12:12;114:20;118:6
**reviewed (5)**

11:17;35:8;72:11;118:7;
119:7
**reviewing (2)**
70:18,21
**revised (1)**
112:11
**Rhett (2)**
36:9;117:5
**Richards (1)**
70:7
**right (30)**
6:1;7:13;8:23;10:1,22;11:4,
4,7,15;12:18;17:3;21:24;
22:10;23:17;24:22;26:3,20;
27:3;30:12;34:22;40:2,12;
53:18;54:4;60:1;77:20;84:16;
91:6;119:18;121:12
**right-hand (2)**
46:3;49:9
**ring (1)**
110:22
**risk (1)**
26:20
**Ritz (1)**
106:11
**RJ (13)**
46:11,13,18;47:11,14,20,
24;48:4,16,19;112:15;113:11,
17
**road (1)**
53:18
**Robert (60)**
10:17;12:10;19:1,15,20;
30:17,21;31:1,6,8,9;32:9;
33:21;34:16;35:3,13,15,19;
37:1;38:6;53:5,6;58:12,23,24;
59:2,7;63:1;84:21;85:3;
86:12;89:12;90:22,24;91:5;
93:10;94:17;95:12;96:18;
97:23;98:16,23;99:5,11,14,18,
19;100:5,12,24;101:5;103:2,
15;104:24;105:17;106:10,15,
23;108:8;111:5
**role (4)**
6:4,10;14:13;15:19;17:5;
25:24
**room (6)**
74:6;93:19,20;94:1,16,23
**Rosenberg (15)**
11:18;13:1,5,9;52:9,21;
70:20;71:1,5,6,8,13;72:6;
114:18;116:19
**routinely (2)**
101:11;104:20
**run (4)**
63:16;104:12;107:5,11
**running (1)**
90:9
**RYDER (16)**
5:1,6,15,18;18:24;30:15;
36:8;38:11,23;42:7,7;66:5;
67:10;68:3,23;69:17
**R-Y-D-E-R (1)**

5:17

**S**

**safe (4)**
81:11,13,14,16
**safes (3)**
93:23;94:2,21
**Saint (2)**
106:16;120:19
**salaried (1)**
79:17
**salary (2)**
25:7;34:18
**sale (3)**
9:12,24;21:21
**sales (19)**
21:8,9,12;22:19;26:19;
31:7;32:12;35:1;58:18,22;
59:1,3,4,8,8;77:1,19;83:5;
95:24
**salesman (1)**
37:4
**same (11)**
7:14;30:16;35:6;37:18;
61:15;90:15;91:3;96:13;
105:24;110:3;118:3
**savings (4)**
29:21;30:1;34:18;102:12
**saw (2)**
81:24;119:7
**saying (3)**
44:24;45:1,18
**schedule (3)**
12:7;36:10;37:19
**scope (4)**
17:23;22:9;26:6;107:21
**screens (1)**
74:18
**se (1)**
38:12
**search (1)**
26:21
**second (2)**
6:18;97:24
**seconds (1)**
5:9
**section (1)**
113:1
**secure (1)**
6:22
**Security (1)**
62:23
**seeing (10)**
26:5;36:1;56:17;60:13,14;
88:5,7;94:6;111:1;119:17
**seem (6)**
14:15;63:12,14;82:11;
101:8;120:13
**seems (1)**
63:12
**sell (1)**
104:9

**selling (2)**
17:14;81:5
**sells (1)**
37:4
**send (2)**
48:16;102:8
**senior (5)**
21:3;58:2,9,13,24
**sense (1)**
43:23
**sent (3)**
52:9,12;85:22
**separate (2)**
84:23,24;93:19
**separately (1)**
77:22
**series (1)**
30:16
**served (2)**
70:3;76:14
**service (1)**
25:5
**services (2)**
25:13;71:7
**serving (2)**
21:7;107:1
**set (2)**
84:15;107:12
**settled (1)**
62:17
**several (2)**
105:5;108:1
**shape (1)**
41:5
**SHAW (23)**
24:23;25:1;41:22;42:13,16,
21;44:2;45:2;65:24;66:1;
69:11,16,17;72:17;74:12,13;
89:2;98:4,5;104:14,22;114:5,
11
**Shelton (2)**
5:19;43:15
**Sherry (4)**
10:8;52:4;85:4;94:19
**shipment (1)**
93:21
**shipments (1)**
27:23
**shipped (6)**
27:12,12,17;33:22;34:7;
86:3
**shipping (5)**
93:20,22;94:1,16,23
**Shirley (1)**
40:18
**shoes (2)**
120:24;121:9
**SHORT (2)**
5:10;18:18
**shotgun (2)**
94:10,15
**show (7)**
33:21;39:16;45:24;65:15;

