| | |
|---|---|
| DAMIAN ORLOWSKI, et al., ) | Case No. 2:11-cv-01396 |
| ) | |
| *Plaintiffs on behalf of* ) | |
| *themselves and others* ) | |
| *similarly situated,* ) | |
| ) | |
| ) | |
| v. ) | |
| ) | |
| LARRY BATES, et al., ) | |
| ) | |
| *Defendants.* ) | |

---

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS BARBARA BATES AND LARRY BATES' MOTION FOR DISMISSAL AND SANCTIONS**

---

Before the Court is Plaintiffs' Motion for Summary Judgment as to Defendants First American Monetary Consultants, Inc. ("FAMC"), Information Radio Network, Inc. ("IRN"), Charles Larry Bates ("Larry Bates"), Barbara Bates, Robert Bates, Charles E. Bates ("Charles Bates"), and Kinsey Brown Bates, filed July 29, 2015. (ECF No. 438.)

Also before the Court is Defendants Barbara Bates and Larry Bates' Motion for Dismissal and Sanctions Against Plaintiffs Attorney and Receiver and Attorneys for Receivership ("Motion for Dismissal and Sanctions"), filed September 28, 2015. (ECF No. 491.)

1

For the reasons stated below, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Summary Judgment. The Court DENIES Defendants Barbara Bates and Larry Bates' Motion for Dismissal and Sanctions.

## I.    BACKGROUND

### A.    Factual Background

This case involves allegations of a complex, large-scale scheme to defraud hundreds of people over the course of many years.  (See 3d Am. Compl., ECF No. 375.)  Plaintiffs allege that Defendants advertised to and solicited money from individuals "for the alleged and believed purpose of purchasing gold, silver and precious metals through Defendants."  (Id. ¶ 25.)  "These purchases of precious metals [were] advertised by Defendants as a 'safe' purchase to protect and harness wealth during, what Defendants characterize[d] as, a period of world chaos and uncertainty, based on Christian beliefs and current political upheavals."  (Id. ¶ 26.)  Defendants received orders for precious metals from more than 500 customers.  (Id. ¶ 148.) Plaintiffs allege that these sales were made as part of a scheme devised by Larry Bates, Robert Bates, Charles Bates, Barbara Bates, Kinsey Brown Bates, and other Defendants, and designed to defraud customers.  (See id. ¶ 46.)

## 1.    First American Monetary Consultants, Inc.

FAMC was established by Larry Bates in 1983 and was in the business of selling precious metals.  (C. Larry Bates ("Larry Bates") Dep. 19:4-15, ECF No. 183; Barbara Bates Dep. 14:15-21, ECF No. 87-1; Statement of Undisputed Facts ("SUF") ¶ 1, ECF No. 438-2.)[1]  Larry Bates owns 50% of FAMC and Barbara Bates owns the other 50%.  (Barbara Bates Dep. 15:3-7, ECF No. 87-1.)  FAMC acquired customers through media advertisements, publications, conferences across the nation, and through referrals from other customers.  (Charles Bates Dep. 52:13-24, ECF No. 323; Larry Bates Dep. 135, ECF No. 183; SUF ¶ 14, ECF No. 438-2.)

When a customer called FAMC, he or she would speak to an FAMC economist or consultant about placing an order for precious metals.  (Larry Bates Dep. 60:24-61:7, ECF No. 183; SUF ¶ 30, ECF No. 438-2.) The economist or consultant would then advise the customer whether and what types of precious metals the customer should purchase.  (Charles Bates Dep. 30:20-31:22, 32:9-25, ECF No. 323.)  The economist or consultant would refer to the market price for gold bullion and a formula developed by Larry Bates to quote a price for the customer.  (Larry Bates

---

[1] Along with their Motion for Summary Judgment, Plaintiffs submit a Statement of Undisputed Facts.  (ECF No. 438-2.)  A review of the record, however, reveals that many of the facts at issue in this case are, in fact, disputed. See Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record." (emphasis added)).  The Court addresses below any factual disputes pertinent to the claims at issue in this Order.

Dep. 61:13-62:10, ECF No. 183; Charles Bates Dep. 33:1-14, ECF No. 323; SUF ¶ 36, ECF No. 438-2.) If the customer accepted the quoted price, the economist or consultant would fill out an internal transaction form, which was slipped under the door of FAMC's executive offices to notify Larry Bates that an order had been placed. (Larry Bates Dep. 62:23-63:5, ECF No. 183; Barnett Dep. 21-22, ECF No. 93-1; SUF ¶ 37, ECF No. 438-2.) All ordering was done by Larry Bates. (Denison Dep. 53:10-54:22, 118:25-119:7, 155:23-25, ECF No. 322-1; Charles Bates Dep. 32:3-5, 38:11-14, ECF No. 323; Larry Bates Dep. 226:6-14, 246:22-24, ECF No. 183; SUF ¶ 48, ECF No. 438-2.) An invoice would then be created by Cindy Standley and mailed to the customer. (Kinsey Bates Dep. 30:15-20, 31:5-7, ECF No. 88-1; SUF ¶ 52, ECF No. 438-2.) The customer would mail a check back to the Tennessee or Colorado office of FAMC. (Barbara Bates Dep. 35:17-20, ECF No. 87-1; SUF ¶ 53, ECF No. 438-2.)

The money received by FAMC was deposited into FAMC operating accounts. (Larry Bates Dep. 88:17-21, ECF No. 183; SUF ¶ 49, ECF No. 438-2.) FAMC was then supposed to purchase the precious metals and deliver them to customers. Some customers received partial orders and some customers received nothing at all. (Carmack Aff. ¶ 5, ECF No. 116-2; Cook Aff. ¶¶ 4, 6, ECF No. 116-3; Conklin Aff. ¶ 3, ECF No. 117-1; Dean Aff. ¶¶ 5, 9, 10, ECF No. 118-1; Matthews Aff. ¶¶ 3-4, ECF No.

4

119-1; Butler Rep. 4-6, ECF No. 426-5; SUF ¶ 45, ECF No. 438-2.)
When shipping products to customers, FAMC used the United States
Postal Service ("USPS"). (Charles Bates Dep. 132:7-11, ECF No.
323; SUF ¶ 55, ECF No. 438-2.)

### 2. Information Radio Network

IRN was a radio network established by Larry Bates in 2008.
(Butler Rep. 1, ECF No. 426-5; Larry Bates Dep. 41:10-13, ECF
No. 183.) IRN has approximately thirty-five different talk
shows and also produces news at the "top and bottom of the
hour." (Charles Bates Dep. 59:14-22, ECF No. 323.)

Larry Bates and Barbara Bates owned a two-thirds interest
in IRN and the Maddoux family owned an encumbered one-third
interest. (Larry Bates Dep. 41:10-24, ECF No. 183.) The IRN
Board of Directors was made up of Larry Bates, Barbara Bates,
and Mark Maddoux. (Larry Bates Dep. 43:16-44:1, ECF No. 183.)
Larry Bates was the CEO of IRN, Charles Bates was the Executive
Vice President and News Director, and Robert Bates was the
Senior Vice President in charge of advertising and affiliate
sales. (Larry Bates Dep. 52:9-19, ECF No. 183; Charles Bates
Dep. 60:13-18, 61:7-12, ECF No. 323.) Charles Bates handled
news gathering and oversaw technical operations and also hosted
a radio show on IRN, during which he, on occasion, mentioned
FAMC. (Charles Bates Dep. 53:3-7, 54:7-9, 61:21-23, ECF No.

323.)  Robert Bates handled advertising and human resources. (Charles Bates Dep. 61:25-62:2.)

### 3.  **Larry Bates**

Dr. Larry Bates established both FAMC and IRN and was the "head honcho." (Denison Dep. 99:23-100:3, ECF No. 322-1; Larry Bates 19:3-7, 41:10-13, ECF No. 183; SUF ¶ 12, ECF No. 438-2.) He was the CEO and Chief Economist of FAMC. (See Larry Bates Dep. 20:20-22, 82:24-83:5, ECF No. 183; SUF ¶ 11, ECF No. 438-2.)  Larry Bates processed every transaction for FAMC: he bought the metals, checked the metals, directed the shipment of the metals, and resolved any customer complaints. (Denison Dep. 156:5-157:1, ECF No. 322-1; Charles Bates Dep. 36:7-17, 38:11-14, ECF No. 323; Larry Bates Dep. 246:4-247:7, ECF No. 183; SUF ¶¶ 9, 10, 38, 44, 48, 50, ECF No. 438-2.)  Larry Bates also developed the formula for quoting the customers a price for precious metals. (Larry Bates Dep. 61:13-62:10, ECF No. 183; SUF ¶ 36, ECF No. 438-2.)  According to Larry Bates, he has no idea what happened to the money belonging to customers or what happened to the coins that were supposed to fill the orders of customers. (Larry Bates Dep. 90:7-20, 213:25-214:14, 221:11-24, ECF No. 183; SUF ¶ 66, ECF No. 438-2.)