Case 2:11-cv-01396-SHL-cgc   Document 433-1   Filed 07/29/15   Page 45 of 47   PageID
6066
DAMIAN ORLOWSKI vs.
LARRY BATES

JOHN RYDER
June 1, 2015

67:5;116:17;117:3
**showed (2)**
  25:22;87:3
**showing (1)**
  117:18
**shown (2)**
  13:2;35:21
**shows (1)**
  26:12
**side (2)**
  46:3;49:9
**sign (8)**
  19:24;20:3;21:18;31:14;
  32:18;55:3;78:15;121:16
**signatories (2)**
  16:19;20:7
**signatory (5)**
  15:23;16:3,16,20;56:2
**signature (2)**
  66:8;121:19
**signed (8)**
  27:1;31:17;57:23;79:18;
  93:7,11;103:17;104:2
**significant (2)**
  37:8;112:23
**signing (8)**
  19:13,16,20;57:20;77:10,
  13;79:1;92:14
**silver (9)**
  27:6;32:22;33:2;39:18;
  40:13;81:18,18;82:1;100:22
**similar (3)**
  11:11;27:5;33:24
**simply (1)**
  95:16
**single (1)**
  29:11
**sit (4)**
  24:14;60:22;61:17;79:5
**site (1)**
  67:7
**sitting (2)**
  18:11;50:20
**situation (7)**
  14:5,11,15;33:24;50:10,22;
  54:24
**six (4)**
  84:13;85:10,11;101:14
**slammed (1)**
  97:12
**slip (1)**
  40:11
**slot (1)**
  21:21
**small (4)**
  81:8,9,11,15
**so-called (1)**
  45:17
**sold (4)**
  8:19,20;9:7;62:18
**sole (2)**
  23:15;29:12
**solely (1)**

93:2
**solicited (1)**
  21:9
**somebody (3)**
  33:16,18;101:14
**Somehow (1)**
  30:18
**someone (2)**
  21:21;31:17
**sometime (1)**
  11:1
**somewhat (2)**
  11:21,22
**sorry (3)**
  24:10;25:1;99:19
**sort (4)**
  14:10;79:23;81:20;82:1
**sought (1)**
  34:23
**sounds (1)**
  98:8
**source (2)**
  21:13;118:1
**sources (1)**
  63:8
**speaking (1)**
  86:23
**specific (7)**
  40:15;51:6;55:23;58:15;
  63:6;73:2;88:9
**specifically (11)**
  29:23;40:9,14;41:3;51:5;
  55:22;62:8;73:14;98:22;
  100:7;118:10
**specifics (1)**
  97:2
**speculate (1)**
  62:8
**speculation (4)**
  42:6;62:4;88:24;89:1
**Spell (1)**
  5:16
**spelled (1)**
  6:16
**spent (1)**
  70:16
**spouse (1)**
  106:17
**staff (4)**
  10:3;61:9;100:11;112:2
**standing (1)**
  42:17
**stands (2)**
  7:12;8:1
**Stanley (36)**
  10:19;12:11;13:12,15,18;
  14:12;15:7;18:13;56:2,20;
  57:19;64:4;75:16;76:4,20,23;
  77:2,24;78:5;80:2;81:1;82:4;
  85:24;98:6;102:9;106:4;
  108:2,23;109:11,15;110:13;
  111:13;119:9,12,16;121:4
**Stanley's (1)**