Additionally, Larry Bates had access to all accounts and monies. (Ryder Dep. 103-104, ECF No. 433-1; SUF ¶ 110.)  Larry Bates took $2,652,000 out of FAMC when it was insolvent, placed

the money into a brokerage account, and reimbursed FAMC $2,620,000. (Butler Rep. 8; see also Ryder Dep. 47:6-49:7; Ryder Status Rep. 4, ECF No. 426; SUF ¶¶ 108, 135.) Mr. Butler, an accountant and certified fraud examiner retained by the Receiver, reported that Larry Bates made $160,306.00 in non-business-related purchases which were included in the operating expenses of the Company. (Ex. H, Butler Rep. at 19, ECF No. 426-5; see SUF ¶¶ 131, 134, ECF No. 438-2.)

### 4. Barbara Bates

Barbara Bates held a 50% ownership in FAMC and was involved with IRN as an owner and director. (Barbara Bates Dep. 15:3-7, 103:19-21, ECF No. 87-1; Larry Bates Dep. 41:10-13, ECF No. 183.) She also worked for FAMC as the vice president of administration and received a salary of approximately $75,000. (Barbara Bates Dep. 19:5-7, 65:2-3, 97:1-9, ECF No. 87-1.) Her duties at FAMC consisted of paying bills and bookkeeping. (Barbara Bates Dep. 19:14-20:16, ECF No. 87-1.) When customers sent checks to the Memphis office of FAMC, Barbara Bates would deposit those checks into FAMC accounts. (Barbara Bates Dep. 22:2-7, ECF No. 87-1; SUF ¶ 53, ECF No. 438-2.) These accounts were accessible to Barbara Bates, as well as Larry Bates and Cindy Standley. (Barbara Bates Dep. 53:18-20, ECF No. 87-2; SUF ¶ 54, ECF No. 438-2.) Barbara Bates could initiate wire transfers or sign checks. (Barbara Bates Dep. 51:24-52:9, 53:5-

10, ECF No. 87-1; SUF ¶ 49, ECF No. 438-2.)  Barbara Bates further testified that she had no authority to make decisions for writing checks or initiating wire transfers in FAMC; she just followed her husband's directions in that regard.  (Barbara Bates Dep. 27:3-14, 52:23-53:2, ECF No. 87-1.)

### 5.  Charles Bates

Charles Bates was Executive Vice President and News Director for IRN (Larry Bates Dep. 52:14-17, ECF No. 183) and was Special Assistant Economist and Political Affairs for FAMC (Charles Bates Dep. 74:24-75:2, ECF No. 323). (SUF ¶¶ 96, 100, ECF No. 438-2.)  With respect to IRN, Charles Bates hosted a two-hour weekday radio program called "News and Views." (Charles Bates Dep. 53:3-7, 55:20-22, ECF No. 323; see SUF ¶ 96, ECF No. 438-2.)  As an economist with FAMC, Charles Bates advised customers and accepted orders over the phone.  (See Charles Bates Dep. 109:23-113:13, ECF No. 323; SUF ¶ 17, ECF No. 438-2.)  Charles Bates testified that when speaking with a client, he would try "to get some ideas of where they're at financially and then try to make recommendations from that." (Charles Bates Dep. 109:5-11, ECF No. 323.)  These recommendations ranged from specific precious metal recommendations to general allocation or sector recommendations. (Charles Bates Dep. 109:23-113:13, ECF No. 323.)

After Larry Bates began experiencing health issues, Charles Bates took over management of FAMC and IRN; Robert Bates participated in management to a lesser extent. (Larry Bates Dep. 95:2-3, ECF No. 183; Ryder Dep. 89:21-90:19, ECF No. 433-1; see SUF ¶ 86, ECF No. 438-2.) The control of the "receipt and delivery of precious metals . . . rested with Dr. Larry Bates." (Ryder Dep. 92:5-23, ECF No. 433-1; see also Larry Bates Dep. 226:6-8, ECF No. 183.) If Larry Bates was absent, Charles Bates had authority to sign for delivery of coins and had access to the shipping room and combinations for the safes kept in that room. (Ryder Dep. 93:4-94:2, ECF No. 433-1; SUF ¶¶ 50, 92, ECF No. 438-2; see also Barbara Bates Dep. 96:5-21, ECF No. 87-1; Barnett Dep. 91:16-92:3, ECF No. 93-1; Larry Bates Dep. 225:12-23, ECF No. 183.)

Charles Bates testified that he knew that customers were still waiting on their orders. (Charles Bates Dep. 94:20-95:7, ECF No. 323.) If a customer informed him that they wanted part or all of their money back or the product, he did not have authority to make a decision on that and would forward the message to Larry Bates. (Charles Bates Dep. 176:4-177:19, ECF No. 323; see Larry Bates Dep. 226:12-14, ECF No. 183.) According to Mr. Ryder, the Receiver appointed to manage the corporate entities, Charles Bates would make representations to clients about when orders would be filled. (Ryder Dep. 101:4-

18, ECF No. 433-1; SUF ¶¶ 47, 91, ECF No. 438-2; <u>see also</u> Rikard
Dep. 131:17-132:13, ECF No. 92-1; Mathews Decl. ¶ 4, ECF No.
119-1.)  Charles Bates also advised other consultants with FAMC
that the coins were delayed because they were hard to find.
(Williams Dep. 40:10-16, ECF No. 94-1; <u>see</u> SUF ¶ 70, ECF No.
438-2.)  Charles Bates "continued to accept orders at a time
when he knew or should have known that orders were routinely not
being filled." (Ryder Dep. 104:8-21, ECF No. 433-1; Rikard Dep.
131:6-10, ECF No. 92-1; SUF ¶¶ 87, 90, ECF No. 438-2.)  Mr.
Butler's report further indicates that $47,561.00 of Charles
Bates' personal expenses were included in the operating expenses
of FAMC.  (Butler Rep. at PageID 5860, ECF No. 426-5; SUF ¶
116(j), ECF No. 438-2; <u>see also</u> Ryder Dep. 105:20-23, ECF No.
433-1.)

### 6.  Robert Bates

Robert Bates was Senior Vice President for IRN and "Senior
Monetary Consultant" for FAMC.  (Robert Bates Dep. 58:3-5, 85:4-
5, ECF No. 89-1.)  As a consultant for FAMC, Robert Bates would
give customers general financial advice and "specific advice
about precious metals" based on what Larry Bates recommended.
(Robert Bates Dep. 37:16-38:8, 39:21-40:11, ECF No. 89-1; <u>see</u>
SUF ¶ 33, ECF No. 438-2.)  His base salary at FAMC was $12,000
plus commissions.  (Robert Bates Dep. 183:2-8, ECF No. 89-1.)
In his role as Senior Vice President for IRN, he "overs[aw] the

advertising and overs[aw] the affiliate relations." (Robert Bates Dep. 58:3-8, ECF No. 89-1.) His base salary at IRN was $36,000. (Robert Bates Dep. 183:4-5, ECF No. 89-1.)

After Larry Bates began experiencing health issues, Robert Bates took over management of FAMC and IRN, though to a lesser extent than Charles Bates. (Ryder Dep. 89:21-90:19, ECF No. 433-1; see SUF ¶ 86, ECF No. 438-2.) The control of the "receipt and delivery of precious metals . . . rested with Dr. Larry Bates." (Ryder Dep. 92:5-23, ECF No. 433-1; see also Larry Bates Dep. 226:6-8, ECF No. 183.) If Larry Bates was absent, Robert Bates had authority to sign for delivery of coins and had access to the shipping room and combinations for the safes kept in that room. (Ryder Dep. 93:4-94:2, ECF No. 433-1; SUF ¶ 92, ECF No. 438-2; see also Barnett Dep. 91:16-92:3, ECF No. 93-1; Robert Bates Dep. 227:22-228:12, ECF No. 89-1; ECF No. 89-7 at PageID 991, 993-95; SUF ¶ 111, ECF No. 438-2.) Robert Bates testified that while Larry Bates was on medical leave, they informed customers that their orders would be taken care of when Larry Bates returned from medical leave and "deferred all complaints to [Larry Bates]." (Robert Bates Dep. 172:4-25, ECF No. 89-1.)

According to Mr. Ryder, Robert Bates would make representations to clients about when orders would be filled. (Ryder Dep. 101:4-18, ECF No. 433-1; see also Robert Bates Dep.