16:22
**State (3)**
  7:18;32:9;50:1
**Stated (3)**
  19:23;29:9;35:18
**statement (7)**
  64:11;97:5,6;113:5,15,19;
  114:1
**statements (7)**
  13:2;18:5,9;86:2;97:9;
  101:17;119:23
**states (1)**
  112:19
**stating (2)**
  41:20;95:14
**status (7)**
  89:16;95:22;100:6,14;
  101:16;111:15;112:4
**Steven (3)**
  64:23;66:7;108:17
**still (8)**
  6:10;51:23;55:10,11;68:9,
  10;80:9;88:19
**stock (3)**
  51:11,19,21
**stopped (1)**
  9:23
**store (1)**
  81:9
**stories (1)**
  75:23
**story (2)**
  22:7,8
**Street (2)**
  71:2,4
**structure (1)**
  29:13
**structures (1)**
  7:16
**studio (1)**
  74:18
**subject (2)**
  7:21;100:8
**submitted (1)**
  83:24
**subscribers (1)**
  21:16
**substantial (2)**
  83:23;90:6
**Suburban (1)**
  113:23
**successor (1)**
  16:10
**suggest (1)**
  88:18
**suite (4)**
  84:14,24;85:8;93:18
**suites (1)**
  85:2
**Suntrust (1)**
  70:9
**supervised (2)**
  21:12,14

**supervising (1)**
  21:8
**supervision (1)**
  58:19
**supplies (2)**
  25:13;79:22
**supply (1)**
  52:15
**sure (15)**
  23:11;25:2;43:15;45:4;
  46:7;50:4;55:17;56:20;59:5,
  23;73:20;92:3,10;102:3;110:5
**surgery (2)**
  90:3,4
**surprise (3)**
  64:3;68:20,22
**suspect (1)**
  55:21
**suspected (1)**
  30:18
**Swiss (1)**
  81:24
**sworn (1)**
  5:2
**system (1)**
  52:14

## T

**talk (2)**
  89:18;114:18
**talked (2)**
  9:5;89:4
**talking (8)**
  20:19,24;26:17;73:4;74:10;
  91:3,4;92:7
**taping (1)**
  74:7
**Tarry (2)**
  18:24;25:1
**tax (6)**
  13:21;75:18,20,21,24;83:5
**taxation (1)**
  7:21
**taxes (2)**
  47:1;102:21
**televisions (1)**
  74:2
**telling (3)**
  51:2,10;57:10
**tended (1)**
  111:22
**Tennessee (10)**
  7:19,22;17:10,12,20,21;
  18:2;78:23;83:4;99:12
**term (2)**
  58:16;92:4
**terminate (2)**
  96:3,10
**terminated (6)**
  10:12,13;11:1;13:16,19;
  96:22
**terms (1)**

DAMIAN ORLOWSKI vs.
LARRY BATES

JOHN RYDER
June 1, 2015

107:8

**test (1)**
49:19

**tested (1)**
114:19

**testified (21)**
5:3;18:4;38:14;41:19;50:7;
56:1;58:2,17;59:9,13;62:10;
65:4,6;91:19;95:17;102:11,
24;111:14;114:12,24;115:13

**testify (2)**
42:3,10

**testifying (2)**
115:2,16

**testimony (14)**
19:4;40:6;42:5;45:10;
50:11,12;65:22;67:2,21;
72:15;103:4,22;111:13;117:9

**testing (1)**
49:21

**Thanks (1)**
66:2;116:16

**theater (1)**
120:18

**theft (5)**
54:1;55:15,19;68:24,24

**theory (1)**
85:19

**thinking (1)**
62:16

**third (2)**
51:3,7

**Thomas (2)**
106:16;120:19

**Thompson (2)**
71:24;72:2

**thorough (3)**
20:9,11;72:4

**though (3)**
29:2;37:14;93:14

**thought (1)**
46:2

**three (26)**
7:5;10:3;13:11;16:4,5;19:4,
12,18;20:21;22:11,13;24:13;
25:21;26:22;27:4;28:1;29:7;
30:22;31:2;32:18;35:10,13,
16;78:11,17;79:1