270:5-7, ECF No. 89-1; Mathews Decl. ¶ 4, ECF No. 119-1; SUF ¶¶ 46, 91, ECF No. 438-2.) Robert Bates represented to customers that their orders were delayed because the U.S. Mint was behind or that their gold was held up in customs. (Robert Bates Dep. 192:3-12, ECF No. 89-1; see SUF ¶ 70, ECF No. 438-2.) According to Robert Bates, when providing this information to clients, he relied on what his dad told him. (Robert Bates Dep. 192:12-24, 270:17-23, ECF No. 89-1.) Additionally, Robert Bates "continued to accept orders at a time when he knew or should have known that orders were routinely not being filled." (Ryder Dep. 104:17-105:1, ECF No. 433-1; SUF ¶¶ 87, 90, ECF No. 438-2; see also Robert Bates Dep. 191:2-8, ECF No. 89-1.) Mr. Butler's report further indicates that $96,012.00 of Robert Bates' personal expenses were included in the operating expenses of FAMC. (Butler Rep. at PageID 5860, ECF No. 426-5; SUF ¶ 116(j), ECF No. 438-2; see also Ryder Dep. 105:16-19, ECF No. 433-1.)

### 7. **Kinsey Bates**

Kinsey Bates was Dr. Larry Bates' Executive Assistant at FAMC beginning in the fall 2009. (Kinsey Bates Dep. 12:9-13, 13:3-5, ECF No. 88-1; see SUF ¶ 78, ECF No. 438-2.) She testified that she earned an annual salary of about $32,000. (Kinsey Bates Dep. 27:5-20, ECF No. 88-1.) Kinsey Bates estimated that 90% of her time was spent working on FAMC-related matters, and 10% was spent on IRN-related matters. (Kinsey

Bates Dep. 20:1-10, ECF No. 88-1.)    As Executive Assistant, Kinsey Bates was responsible for giving Larry Bates his messages, taking and sorting the FAMC/IRN mail, delivering items to the post office, delivering mail to Larry Bates when he was on medical leave, fielding customer calls regarding the status of their orders, and delivering checks to Barbara Bates. (Kinsey Bates Dep. 12:18-24, 16:18-22, 19:2-25, 20:14-22:7, 48:25-49:9, ECF No. 88-1; SUF ¶ 82, ECF No. 438-2.)   Kinsey Bates testified that she has not been in the area of FAMC where the coins are kept and that she was not involved with any shipping. (Kinsey Bates Dep. 44:23-25, 56:20-57:1, ECF No. 88-1.)

Kinsey Bates testified that when customers requested a status update on their order, she would inform them that she did not know the status of their order. (Kinsey Bates Dep. 21:3-22:4, ECF No. 88-1; see SUF ¶¶ 78, 81, ECF No. 438-2.)   Any customer complaints were forwarded to Larry Bates. (Kinsey Bates Dep. 23:10-14, ECF No 88-1.)   Kinsey Bates was aware that some customers reported a delay in receiving their orders. (Kinsey Bates Dep. 46:13-47:5, ECF No. 88-1.)

On October 14, 2013, the same day that this Court issued its Order for Temporary Restraining Order Freezing All Assets of Defendants (ECF No. 120), Kinsey Bates endorsed her name on the back of a check for $1,200.00 made out to Robert Bates from Larry Bates. (SUF ¶ 83, ECF No. 438-2.)   On October 28, 2013,

after the Receiver had been appointed and Defendants had notice of the TRO, Kinsey Bates deposited this check into her account. (See ECF No. 124; SUF ¶¶ 78, 83, ECF No. 438-2.)  Mr. Butler's report indicates that Kinsey Bates was paid $6,474.00 in unearned commissions, although she was not an economist. (Butler Rep. at PageID 5859 & n.1, ECF No. 426-5; see SUF ¶ 113, ECF No. 438-2.)  Mr. Butler's report further shows that $9,758.00 of Kinsey Bates' personal expenses were included in the operating expenses of FAMC. (Butler Rep. at PageID 5860, ECF No. 426-5; see SUF ¶¶ 113, 116(j), ECF No. 438-2.)

**B.  Procedural Background**

Plaintiffs filed the Complaint in this action on December 28, 2011. (Compl., ECF No. 1.)  Plaintiffs filed their First Amended Complaint on August 13, 2012 (ECF No. 53), their Second Amended Complaint on March 14, 2014 (ECF No. 224), and their Third Amended Complaint on October 20, 2014 (ECF No. 375).

On December 17, 2013, Plaintiffs moved for class certification. (ECF No. 182.)  The Court held a hearing on the motion for class certification on April 29, 2014. (ECF No. 285.)  The Court granted Plaintiffs' motion for class certification on April 30, 2014 (ECF No. 289), and issued an amended order certifying the class later that same day (ECF No. 290).

On July 29, 2015, Plaintiffs filed a Motion for Summary Judgment as to Defendants FAMC, IRN, Larry Bates, Barbara Bates, Robert Bates, Chuck Bates, and Kinsey Bates. (ECF No. 438.) On September 4, 2015, the Court granted Defendants Larry and Barbara Bates a thirty-day extension to respond to Plaintiff's Motion. (ECF Nos. 481, 482.) Defendants Larry and Barbara Bates filed a joint Response to Plaintiffs' Motion for Summary Judgment and Motion for Dismissal and Sanctions on September 28, 2015. (ECF No. 491.) Defendants Charles Bates and Robert Bates untimely filed a Response on October 20, 2015, eighty-three (83) days after Plaintiffs' Motion for Summary Judgment was filed. (ECF No. 504.) Defendants FAMC, IRN, and Kinsey Bates did not file a response. The Receiver filed a reply brief and responded to Defendants Larry and Barbara Bates' Motion on October 1, 2015. (ECF No. 496.) Plaintiffs filed a reply on October 7, 2015. (ECF No. 498.) Plaintiffs responded to Defendants Larry and Barbara Bates' Motion on October 9, 2015. (ECF No. 499.) The Court held a hearing on Plaintiffs' Motion for Summary Judgment on October 27, 2015. (ECF No. 515.)

## II. LEGAL STANDARD

### A. Summary Judgment

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of summary judgment if proof of that fact would establish or refute an essential element of the cause of action or defense." Bruederle v. Louisville Metro Gov't, 687 F.3d 771, 776 (6th Cir. 2012).

"In considering a motion for summary judgment, [the] court construes all reasonable inferences in favor of the nonmoving party." Robertson v. Lucas, 753 F.3d 606, 614 (6th Cir. 2014) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact." Mosholder v. Barnhardt, 679 F.3d 443, 448 (6th Cir. 2012) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

"Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." Mosholder, 679 F.3d at 448-49; see also Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587. "When the non-moving party fails to make a sufficient showing of an essential element of his case on which he bears the burden of proof, the moving parties are entitled to judgment as a matter of law and summary judgment is proper." Martinez v. Cracker Barrel Old Country Store, Inc., 703 F.3d 911, 914 (6th Cir. 2013) (quoting Chapman v. UAW Local 1005, 670 F.3d

677, 680 (6th Cir. 2012) (en banc)); <u>see also</u> <u>Kalich v. AT & T</u>
<u>Mobility, LLC</u>, 679 F.3d 464, 469 (6th Cir. 2012).

"To show that a fact is, or is not, genuinely disputed,
both parties are required to either 'cite[] to particular parts
of materials in the record' or 'show[] that the materials cited
do not establish the absence or presence of a genuine dispute,
or that an adverse party cannot produce admissible evidence to
support the fact.'" <u>Bruederle</u>, 687 F.3d at 776 (alterations in
original) (quoting Fed. R. Civ. P. 56(c)(1)); <u>see also</u>
<u>Mosholder</u>, 679 F.3d at 448 ("To support its motion, the moving
party may show 'that there is an absence of evidence to support
the nonmoving party's case.'") (quoting <u>Celotex Corp.</u>, 477 U.S.
at 325). "Credibility determinations, the weighing of the
evidence, and the drawing of legitimate inferences from the
facts are jury functions, not those of a judge[.]" <u>Martinez</u>,
703 F.3d at 914 (alteration in original) (quoting <u>Anderson v.</u>
<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986)).

"The court need consider only the cited materials, but it
may consider other materials in the record." Fed. R. Civ.
P. 56(c)(3). "[T]he district court has no 'duty to search the
entire record to establish that it is bereft of a genuine issue
of material fact.'" <u>Pharos Capital Partners, L.P. v. Deloitte &</u>
<u>Touche</u>, 535 F. App'x 522, 523 (6th Cir. 2013) (per curiam)
(quoting <u>Tucker v. Tennessee</u>, 539 F.3d 526, 531 (6th Cir.