**tickets (1)**
120:18

**timely (1)**
104:11

**times (1)**
108:1

**tiny (1)**
70:1

**title (1)**
52:6

**Tobacco (1)**
67:6

**today (20)**
6:11;7:3;9:6;18:11;24:14;
28:10;32:1,6,7;37:22,24;

9:11;52:8,16;60:22;61:17;
62:7;65:2;79:5;115:1

**together (2)**
67:13;110:18

**told (14)**
15:23;16:1;49:11;56:1,4;
57:4,7,7;63:5,7,24;73:11;
88:3;102:5

**ton (3)**
29:6;49:18,19

**took (13)**
10:1;11:5;15:12;47:24;
48:11;49:1;81:4;84:6;86:18;
90:21;95:17;102:15,23

**total (2)**
54:9;114:21

**totally (1)**
54:5

**TOWNLEY (15)**
5:5,12;18:16;66:10,13;
74:9;104:12;116:13,24;117:2,
10,14;119:24;120:6;121:13

**traces (1)**
110:6

**tracing (1)**
110:6

**Tracy (1)**
61:9

**trade (1)**
95:8

**trading (3)**
46:17;112:23;113:11

**transacted (1)**
73:23

**transacting (1)**
92:13

**transaction (22)**
44:11,13,15,22,24;45:8,14,
22;47:9,24;48:5;49:9,15,17;
55:23;68:1;88:13;105:9;
111:2;112:24;116:5;119:20

**transactions (25)**
9:19,22;18:2;28:5,14;48:7;
51:24;55:23;60:6;81:24;
105:14,18,22;117:19;118:2,
22;119:3,9,11,13,15,21,22;
120:12;121:3