2008)). "'[J]udges are not like pigs, hunting for truffles' that might be buried in the record." Emerson v. Novartis Pharm. Corp., 446 F. App'x 733, 736 (6th Cir. 2011) (alteration in original) (quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)).

The decisive "question is whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Johnson v. Memphis Light Gas & Water Div., 777 F.3d 838, 843 (6th Cir. 2015) (quoting Anderson, 477 U.S. at 251–52). "[A] mere 'scintilla' of evidence in support of the non-moving party's position is insufficient to defeat summary judgment; rather, the non-moving party must present evidence upon which a reasonable jury could find in her favor." Tingle v. Arbors at Hilliard, 692 F.3d 523, 529 (6th Cir. 2012) (quoting Anderson, 477 U.S. at 251).

**B.    Pro Se Standards**

Documents filed by pro se litigants are "'to be liberally construed'" and "'however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)). Pro se litigants, however, are not exempt from the basic pleading requirements of

the Federal Rules of Civil Procedure. <u>Wells v. Brown</u>, 891 F.2d 591, 594 (6th Cir. 1989).

## III. ANALYSIS

In their Motion for Summary Judgment, Plaintiffs argue that they are entitled to summary judgment on six causes of action against Defendants FAMC, IRN, Larry Bates, Barbara Bates, Charles Bates, Robert Bates, and Kinsey Bates[2]: (1) breach of contract/unjust enrichment (ECF No. 438-1 at 12-19); (2) fraud/tortious misrepresentation (<u>id.</u> at 19-27); (3) wrongful trover/conversion (<u>id.</u> at 27-28); (4) breach of trust/breach of fiduciary duty (<u>id.</u> at 28-31); (5) civil RICO (<u>id.</u> at 31-37); and (6) tortious conspiracy (<u>id.</u> at 38-41).

### A. Choice of Law

Because five of the six causes of action alleged by Plaintiffs are based on state law, the Court must first address the threshold question of which state's law applies. Plaintiffs argue that Tennessee law applies because Tennessee has the most significant relationship to the claims in this case. (ECF No. 438-1 at 10-12.) Defendants have not challenged the application of Tennessee law.

---

[2] In addition to the six apparent causes of action, Plaintiffs also include "constructive trust" in their causes of action section. (ECF No. 438 at 37-38.) This "cause of action," however, appears to be relief requested as a result of the other causes of action as opposed to an independent ground for relief.

"[A] federal court sitting in diversity applies the choice-of-law rules of the state in which the court sits." Performance Contracting Inc. v. DynaSteel Corp., 750 F.3d 608, 611 (6th Cir. 2014) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 497 (1941)). "Tennessee has adopted the 'most significant relationship' test of the Restatement (Second) Conflict of Laws to choice-of-law questions for tort claims." Carbon Processing & Reclamation, LLC v. Valero Mktg. & Supply Co., 823 F. Supp. 2d 786, 809 (W.D. Tenn. 2011). Under this test, courts

> should weigh the parties' contacts to determine which state has the most significant relationship to the action, including (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered.

Id. at 810; see also Gov't Emps. Ins. Co. v. Bloodworth, No. M2003-02986-COA-R10-CV, 2007 WL 1966022, at *28 (Tenn. Ct. App. June 29, 2007).

As Plaintiffs correctly point out, Tennessee has the most significant relationship to the tort claims in this case for several reasons: (1) the majority of the defendants are citizens of Tennessee; (2) FAMC's business was centered in Tennessee and three-quarters of its employees worked in the Tennessee office; (3) all of the purchasing of precious metals by FAMC was done in Tennessee; (4) all metals were shipped to the Memphis office of

FAMC; (5) all FAMC employees, in both Tennessee and Colorado, reported to Larry Bates and their commissions were paid out of the Tennessee office; and (6) Larry Bates, the "head honcho of FAMC" resides in and worked in Tennessee. (ECF No. 438-1 at 11-12.) Although FAMC was a Colorado corporation and the injuries occurred in multiple states, the fraudulent scheme emanated from and was controlled from Tennessee. (Id.) The Court finds that factors (2), (3), and (4) weigh heavily in favor of applying Tennessee law. Consequently, Tennessee law applies to the tort claims in this action.

For contract claims, "Tennessee adheres to the rule of lex loci contractus—'a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent.'" Se. Texas Inns, Inc. v. Prime Hosp. Corp., 462 F.3d 666, 672 n.8 (6th Cir. 2006) (quoting Vantage Tech., LLC v. Cross, 17 S.W.3d 637, 650 (Tenn. Ct. App. 1999)). In a contract for the sale of goods, section 47-1-301 of the Tennessee Code provides that "when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties." Tenn. Code Ann. § 47-1-301. "In the absence of such an agreement, Tennessee's UCC applies 'to transactions bearing

an appropriate relation to' the state of Tennessee." <u>Carbon Processing</u>, 823 F. Supp. 2d at 801.

In the instant matter, the parties have not disputed that Tennessee law governs the contract claim. In the absence of a contractual choice of law agreement to the contrary, Tennessee law applies to this claim. <u>See</u> <u>id.</u> Plaintiffs primarily placed their orders via telephone to economists and consultants located in Tennessee. Many of the customers mailed back the invoices to Tennessee. Additionally, the orders of precious metals were shipped from Tennessee. These transactions bear an appropriate relation to the State of Tennessee, and accordingly, Tennessee law applies to the contract claim.[3]

**B.  Breach of Contract**

Plaintiffs argue that "Defendants breached their contracts with the Plaintiffs for the sale of precious metals when they failed to substantially perform within a reasonable amount of time." (ECF No. 438-1 at 12.) Plaintiffs contend that

> [t]he Defendants' breaches include, but are not limited to, failing to deliver all or part of the ordered and paid for precious metals; failing to deliver the ordered and paid for precious metals within the represented delivery time frame; failing to deliver the products ordered, and instead substituting inferior products; and failing to deliver monies for metals purchased from customers by FAMC.

(<u>Id.</u> at 13.)

---

[3] Applying Colorado law to the breach of contract claim would result in the same determination. <u>See</u> Colo. Rev. Stat. § 4-2-101 <u>et</u> <u>seq.</u> (codifying the Uniform Commercial Code).

22

To establish breach of contract under Tennessee law, Plaintiffs must prove: "(1) the existence of a contract, (2) breach of the contract, and (3) damages which flow from the breach." Life Care Ctrs. of Am., Inc. v. Charles Town Assocs. Ltd. P'ship, LPIMC, Inc., 79 F.3d 496, 514 (6th Cir. 1996). "Tennessee has adopted UCC 2-207(3) . . . which provides, 'Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract.'" Carbon Processing, 823 F. Supp. 2d at 804 (quoting Tenn. Code Ann. § 47-2-207(3)). Tennessee law further provides that "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Tenn. Code Ann. § 47-2-204(1). The Statute of Frauds provides that, in general,

> a contract for sale of goods for the price of five hundred dollars ($500) or more is not enforceable by way of action or defense unless there is some writing or record sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

Tenn. Code Ann. § 47-2-201(1). Alternatively, the Statute of Frauds is satisfied and an enforceable contract results "with respect to goods for which payment has been made and accepted or

23

which have been received and accepted." Tenn. Code Ann. § 47-2-201(3)(c).

Whether a contract has been breached "is a pure and simple question of contract interpretation which should not vary from state to state." Indianer v. Franklin Life Ins. Co., 113 F.R.D. 595, 607 (S.D. Fla. 1986), overruled in part on other grounds by Ericsson GE Mobile Commc'ns, Inc. v. Motorola Commc'ns & Elecs., Inc., 120 F.3d 216, 219 n.12 (11th Cir. 1997). "The obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract." Tenn. Code Ann. § 47-2-301. The failure of either party to satisfy this obligation constitutes a breach.

As an initial matter, the sale of precious metals is a sale of goods and is subject to Tennessee's enactment of the UCC. Under section 47-2-105(1) of the Tennessee Code, goods are "all things . . . which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities . . . and things in action." Tenn. Code Ann. § 47-2-105(1). The precious metals were not "money" or "investment securities" as defined in the Tennessee Code.[4] Accordingly, the precious metals are goods, and their

---

[4] "Money" is "a medium of exchange currently authorized or adopted by a domestic or foreign government. The term includes a monetary unit of account established by an intergovernmental organization or by an agreement between two (2) or more countries[.]" Tenn. Code Ann. § 47-1-201(b)(24). A "security" is

24

sale is subject to Chapter 2 of Tennessee's Commercial Instruments and Transactions statutes. <u>See also</u> Sales Tax on Gold & Silver Coins, Op. Tenn. Att'y Gen. No. 12-110 (Dec. 28, 2012) (holding that gold and silver coins are tangible personal property for sales tax purposes).