**transfer (1)**
60:3

**transferred (3)**
47:10,14;48:2

**transfers (1)**
116:6

**travel (3)**
120:14,19;121:9

**traveled (2)**
75:13;81:13

**Traverse (1)**
113:22

**trip (5)**
38:24;53:4,5;106:12,16

**true (6)**
38:5;79:4;91:22;100:17;

110:17;111:7

**Trust (3)**
56:3;57:5,16

**try (1)**
83:9

**trying (3)**
14:23;54:14;73:5

**turned (1)**
95:13

**two (18)**
9:22;11:18;22:24;26:8;
52:8;70:5,24;72:9,10;79:3,8;
82:14,19;87:4,6,11;93:23;
118:11

**two-year (1)**
90:7

**type (5)**
25:7;119:15,21;120:9;
121:3

**types (5)**
70:21;100:18,19;107:2;
120:12

## U

**ultimate (1)**
119:4

**Ultimately (2)**
47:21;110:1

**unaware (1)**
51:9

**under (2)**
50:7;85:20

**undertake (1)**
83:20

**undertook (1)**
83:8

**unearned (6)**
36:10,12,15;38:13,21;113:4

**unfilled (3)**
49:5;114:17,22

**unusual (3)**
79:14,16;107:15

**up (16)**
8:7;9:23;11:16;18:6,9;19:3;
41:1;43:19,20;62:17;64:1;
84:15;102:2,3,8;118:20

**upon (1)**
112:23

**USA (3)**
7:15;29:13;31:7

**use (15)**
12:2;13:13;47:7;49:4;
52:22;53:1,12;54:21;67:16;
85:1;98:23;103:21;106:11,15;
108:20

**used (20)**
25:11;28:21;29:2,4;45:8;
48:9;49:3,6;71:23;73:16;
81:9;102:19;105:13,17,21;
112:19,20;113:10,16;120:10

**using (1)**
92:4

## V

**vague (1)**
107:8

**variance (1)**
118:21

**various (5)**
12:9;43:14;75:23;84:21;
89:7

**vehicle (3)**
80:7,9,19

**vendors (1)**
33:18

**versus (3)**
6:3;70:7,9

**Verus (15)**
16:2,12;19:5;56:2,4,6,9,21;
57:2,4,7,9,12;77:7;79:6

**V-E-R-U-S (2)**
16:2,12

**vice (16)**
17:7;21:3;35:21;36:2;58:2,
6,9,10,11,13,14,16;59:1,2,7;
108:24

**video (2)**
74:17,18

**violently (1)**
97:13

**Virgin (2)**
53:6;106:17

**visit (3)**
49:22;72:21;86:23

## W

**W2s (1)**
13:21

**WAIVED (1)**
121:19

**Walsh (1)**
5:19

**way (18)**
9:2,15;13:5;19:23;23:22;
33:9;39:9;41:5;44:21,23;
46:23;63:15;84:15;87:24;
104:4;107:10,19;110:1

**web (1)**
67:7

**weekend (1)**
52:14

**Wells (9)**
16:1,7;19:5;56:24;57:8;
77:14,17;78:16;79:4

**weren't (5)**
16:1;56:1;57:3,3;61:15

**what's (1)**
115:3

**wherein (1)**
47:9

**WHEREUPON (13)**
5:10;18:20;36:5;40:4;45:9;
65:20;67:1,20;69:13;72:13;

DAMIAN ORLOWSKI vs.
LARRY BATES

JOHN RYDER
June 1, 2015

104:15;120:2;121:17
**whipped (1)**
97:8
**whose (4)**
46:18;47:4,4;48:8
**Williams (5)**
60:11,13,15,17;61:9
**willing (1)**
69:3
**wire (2)**
116:2,6
**wired (1)**
47:18
**wished (1)**
91:14
**withdrawal (1)**
78:14
**withdrawn (1)**
79:3
**within (7)**
15:19;78:13,24;85:8;86:4;
93:18;101:13
**without (2)**
42:24;66:22
**witness (23)**
5:2;18:17;24:24;25:3;38:8;
40:6,8;41:19,24;42:14;44:4;
45:7,11;62:7;65:22;66:12;
67:3,22;72:15;104:17;114:7;
120:4;121:15
**word (1)**
75:8
**words (2)**
16:23;20:2
**work (4)**
70:17;71:14,21;95:20
**worked (6)**
10:16;21:10;70:23;71:1,6,
10
**working (2)**
25:17;71:18
**worth (1)**
64:17
**wrapped (1)**
9:23
**write (1)**
79:2
**written (5)**
26:23;79:8;98:19,22;99:1
**wrote (3)**
17:1;31:24;103:16

## Y

**y'all (2)**
18:19;69:11
**year (2)**
9:11;13:22
**years (3)**
70:16;71:4;75:22
**yellow (1)**
40:11
**York (5)**

43:3;53:5;106:12;120:18,
19

## 1

**1 (6)**
40:5;79:17;88:2,4,6,7
**1:25 (1)**
121:18
**10 (1)**
5:9
**10:48 (1)**
18:21
**10:54 (1)**
18:21
**1099-type (1)**
14:4
**12 (1)**
71:1
**16 (9)**
36:22;37:12;114:12,24;
115:2,13,16,16,20
**18 (3)**
114:22;115:3,6
**18.5 (4)**
114:11;115:11,17,21
**18-and-a-half (1)**
112:11
**18-million-dollar (1)**
115:9
**197 (1)**
99:12

## 2

**2 (8)**
45:2,10;46:10;49:8,12;
79:19;88:2,12
**2.6 (1)**
48:1
**2011 (1)**
90:2
**2012 (1)**
90:2
**2013 (13)**
6:9,10;7:2;8:24;10:2,7;
14:2,11;30:5;38:23;49:22;
69:20;72:21
**2014 (1)**
9:10
**20-dollar (1)**
40:16
**26 (4)**
112:9;114:16;115:4,7
**27 (1)**
67:7

## 3

**3 (6)**
65:19,21;66:4;88:2,4,15
**3rd (4)**
38:23;49:22;56:7,10

## 4

**4 (2)**
66:24;67:2
**4,351,500 (1)**
47:18
**41 (1)**
70:16
**4473 (2)**
67:24;68:4
**478.11 (1)**
67:8
**478.124c (1)**
67:8

## 5

**5 (2)**
67:21,24
**50 (9)**
7:23,24;8:2,3;40:13;50:8,9,
13,14
**50/50 (1)**
29:11
**500,000 (2)**
54:12,13
**57 (1)**
66:6

## 6

**6 (2)**
72:14;112:18

## 7

**7 (1)**
72:14

## 8

**8 (2)**
37:19;113:9

## 9

**90 (1)**
101:13