The record reflects that Defendant FAMC took orders with customers over the phone and then memorialized the material terms in a written invoice, which was mailed to customers. (<u>See</u> Charles Bates Dep. 217:6-11, ECF No. 323.) In response, customers mailed checks to FAMC, and FAMC deposited these checks. The mailing of a written invoice and receipt and deposit of customer checks created enforceable, written contracts for the sale of goods. The Statute of Frauds was alternatively satisfied when payment for the goods was received and accepted by FAMC. <u>See</u> Tenn. Code Ann. § 47-2-201.

---

an obligation of an issuer or a share, participation, or other interest in an issuer or in property or an enterprise of an issuer:

(i)   Which is represented by a security certificate in bearer or registered form, or the transfer of which may be registered upon books maintained for that purpose by or on behalf of the issuer;

(ii)  Which is one of a class or series or by its terms is divisible into a class or series of shares, participations, interests, or obligations; and

(iii) Which:

     (A)   is, or is a type, dealt in or traded on securities exchanges or securities markets; or

     (B)   is a medium for investment and by its terms expressly provides that it is a security governed by this chapter.

Tenn. Code Ann. § 47-8-102(a)(15).

The fact that Defendant FAMC failed to satisfy these customer orders in full is undisputed. Accordingly, Defendant FAMC breached its contracts with Plaintiffs by failing to fully perform. Plaintiffs are entitled to summary judgment on their breach of contract claim against Defendant FAMC. There is no evidence that any other Defendant is a party to the customer contracts. Plaintiffs are therefore not entitled to summary judgment on their breach of contract claims against the other Defendants.

### C. Fraud/Tortious Misrepresentation

Plaintiffs argue that Defendants' actions constitute fraud either (1) by way of inference because their actions constitute a Ponzi scheme or (2) pursuant to common law in Tennessee. (ECF No. 438-1 at 19-27.)

"Fraud occurs when a person intentionally misrepresents a material fact or intentionally produces a false impression in order to mislead another or to obtain an unfair advantage." Lopez v. Taylor, 195 S.W.3d 627, 634 (Tenn. Ct. App. 2005) (citing Brown v. Birman Managed Care, Inc., 42 S.W.3d 62, 66 (Tenn. 2001)).

"A Ponzi scheme is any sort of fraudulent arrangement that uses later acquired funds or products to pay preexisting investments." Bartson v. Marroquin (In re Marroquin), 441 B.R. 586, 598 (Bankr. N.D. Ohio 2010). Ponzi schemes are by

definition fraudulent.   <u>Id.</u>   "One can infer intent to defraud future undertakers from the mere fact that a debtor was running a Ponzi scheme.   Indeed, no other reasonable inference is possible."   <u>Merrill v. Abbott</u> (<u>In re Indep. Clearing House Co.</u>), 77 B.R. 843, 860 (D. Utah 1987).   The court in <u>Independent Clearing House</u> further explained,

> A Ponzi scheme cannot work forever.  The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors.   The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors.   He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money.   Knowledge to a substantial certainty constitutes intent in the eyes of the law.

<u>Id.</u> at 656 (citations omitted).

To establish a claim of common law fraud, Plaintiffs must prove:

> (1) an intentional misrepresentation with regard to a material fact, (2) knowledge of the representation['s] falsity—that the representation was made "knowingly" or "without belief in its truth," or "recklessly" without regard to its truth or falsity, (3) that the plaintiff reasonably relied on the misrepresentation and suffered damage, and (4) that the misrepresentation relates to an existing or past fact, or, if the claim is based on promissory fraud, then the misrepresentation must "embody a promise of future action without the present intention to carry out the promise."

<u>Shahrdar v. Glob. Hous., Inc.</u>, 983 S.W.2d 230, 237 (Tenn. Ct. App. 1998) (alteration in original) (quoting <u>Stacks v. Saunders</u>,

812 S.W.2d 587, 592 (Tenn. Ct. App. 1990)). Generally, a misrepresentation is a false statement, but a defendant's silence may constitute a misrepresentation when there is "some trick or contrivance intended to exclude suspicion and prevent inquiry" or there is "a duty resting on the party knowing such facts to disclose them." Shadrick v. Coker, 963 S.W.2d 726, 735-36 (Tenn. 1998) (emphasis omitted) (quoting Benton v. Snyder, 825 S.W.2d 409, 414 (Tenn. 1992)).

Despite Plaintiffs' contentions to the contrary, a review of the record in this matter reflects material factual disputes as to these claims. Construing the evidence in the light most favorable to the non-moving party, the record demonstrates that Defendants held customer funds in a corporate FAMC account to purchase coins in bulk. The record is not clear, however, as to whether Defendants used later-acquired funds to pay for pre-existing orders. Because the Court may not weigh the credibility of evidence or make inferences at this stage, the Court cannot determine from the evidence that Defendants engaged in a Ponzi scheme.

Similarly, there is a factual dispute as to whether any of the Defendants knowingly made misrepresentations to customers. Additionally, in their Statement of Undisputed Facts, Plaintiffs generally attribute false statements to Larry Bates, Charles Bates, and Robert Bates. (SUF ¶¶ 18, 70, ECF No. 438-2.)

Without additional evidence, however, the Court cannot determine which Defendant or Defendants made the statements at issue and whether that particular Defendant had knowledge of its falsity at the time he made the statement. With respect to Plaintiffs' allegations that Defendants Barbara and Kinsey Bates made misrepresentations to customers, Plaintiffs fail to identify the particular statement or statements that were allegedly made with knowledge of their falsity. Accordingly, Plaintiffs have not sufficiently demonstrated that they are entitled to summary judgment on their fraud claims.

### D. Tortious Conversion

Plaintiffs argue that Defendants' misappropriation of Plaintiffs' precious metals and money specifically designated for the purchase of precious metals constitutes conversion. (ECF No. 438-1 at 27-28.)

"A conversion, in the sense of the law of trover, is the appropriation of the thing to the party's own use and benefit, by the exercise of dominion over it, in defiance of plaintiff's right." Mammoth Cave Prod. Credit Ass'n v. Oldham, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977) (quoting Barger v. Webb, 391 S.W.2d 664, 665 (1965)). "To be liable for conversion, the defendant 'need only have an intent to exercise dominion and control over the property that is in fact inconsistent with the plaintiff's rights, and do so.'" Hanna v. Sheflin, 275 S.W.3d

423, 427 (Tenn. Ct. App. 2008) (quoting Mammoth, 569 S.W.2d at 836).

"Property may be converted in three ways. First, a person may dispossess another of tangible personalty. Second, a person may dispossess another of tangible property through the active use of an agent. Third, under certain circumstances, a person who played no direct part in dispossessing another of property, may nevertheless be liable for conversion for 'receiving a chattel.'" PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp., 387 S.W.3d 525, 553 (Tenn. Ct. App. 2012) (citations omitted). In general, conversion involves tangible property, but "[m]isappropriated funds placed in the custody of another for a definite purpose may be subject to a suit for conversion." Id. at 553-54 (quoting 90 C.J.S. Trover and Conversion § 16 (2012)). Specifically, "where the defendant is under an obligation to deliver specific money to the plaintiff and fails or refuses to do so, or when wrongful possession of it has been obtained by the defendant, there is a conversion for which trover lies." Id. (quoting C.J.S. Trover and Conversion § 16 (2012)).

Plaintiffs have presented evidence that Defendants used FAMC corporate credit cards for "potentially non-business related" expenses. (See Butler Rep. 6-7, ECF No. 426-5; Ex. H at PageID 5860, Butler Rep., ECF No. 426-5.) The expenses

30

identified by Mr. Butler include purchases at local restaurants, gas expenses, and other various expenses. Mr. Butler's analysis was based solely on the bank and credit card statements, cash journals, and ledgers, and his determination of whether these expenses were for business or personal use. (See Butler Dep. 13:8-18:10, ECF No. 435-1.) He was not provided with any additional documentation from which he could make a more conclusive determination. (Butler Dep. 19:24-20:6, 44:15-19, ECF No. 435-1.) Accordingly, a reasonable juror could find that these items were, in fact, business expenses. Thus, Plaintiffs have not shown that Defendants converted these funds for their personal benefit.

Similarly, the record is not clear as to the extent that the advances taken by Defendants constitute conversion. In certain situations, employees are permitted to accept loans or advances from their employer. See, e.g., Gregg v. New Careyville Coal Co., 31 S.W.2d 693, 694 (Tenn. 1930) ("The Compensation Act does not forbid the employer and employee from contracting in good faith, pending a settlement for the claim for compensation, for advancement by the employer to the employee . . . ."); Solomon v. FloWarr Mgmt., Inc., 777 S.W.2d 701 (Tenn. Ct. App. 1989) (referring to a loan agreement between an employer and employee). Additionally, the record reflects that at least some of the advances to the individual Defendants

were paid back to FAMC; *see also* <u>Unker v. Joseph Markovits,
Inc.</u>, 643 F. Supp. 1043, 1050 (S.D.N.Y. 1986) (construing the
terms of a promissory note under which an employer loaned money
to its employee).

Moreover, Plaintiffs have not demonstrated that the funds
allegedly converted by the individual Defendants were, in fact,
customer funds. There is no dispute that FAMC charged consumers
a marked-up price for the precious metals. Defendants allege
that the customer funds had been sent out to fill orders.
Construing the evidence in the light most favorable to the non-
moving party, the funds allegedly removed by Defendants could
have related to FAMC's profits from the precious metal sales,
rather than to the customer funds allocated to the purchase of
precious metals.

For these reasons, Plaintiffs are not entitled to summary
judgment on their conversion claims.

**E.  Breach of Trust[5] and Breach of Fiduciary Duty**

Plaintiffs argue that Defendants were agents of the
customers and, therefore, owed a fiduciary duty to their
customers. (ECF No. 438-1 at 28-31.) Plaintiffs argue that, as

---

[5] The Court notes that Plaintiffs' claim as to "breaches of trust" appears to
be an alternative way to describe breaches of fiduciary duty. Although a
"breach of trust" is actionable in the State of Tennessee, it is an action
that relates to trust instruments, which are not at issue in this case. <u>See</u>
Tenn. Code Ann. § 35-15-1001 <u>et seq.</u>; <u>Kennard v. AmSouth Bank</u>, No. M2007-
00075-COA-R3-CV, 2008 WL 427260, at *2 (Tenn. Ct. App. Feb. 12, 2008).
Consequently, the Court addresses the allegations in paragraphs 194-202 of
the Third Amended Complaint (ECF No. 375) under Tennessee law regarding
breaches of fiduciary duty.

fiduciaries, Defendants owed Plaintiffs a duty to act in the best interests of Plaintiffs and a duty to disclose known facts. (Id. at 30-31.) Plaintiffs argue that Defendants breached these duties by failing to procure precious metals, diverting the money and metals to their own benefit and providing false and misleading information to Plaintiffs. (Id. at 29.)

"In order to recover for breach of fiduciary duty, a plaintiff must establish: (1) a fiduciary relationship, (2) breach of the resulting fiduciary duty, and (3) injury to the plaintiff or benefit to the defendant as a result of that breach." Ann Taylor Realtors, Inc. v. Sporup, No. W2010-00188-COA-R3-CV, 2010 WL 4939967 (Tenn. Ct. App. Dec. 3, 2012). "Fiduciary relationships may arise whenever confidence is reposed by one party in another who exercises dominion and influence." Thompson v. Am. Gen. Life & Accident Ins. Co., 404 F. Supp. 2d 1023, 1028 (citing Oak Ridge Precision Indus., Inc. v. First Tenn. Bank Nat'l Ann'n, 835 S.W.2d 25, 30 (Tenn. Ct. App. 1992)).

"The scope of the broker's or investment advisor's fiduciary obligations depend on the degree of discretion the client has entrusted to the broker or advisor." Johnson v. John Hancock Funds, 217 S.W.3d 414, 428 (Tenn. Ct. App. 2006).

> If the transaction is non-discretionary and at arm's length, i.e., a simple order to buy or sell a particular stock, the relationship does not give rise

> to general fiduciary duties. However, if the client
> has requested the broker or advisor to provide
> investment advice or has given the broker discretion
> to select his or her investments, the broker or
> advisor assumes broad fiduciary obligations that
> extend beyond the individual transactions.

Id. In the latter case, the broker "is required to exercise the utmost good faith, loyalty, and honesty toward the client. . . . He or she is also required to disclose facts that are material to the client's decision-making." Id. at 428-29 (citations omitted).

In order to establish breaches of fiduciary duties for summary judgment, Plaintiffs would need to show the particular fiduciary duty that arose between a defendant and a client, how there was a breach of said duty, and how the customer was injured as a result. There is no question that customers with partially unfulfilled or unfulfilled orders were injured in this matter. Plaintiffs have failed to demonstrate with sufficient specificity, however, which Defendant or Defendants owed a fiduciary duty to which customers or how that duty was breached. The record reflects that some customers merely placed orders for precious metals, some customers received additional advice, and some customers were approached to modify their orders. Without more specific evidence, the Court cannot determine whether any Defendants breached a fiduciary duty to any customers. Construing the evidence in the light most favorable to the non-

moving party, Plaintiffs are not entitled to summary judgment on these claims.

## F. Civil RICO

Plaintiffs argue that they are entitled to summary judgment on their civil Racketeer Influenced and Corrupt Organizations Act ("RICO") claim because "Defendants associated together for the purpose of soliciting fraudulent purchases of coins." (ECF No. 438-1 at 34.) Plaintiffs allege that all of the Defendants "engaged in a pattern of Racketeering Activity, which included mail fraud, wire fraud, and money laundering." (Id. at 35.)

The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  "To state a claim under this section, a plaintiff must plead the following elements: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  West Hills Farms, LLC v. ClassicStar Farms, Inc. (In re ClassicStar Mare Lease Litig.), 727 F.3d 473, 483 (6th Cir. 2013) (quoting Moon v. Harrison Piping Supply, 465 F.3d 719, 723 (6th Cir. 2006)).  "A

RICO '"enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" Id. at 490 (quoting 18 U.S.C. § 1961(4)). "The enterprise itself is not liable for RICO violations; rather the 'persons' who conduct the affairs of the enterprise through a pattern of racketeering activity are liable." Id. (citing United States v. Philip Morris USA, Inc., 566 F.3d 1095, 1111 (D.C. Cir. 2009)).

"Racketeering activity," as defined in the statute, includes predicate acts, such as "any act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud) . . . ." 18 U.S.C. § 1961(1). The elements of wire fraud are (1) "that the defendant devised or willfully participated in a scheme to defraud"; (2) "he used or caused to be used an interstate wire communication 'in furtherance of the scheme,'"; and (3) "he intended 'to deprive a victim of money or property.'" United States v. Faulkenberry, 614 F.3d 573, 581 (6th Cir. 2010) (quoting United States v. Prince, 214 F.3d 740, 748 (6th Cir. 2000)). "[M]ail fraud requires proof of the following three elements: (1) devising or intending to devise a scheme to defraud (or to perform specified fraudulent acts); (2) involving a use of the mails; and (3) for

the purpose of executing the scheme or attempting to do so."
United States v. Frost, 125 F.3d 346, 354 (6th Cir. 1997)
(quoting United States v. Oldfield, 859 F.2d 392, 400 (6th Cir.
1988)).  "[T]he mailing need only be closely related to the
scheme and reasonably foreseeable as a result of the defendant's
actions."  Id. (quoting Oldfield, 859 F.2d at 400).

"A scheme to defraud is 'any plan or course of action by
which someone intends to deprive another . . . of money or
property by means of false or fraudulent pretenses,
representations, or promises.'"  Faulkenberry, 614 F.3d at 581
(quoting United States v. Daniel, 329 F.3d 480, 485 (6th Cir.
2003)).  In order to establish a scheme to defraud, "[a]
plaintiff must also demonstrate scienter . . . , which is
satisfied by showing the defendant acted either with a specific
intent to defraud or with recklessness with respect to
potentially misleading information."  Heinrich v. Waiting Angels
Adoption Servs., Inc., 668 F.3d 393, 404 (6th Cir. 2012).  While
"claims involving proof of a defendant's intent seldom lend
themselves to summary disposition, summary judgment is
appropriate when the evidence is so one-sided that no reasonable
person could decide the contrary."  ClassicStar, 727 F.3d at 484
(citations and internal quotation marks omitted).

It is undisputed that Defendants used the mail and wires in
their business.  The record reflects that FAMC used the United

States Postal Service to mail invoices and coins to customers; customers mailed back checks; Charles Bates and Robert Bates had authority to sign for coins received through the mail; Barbara and Larry Bates had authority to wire transfer money between FAMC accounts and personal accounts; Larry Bates, Charles Bates and Robert Bates took customer orders over the phone; and they, along with Kinsey Bates, spoke with customers regarding the status of their orders. Plaintiffs have presented additional evidence that suggests that each of these Defendants acted with at least recklessness with respect to potentially misleading information. This evidence is not, however, "so one-sided that no reasonable person could decide the contrary." In light of this high standard, Plaintiffs have not established that two or more Defendants possessed the requisite scienter and associated together for the purpose of executing a fraudulent scheme. Accordingly, Plaintiffs are not entitled to summary judgment on their civil RICO claims.

### G. Tortious Conspiracy

Plaintiffs argue that "[b]y common purpose and design, Defendants engineered a conspiracy to gain access to the monies belonging to FAMC customers, and this conspiracy was successful." (ECF No. 438-1 at 41.) Plaintiffs argue that the evidence and inferences drawn from the evidence establish that each Defendant "participated in a conspiracy to fraudulently

deprive Plaintiffs of monies and coins." (Id.) Plaintiffs further argue that, as co-conspirators, Defendants should be held jointly and severally liable for all the damages caused by the other conspirators. (Id.)

"The elements of a cause of action for civil conspiracy are: (1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury." Kincaid v. SouthTrust Bank, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006) (citing Morgan v. Brush Wellman, Inc., 165 F. Supp. 2d 704, 720 (E.D. Tenn. 2001)). "An essential element of a conspiracy claim is that the conspiring parties intend to accomplish an unlawful purpose, or a lawful purpose by unlawful means." Id. at 39 (citing Morgan, 165 F. Supp. 2d at 720). "In addition, a claim for civil conspiracy 'requires an underlying predicate tort allegedly committed pursuant to the conspiracy.'" PNC Multifamily Capital Institutional Fund, 387 S.W.3d at 556 (quoting Watson's Carpet & Floor Coverings, Inc. v. McCormick, 247 S.W.3d 169, 180 (Tenn. Ct. App. 2007)).

When a conspiracy is to defraud, there must be a "common purpose, supported by a concerted action to defraud, that each [conspirator] has the intent to do it, and that it is common to each of them, and that each has the understanding that the other

has that purpose." Chenault v. Walker, 36 S.W.3d 45, 52 (Tenn. 2001) (alteration in original) (quoting Dale v. Thomas H. Temple Co., 208 S.W.2d 344, 353-54 (Tenn. 1948)). "[T]he 'agreement need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy.'" Id. (quoting Dale, 208 S.W.2d at 353-54). "Upon a finding of conspiracy, each conspirator is liable for the damages resulting from the wrongful acts of all co-conspirators in carrying out the common scheme." Trau-Med of Am., Inc. v. Allstate Ins. Co., 71 S.W.3d 691, 703 (Tenn. 2002).

Under Tennessee law, however, "there can be no actionable claim of conspiracy where the conspiratorial conduct alleged is essentially a single act by a single corporation acting through its officers, directors, employees, and other agents, each acting within the scope of his or her employment." Id. at 703-04. "As long as the agent is acting within the scope of his or her authority, the agent and the corporation are not separate entities" for the purpose of determining parties to a conspiracy. Id. at 704. "Whether the employee's act is within the scope of his employment is ordinarily a question of fact for the jury, except where the departure from the master's business is of marked and decided character." Craig v. Gentry, 792 S.W.2d 77, 80 (Tenn. Ct. App. 1990) (citing Home Stores, Inc. v. Parker, 166 S.W.2d 619, 622 (Tenn. 1942)).

Because Plaintiffs have not demonstrated that they are entitled to summary judgment on their fraud claim, they have failed to establish the underlying predicate tort requisite to a civil conspiracy claim. Accordingly, Plaintiffs are not entitled to summary judgment on this claim.

Additionally, at this stage, there is insufficient evidence to find that IRN conspired with FAMC or other Defendants simply by virtue of airing FAMC advertisements, hosting Charles Bates' radio show, and accepting additional funds from FAMC. Moreover, the individual Defendants are all employees of Defendant FAMC. As a result, there is a factual dispute as to whether Defendants Larry Bates, Barbara Bates, Charles Bates, Robert Bates, and Kinsey Bates acted within the scope of their employment with FAMC. If they did act within the scope of their employment, then Plaintiffs' conspiracy claims would fail under the doctrine of intracorporate conspiracy immunity. These are questions of fact best left for jury determination.

## H. Damages

Because the Court finds that Plaintiffs are entitled to summary judgment on their breach of contract claim, they are entitled to contract damages. Where the seller fails to deliver goods, the buyer is entitled to recover "so much of the purchase price as has been paid[.]" Tenn. Code Ann. 47-2-711(1); see also Patton v. McHone, 822 S.W.2d 608, 619 (Tenn. Ct. App.

1991).  Although Plaintiffs have argued an aggregate amount of damages totaling approximately $18.5 million, a damages award on their breach of contract claim requires an individual damages finding as to each class member.  The Court finds that the record is not clear as to the particular amount of damages each class member has suffered as a result of Defendant FAMC's breaches of contracts.  Accordingly, Plaintiffs are not entitled to summary judgment on the amount of damages.

Because Plaintiffs are not entitled to summary judgment on the amount of damages, the Court declines to consider whether Plaintiffs are entitled to a constructive trust or an equitable lien remedy for this claim.

## IV. DEFENDANTS LARRY AND BARBARA BATES' MOTION FOR DISMISSAL AND SANCTIONS

Defendants Larry Bates and Barbara Bates argue that they are entitled to "dismissal of the action or in the alternative recusal of the Court."  (ECF No. 491 at 7.)  Defendants further request sanctions against all parties involved in the instant matter.  (Id.)  Defendants Larry Bates and Barbara Bates set forth eight specific allegations that they believe entitle them to dismissal, recusal, or sanctions.  The Court addresses each allegation in turn.

## A.    Access to Records

First, Defendants Larry Bates and Barbara Bates argue that the Plaintiffs' attorneys and the Receiver filed an <u>ex parte</u> motion seizing their residence. (<u>Id.</u> at 2.) They contend that since this seizure, they have been denied access to their records necessary to properly answer Plaintiffs' Motion for Summary Judgment or otherwise defend themselves in this proceeding. The Receiver and Plaintiffs contend that Defendants Larry Bates and Barbara Bates have not identified the necessary records, nor contacted the Receiver to request the opportunity to retrieve or review the records at the Receiver's office. (ECF No. 496 at 2-3; ECF No. 499 at 2-3.) Additionally, Plaintiffs argue that the Court held two hearings on the prejudgment attachment in order to afford due process and determine if the prejudgment attachment should remain in place. (ECF No. 499 at 2.)

The Court finds no merit to Defendants Larry Bates and Barbara Bates' argument that they are entitled to sanctions on this basis. Tennessee law provides for prejudgment attachment when certain criteria are met. <u>See</u> Tenn. Code Ann. § 29-6-101. After multiple hearings, the Court found that the criteria for prejudgment attachment had been met in the instant matter. (<u>See</u> ECF No. 503.) The Receiver has explicitly offered all parties the opportunity to review the records in the Receiver's

possession.  (See, e.g., ECF Nos. 487, 515.)  The Receiver has further represented to the Court that he has suspended the disposal of records and is considering alternative solutions for storing these records.  Accordingly, Defendants Larry Bates and Barbara Bates may still request the opportunity to review the records in the Receiver's possession.  Because they have not yet done so, and thus, the Receiver has not refused, they cannot establish that they are entitled to sanctions on this ground.

## B.  Due Process

Second, Defendants Larry and Barbara Bates argue that the Court's ex parte orders of prejudgment attachment violated their constitutional right to due process.  (ECF No. 491 at 2.)  In McLaughlin v. Weathers, the Sixth Circuit determined that Tennessee's prejudgment statute is constitutional, even where there is no pre-deprivation hearing.  170 F.3d 577, 580-83 (6th Cir. 1999).  The court in McLaughlin noted that due process was met because plaintiff was afforded an adequate post-deprivation remedy.  Id. at 583.  In the instant matter, the Court held a post-order hearing on August 12, 2015, almost immediately following the entry of the orders of prejudgment attachment.  (See ECF No. 448.)  On September 2, 2015, the Court held another hearing regarding the prejudgment attachment to ensure due process was afforded to Defendants and to determine whether the prejudgment attachment should remain in place.  (ECF No. 478.)

Defendants Larry and Barbara Bates have been afforded notice and an opportunity to be heard throughout these proceedings. Accordingly, the Court finds no merit to this argument.

## C.   Search and Seizure

Third, Defendants Larry Bates and Barbara Bates argue that the prejudgment attachment orders violated their Fourth Amendment protection against unreasonable search and seizure. (ECF No. 491 at 3.)  As the Receiver and Plaintiffs correctly point out, however, the Fourth Amendment does not protect against the actions of private individuals. (See ECF No. 496 at 3 (citing United States v. Jacobsen, 466 U.S. 109, 113 (1984)); ECF No. 499 at 2-3.)  As discussed above, the Sixth Circuit has held that Tennessee's prejudgment attachment statute is constitutional.  See McLaughlin, 170 F.3d at 580-83.  There is no evidence that the Receiver or Plaintiffs acted at the request or encouragement of the government in arguing for prejudgment attachment.   Rather, the Receiver and Plaintiffs acted as private individuals.  Their actions, therefore, do not implicate the Fourth Amendment.

## D.   Free Exercise of Religion

Fourth, Defendants Larry Bates and Barbara Bates argue that the Receiver and Plaintiffs' attorneys violated their First Amendment right to free exercise of religion. (ECF No. 491 at 3-4.)  Defendants Larry Bates and Barbara Bates further argue

that Plaintiffs' attorneys, Receiver, and Receiver's attorneys involved themselves in an extra-judicial matter. (<u>Id.</u> at 4.) The Free Exercise Clause of the First Amendment limits Congress's ability to enact any law that restricts religious activity. U.S. Const. amend. I. Again, this case does not involve actions by Congress, but those of private individuals. Accordingly, the Free Exercise Clause is inapplicable in this instance. Additionally, Defendants' claims that the parties and the Court involved themselves in the extra-judicial child custody matter are unfounded. At the hearing on August 12, 2015, the Court instructed the parties to turn over to the Juvenile Court of Hardeman County documentation relating to the welfare of the child. The Court explicitly declined to otherwise involve itself in the child custody matter and the Receiver and Plaintiffs assert that they have not become "involved" in any juvenile court proceedings. (<u>See</u> ECF No. 496 at 3-4; ECF No. 499 at 4.) The Court is unable to discern that any of these actions interfered with Defendants' free exercise of religion, and accordingly, finds this ground unfounded.

**E.    Conduct Relating to Issuance of Subpoena**

Fifth, Defendants Larry Bates and Barbara Bates argue that Plaintiffs' attorneys, the Receiver, and the Receiver's attorneys engaged in egregious conduct. (ECF No. 491 at 5.) Specifically, Defendants Larry Bates and Barbara Bates argue

that when Defendant Larry Bates raised the issue of non-notice of a subpoena issued to Bancorp South in a proceeding before Magistrate Judge Claxton, Plaintiffs' attorney responded that she did not issue the subpoena. (Id.) The Receiver and Plaintiffs both assert that Plaintiffs' attorney misspoke and contend that this issue has since been resolved. (ECF No. 496 at 4, ECF No. 499 at 4-5.) More importantly, the record reflects that Plaintiffs' counsel issued the subpoena with notice to all parties. (See ECF Nos. 168, 168-4.)

Although Defendants Larry Bates and Barbara Bates do not assert which rule or statute they believe entitles them to dismissal or sanctions, it appears that they rely on the Court's inherent power to sanction parties for bad faith conduct and willful disobedience. See Chambers v. NASCO, Inc., 501 U.S. 32, 46 (1991). "Because of their very potency, inherent powers must be exercised with restraint and discretion." Id. at 44. The record reflects that Plaintiffs' counsel misspoke at the hearing before Magistrate Judge Claxton and that she has repeatedly explained her mistake to Defendants. (See ECF No. 496 at 4, ECF No. 499 at 4-5.) There is no evidence that Plaintiffs' attorney insisted upon her untenable contention that she did not issue the subpoena or that she otherwise acted in bad faith. Accordingly, sanctions are inappropriate on these facts.

**F.   Allegedly False Testimony**

Sixth, Defendants Larry Bates and Barbara Bates argue that the Receiver's attorney falsely testified under oath regarding precious metals sold and a check signed by Robert Bates. (ECF No. 491 at 5.)  The Receiver argues that the Receiver and his counsel have no personal knowledge of the details of any transaction between Robert Bates and FAMC prior to the appointment of the Receiver. (ECF No. 496 at 4.)  The Receiver testified that, in November 2013, Defendant Larry Bates gave the Receiver some silver eagle coins and represented that these coins belonged to Robert Bates.  (Id.)  The Receiver contends that he "does not know and cannot know if Robert Bates in fact sold any silver eagles to FAMC and if the silver eagles at issue ever belonged to Robert Bates."  (Id.)  The Defendants mischaracterize the testimony of the Receiver and his attorney. There is no evidence that the Receiver's attorney acted in bad faith or testified falsely based on her personal knowledge of the events, and accordingly, the Court finds that this ground is unfounded.

**G.   Mr. Rosenberg's and Mr. Butler's Reports**

Seventh, Defendants Larry Bates and Barbara Bates challenge the filing of the report and deposition of Mr. Rosenberg, the financial consultant retained by the Receiver, on the basis that Mr. Rosenberg improperly relies on Mr. Butler's report.  (ECF

No. 491 at 5-6.)  Defendants Larry and Barbara Bates further argue that Mr. Butler's report was based on insufficient information, that he was not aware of prepaid corporate income taxes, and that he was not provided the HSBC Bank and Brinks records.  (Id.)  The Receiver argues that Defendants Larry and Barbara Bates mischaracterize Mr. Butler's testimony and that Mr. Butler was provided full access to all the records secured by the Receiver.  (ECF No. 496 at 5.)  The Receiver contends that he has been unable to identify a payment by check or electronic transfer to the Internal Revenue Service for prepaid corporate income taxes.  (Id.)  Additionally, the Receiver asserts that he and Mr. Butler investigated Larry Bates' claim that not all metals held by HSBC were transferred to Brinks and determined that the claim did not have merit.  (Id.)

Mr. Rosenberg's report pertains only to his opinion as to (1) the solvency of FAMC between 2007 and 2013 and (2) whether certain transactions during that period were appropriate.  (Rosenberg Rep. at 1, ECF No. 426-6.)  Although he relied on Mr. Butler's report, Mr. Rosenberg's investigation centered on different questions and involved an independent review of various documents.  (Id. at 1-2.)  As Mr. Butler testified, he prepared a report based on the information that was available to him.  (See Butler Dep. 13:8-18:10, ECF No. 435-1.)  The Court has taken this information into account in evaluating Mr.

Butler's report.  See supra Part III.D.  Defendants Larry Bates and Barbara Bates have not established that they are entitled to sanctions on this ground.

### H.  Improper Conduct During Deposition

Eighth, Defendants Larry Bates and Barbara Bates assert that Plaintiff's counsel and the Receiver's counsel attempted to suppress Defendant Larry Bates' questioning at Mr. Butler's deposition.  (ECF No. 491 at 6.)  The Receiver and Plaintiffs refute this contention and assert that they appropriately objected to the form of Larry Bates' questions and to questions outside the scope of Mr. Butler's report and personal knowledge.  (ECF No. 496 at 5; ECF No. 499 at 5-6.)  A review of Mr. Butler's deposition supports the Receiver and Plaintiffs' assertions.  (See ECF No. 435-1.)  Plaintiffs' counsel and the Receiver's counsel merely made a record of their objections at the deposition; they did not instruct Mr. Butler not to answer or in any other way "suppress" Larry Bates' questioning of Mr. Butler.  Rule 30 of the Federal Rules of Civil Procedure requires "[a]n objection at the time of the examination" to "be noted on the record."  Fed. R. Civ. P. 30(c)(2).  The Court will not sanction Plaintiffs' counsel or the Receiver's counsel for acting in accordance with the Federal Rules.

## I.   Request for Recusal

Defendants Larry Bates and Barbara Bates further request that this Court recuse itself "due to a possible conflict of interest, or lack of impartiality." (ECF No. 491 at 7.) Twenty-eight U.S.C. § 455(a) requires that a federal judge "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Additionally, 28 U.S.C. § 144 provides for recusal "[w]henever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party . . . ." The affidavit must also be accompanied by a certification that it is made in good faith. 28 U.S.C. § 144. Defendants have not attached an affidavit setting forth the facts and reasons for their belief that bias or prejudice exists. Nevertheless, recusal is unwarranted in the instant matter. The Court's familiarity with this case is derived solely from the proceedings in the case itself, not from extra-judicial sources. The Court has no conflict of interest or outside knowledge of the parties or matters at issue in this case. None of the allegations set forth in Defendants Larry Bates and Barbara Bates' Motion warrant disqualification of this Court.

## IV.  CONCLUSION

For these reasons, the Court GRANTS IN PART Plaintiffs' Motion for Summary Judgment as to their breach of contract claim against Defendant FAMC.  The Court DENIES IN PART Plaintiffs' Motion for Summary Judgment as to all other claims.  The Court DENIES Defendants Larry Bates and Barbara Bates' Motion for Dismissal and Sanctions.

It is so ORDERED, this the 18th day of November, 2015.


/s/ Jon P. McCalla
JON P. McCALLA
U.S. DISTRICT COURT JUDGE